IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-CR-00013-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**ANDRES CUETARA**,

      Defendant.

---

**UNOPPOSED MOTION FOR EVALUATION OF COMPETENCY UNDER § 4241(b)**

---

Andres Cuetara, through his attorney, Assistant Federal Public Defender Laura H. Suelau, moves this Court to order that Mr. Cuetara be evaluated to determine whether he is mentally competent to proceed, as that term is defined in 18 U.S.C. § 4241. Mr. Cuetara requests that the court order the evaluation be conducted outpatient by licensed clinical psychologist Dr. Robert Q. Pollard. Mr. Cuetara further requests this court authorize Dr. Pollard to travel from Rochester, New York to Denver, Colorado for the purpose of conducting the evaluation. The government, through AUSA Alecia Riewerts, does not oppose this motion, including the requests that Dr. Pollard be the competency evaluator and that the evaluation be conducted outpatient. In support thereof, Mr. Cuetara states:

**I.    Statement of relevant facts.**

Andres Cuetara was initially charged by complaint in this case and appeared before the Court on November 24, 2020. Doc 7. On November 30, 2020, Mr. Cuetara was released from custody on a $1,000 unsecured bond with conditions. Docs. 13-17. Mr. Cuetara remained in ICE custody until March 2021. An indictment was filed on February 2, 2021 charging him with one violation of 18 U.S.C. § 2252A(a)(1) and (b)(1) and one violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). Doc. 29.

Mr. Cuetara pled not guilty at arraignment on February 3, 2021. Doc 32.

Counsel for Mr. Cuetara has filed, and this court has granted, five motions to exclude time from the Speedy Trial Clock. In those motions, counsel outlined the difficulty of communicating with Mr. Cuetara and the necessity to have him evaluated. Mr. Cuetara was evaluated in July and October of 2021 by an audiologist, speech language pathologist, and psychologist from Gallaudet University in Washington, D.C. What follows is a summary of their findings.

Dr. Megan Hoben, Audiologist, evaluated Mr. Cuetara and determined that he demonstrated a "bilateral, severe-profound sensorineural hearing loss." She continued, "Given Mr. Cuetara's degree of hearing loss and the volume necessary to detect the presence of one's voice, he cannot access the necessary frequencies or volume to comprehend spoken language when unaided." Dr. Hoben further concluded that Mr. Cuetara's lack of hearing and limited access to language as a child resulted in language deprivation, "a term used to describe a child's lack of language during their critical learning period."

Speech-Language Pathologist Margarita Perez, M.S., CCC-SLP, then conducted a "language" evaluation to help assess Mr. Cuetara's vocabulary, receptive language (input), expressive language (output), and literacy. In regard to literacy, Mr. Cuetara's highest comprehension accuracy (4 of 5 questions correct) was at the 1-3 grade level. By grades 4-5, he answered just 2 of 5 comprehension questions accurately for 5-9 word sentences, and 1 of 5 questions accurately for 5-11 word sentences. His comprehension is most strongly correlated with a 1st through 3rd grade deaf child.

Ms. Perez observed similar deficiencies with Mr. Cuetara's expressive language: "When analyzing his language samples, Mr. Cuetara primarily used 3-5 signs on average per independent utterance. He incidentally received language modeling through the interpreters and was noted to use similar phrasing/vocabulary to repeat himself or express himself." When expressing himself "[h]e

tended to use repetition to reemphasize his thoughts or as filler; in 2/3 of his more narrative-like utterances (24-31 words used) approximately 58% of the vocabulary used was varied or different. He used a variety of Tier 1 noun vocabulary and select, routine verb-vocabulary." More plainly, Mr. Cuetara's longest utterance during the day-long evaluation was 31 words long, using 16 different words. In his most cohesive sample (a commonly repeated story about traveling with his brother) Mr. Cuetara used 30 words with 80% varied vocabulary. Ms. Perez noted that deaf children with access and exposure to ASL are typically using over 2,500 words by 4-5 years of age with significant variation. Although she was unable to determine Mr. Cuetara's "total lexicon," of words, she determined his "expressive vocabulary is significantly disordered."

Ms. Perez concluded by recommending the following:

> It is strongly recommended that a CDI and ASL interpreter continue to be used with Mr. Cuetara when communicating. Similar to strategies provided for English Language Learners, Mr. Cuetara is best supported by use of simplified language, vocabulary and visuals with text support to bridge comprehension between ASL and English. Use of visual supports (e.g. illustrations, photos), repetition using consistent language modeling, frequent checks for comprehension are highly recommended. Use of written English or Spanish to communicate with Mr. Cuetara is not recommended nor encouraged as a primary method. Written English (single words, simple 2-4 word phrases) can support his comprehension when paired with ASL and gestural/visual support. Reading and writing are not an effective means for communication given his unique linguistic profile. However, can be used as strategies to support what the CDI or his communication partners are conveying. Information should be presented at a reduced rate, he should be allowed adequate wait-time or processing time, and chunking of information while limiting the number of concepts in an utterance is similarly warranted. If presenting non-contextual, novel information, use of his background knowledge and providing context to bridge gaps in understanding, along with aforementioned supports are recommended. Use of multiple modalities to present information and consistent, frequent comprehension checks with simplified language (e.g. yes/no prompts to check for comprehension) will support Mr. Cuetara's ongoing language growth.

Finally, Dr. Lawrence Pick, Ph.D., ABPP, conducted a psychological evaluation of Mr. Cuetara. Dr. Pick is a board-certified neuropsychologist who is "trained to work with deaf individuals from other countries who have a variety of language and educational experiences." He did note,

however, "that the majority of available tests were not developed or normed for deaf signing individuals born in foreign countries who do not have a native or fluent spoken or signed language." He further explained to counsel that the tests administered are normed for deaf 18-year-olds with a native language of ASL.

Dr. Pick estimated that Mr. Cuetara's Nonverbal intellectual functioning was "below-average" with an estimated IQ of 80, in the 9th percentile. His knowledge of English or ASL vocabulary was in the 2nd percentile as was his ability to "explain common values, customs, and behaviors occurring for people in the United States." Based on the forgoing and other testing, Dr. Pick observed Mr. Cuetara to be "somewhat non-fluent" in English and ASL and produce expressive language slowly "unless he was discussing a familiar personal experience."

Dr. Pick also evaluated Mr. Cuetara's memory and "overall learning" which he found to be "very low" – in the 4th percentile compared to other deaf adults. On a test of Academic Achievement Mr. Cuetara performed in the 2nd percentile and indicated "extremely limited knowledge of reading and writing of the English language, as well as basic math facts." Consist with the findings of Ms. Perez, Dr. Pick determined his "raw scores…were similar to individuals who have skills falling at the levels of Kindergarten and 1st grade."

Dr. Pick concluded, among other things, that Mr. Cuetara's ASL was "fairly limited given he has resided in this country for over 25 years." He continued:

> His performances on visually based memory tasks ranged from low average to borderline. On verbally based memory tasks, scores fell between average to profoundly impaired. While he benefited somewhat from information that was meaningful and repeated to him, his memory capacity appears to be somewhat limited, and he did not benefit from visual or verbal cues when asked to recognize previously learned information. Mr. Cuetara also experienced difficulty on tasks of executive functioning that included reasoning with common visual information or generation of signs based on verbal cues.

Based on those impressions and his knowledge of Mr. Cuetara's history, Dr. Pick surmised

that Mr. Cuetara suffers from language deprivation:

> Mr. Cuetara is determined to have experienced **Language Deprivation Syndrome (LDS)**. Currently, LDS is not a formal psychiatric or psychological diagnosis, but has been conceptualized by researchers as a unique language history experienced by many deaf individuals not only in the United States but also other countries [Glickman, N. S., & Hall, W. C. (Eds.). (2018). *Language deprivation and deaf mental health*. Routledge.]. These authors define language deprivation as "…this phenomenon of deaf children growing up without quality exposure to any fully accessible language (p. 2). The authors also note that "The proposed diagnose of language deprivation syndrome must still be defined with clear diagnostic criteria established through research (p. 21), Hall, Levin and Anderson discuss possible difference in brain development for deaf individuals without exposure to fully accessible language during childhood [Hall, W. C., Levin, L. L., & Anderson, M. L. (2017). Language deprivation syndrome: A possible neurodevelopmental disorder with sociocultural origins. *Social psychiatry and psychiatric epidemiology*, *52*(6), 761-776.]. They propose that LDS is a neuro/developmental disorder that has implications not only for delayed language development/language dysfluency, but also deficits in fund of general knowledge, and possible delays or deficits in cognition, mood and/or behavior that may include weaker social and emotional skills. Although this conceptualization of deaf youth and adults with limited to no accessible language during their childhood is still being formulated, it clearly describes a subset of deaf youth/adults in the United States, as well as individuals from other countries with similar experiences. It is likely the best explanation for Mr. Cuetara's current level of cognitive functioning and academic achievement.

Since his release from custody in March 2021, Counsel has met with Mr. Cuetara, with the assistance of a certified deaf interpreter team, on numerous occasions (she estimates 15). After receiving the final evaluations from Gallaudet in early 2022, counsel met with Mr. Cuetara every few weeks with a highly skilled deaf interpreter team (Liz Keyser and Kevin Harrer), using the information provided and the tools suggested by the evaluators at Gallaudet.[1] During that time, counsel observed *some* improvement in her communication with Mr. Cuetara and in Mr. Cuetara's perceived comprehension. However, Ms. Keyser, Mr. Harrer, and counsel continued to observe reasons to believe that Mr. Cuetara is suffering from a mental disease or defect that make him unable to

---

[1] Ms. Keyser is a hearing ASL interpreter. Mr. Harrer is a non-hearing certified deaf interpreter. Prior to late 2021, counsel employed the services of a different interpreter team. Mr. Cuetara appears to comprehend information conveyed by Mr. Harrer better than the previous non-hearing interpreter.

understand the nature and consequences of the proceedings against him or to assist properly in his defense.

Based on these observations, counsel contacted Drs. Neil Glickman and Wyatte Hall, authors of the aforementioned research study on Language Deprivation Syndrome. Drs. Glickman and Hall referred counsel to Dr. Robert Pollard at the National Technical Institute for the Deaf at Rochester Institute of Technology. Dr. Pollard is also the Founder of the Deaf Wellness Center at the University of Rochester Medical Center. In the course of contacting Dr. Pollard, counsel reviewed his publications, "Forensic Evaluation of Deaf Individuals: Challenges and Strategies," and "Forensic Evaluation of Deaf Adults with Language Deprivation." Exhibits A and B. Dr. Pollard has significant experience evaluating deaf individuals, and more specifically, individuals with language deprivation, for the purpose of legal competency determinations. Indeed, Dr. Pollard wrote the book (or paper) on how to effectively and competently conduct competency evaluations on deaf individuals with language deprivation. *See* Exhibit B; Exhibit C (Dr. Robert Pollard C.V.). Dr. Pollard confirmed to counsel that he is both qualified to conduct an evaluation pursuant to 18 U.S.C. § 4241 and available to travel to the District of Colorado to meet with Mr. Cuetara, evaluate him, and prepare a report for this court consist with the deadlines provided by 18 U.S.C. § 4247(b).[2]

**II.   The Court should order a competency evaluation at this time.**

The Constitution prohibits the trial of a defendant who lacks mental competency. *Indiana v. Edwards*, 554 U.S. 164, 170 (2008). The Court may order a competency hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and

---

[2] 30 days and a reasonable extension of up to 15 days with a showing of "good cause." 18 U.S.C. § 4247(b).

consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). The test for competency to stand trial asks whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *United States v. Mackovich*, 209 F.3d 1227, 1232 (10th Cir. 2000) (quotations omitted); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."); *United States v. Deshazer*, 554 F.3d 1281, 1286 (10th Cir. 2009). Before holding a competency hearing, a "court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247(b) and (c)." 18 U.S.C. § 4241(b).

Here, there is "reasonable cause to believe" that Mr. Cuetara is presently "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). Based on that cause, this court may (and should) order that a psychiatric or psychological examination be conducted. 18 U.S.C. § 4241(b). Due to the nature of Mr. Cuetara's suspected disease or defect, a psychological examination is appropriate. 18 U.S.C. § 4247(b) provides that a psychological examination ordered pursuant to § 4241 "shall be conducted by a licensed or certified psychiatrist or psychologist." Dr. Pollard is such a psychologist. *See* Ex. A-C. Therefore, this court should order Dr. Pollard conduct an examination pursuant to 18 U.S.C. § 4241 and 4247.[3]

---

[3] Examinations conducted pursuant to 18 U.S.C. § 4241 are considered "non-defense" and paid for by the Department of Justice. *See* Guide to Judiciary Policy, Vol. 7, Ch. 3. §§ 320.20.20 and 320.20.60

### III. This court should order the psychological examination of Mr. Cuetara be conducted outpatient by Dr. Robert Pollard.

Although "the court *may* commit" a defendant for the psychiatric or psychological examination for a period not to exceed thirty days, such commitment is not necessary and is tempered by the directive that the examination take place in a "suitable facility." 18 U.S.C. § 4247(a)(2) defines a "suitable facility" as "a facility that is suitable to provide care or treatment given the nature of the offense and the characteristics of the defendant." In this case, Dr. Pollard is the best-suited expert to evaluate Mr. Cuetara, given his unique characteristics.[4] Counsel has conferred with Dr. Pollard and he is available to travel to Denver in July 2022.

An inpatient commitment is not appropriate in this case. Before the court orders a custodial commitment pursuant to 18 U.S.C. 4241(b), the government must offer evidence establishing "the presence of compelling governmental interests" requiring the examination be conducted in custody rather than outpatient. *United States v. Deters,* 143 F.3d 577, 584 (10th Cir. 1998) (finding confinement appropriate where a defendant living in California under transient and unstable living conditions was seeking to be evaluated in California for a case pending in the District of Kansas); *See In re Newchurch,* 807 F.2d 404, 409 (5th Cir. 1986)( "a district court should not exact such a deprivation of liberty" unless there is "some evidence that commitment is necessary."). Thereafter, this court "should make findings of fact concerning the need for commitment and the appropriateness of confinement." *Id.* Here, the government asserts no government interest in Mr. Cuetara's confinement and has no

---

"Source of Payment," https://www.uscourts.gov/rules-policies/judiciary-policies/cja-guidelines/chapter-3-ss-320-authorization-investigative-expert#a3 (last accessed June 1, 2022) ("In these situations, the court or the government selects the expert and persons other than the defendant also have access to the expert's report. The Department of Justice (DOJ) generally pays for these "non-defense" services.").

[4] Despite reasonable efforts, counsel has been unable to locate any comparable expert in the District of Colorado.

8

objection to Mr. Cuetara being examined outpatient by Dr. Pollard. Nor is there evidence that commitment is necessary. Mr. Cuetara has been out of custody, under pretrial supervision since March 2021. He's lived in the same Denver-area residence with two roommates for over five years.

It is also unlikely that the appropriate examination would occur in the 30 (or 45) -day time limitations set out in § 4247 were Mr. Cuetara ordered committed to the Bureau of Prisons. In pre-COVID District of Colorado cases involving non-deaf defendants, defendants who were ordered to be evaluated under § 4241 were often sent to facilities outside of Colorado. The evaluation process in those cases took longer than a local evaluation and involved a great deal of travel.[5] In light of the COVID-19 pandemic, and the unique needs of Mr. Cuetara, that evaluation would likely take even longer.[6]

### IV.     This court should vacate the current trial date and accompanying deadlines.

Any period of delay resulting from "any examinations, to determine the mental competency . . . of the defendant" are excluded from computation of time by which trial must commence under the Speedy Trial Act.  18 U.S.C. § 3161(h)(1)(A). Mr. Cuetara is set to proceed to trial on September 26, 2022 and this court has excluded time to and including that date. The deadline for pretrial motions is July 1, 2022. Counsel does not anticipate that the competency evaluation and hearing will be completed

---

[5] For example, in *United States v. Henry Soto*, 16-CR-00138-CMA, the Court ordered an evaluation on May 9, 2016.  The defendant was then transported to Oklahoma City – a standard routing point – on his way to a medical facility in San Diego, California.  By the time Mr. Soto arrived in San Diego on June 16, the facility no longer had the capacity to do his evaluation.  He was then routed through Oklahoma City again, and this time sent to Springfield, Missouri, where he finally arrived on July 21, 2016.  Given the statute's presumption that transportation will only take 10 days, this led to a contested speedy trial motion.  *See* Gov't Response to Def. Mot. to Dismiss for Viol'n of his Right to a Speedy Trial, *United States v. Henry Soto*, 16-CR-00138-CMA, Doc. 44 (Oct. 17, 2016).

[6] Counsel contends that due to the nature of his suspected "defect" the Bureau of Prisons is not a "suitable facility" that could provide Mr. Cuetara with a psychological examination.

before July 1, 2022.

**V.     Conclusion**

As discussed above, there is reason to believe that Mr. Cuetara may be incompetent. Therefore, it is requested that the court order he be evaluated for competency. Additionally, this court should order that the evaluation be conducted outpatient by Dr. Robert Pollard.[7] This court should further order Dr. Pollard to submit a written evaluation pursuant to 18 U.S.C. §§ 4241(b) and 4247(b) and (c). Finally, this court should authorize the payment of the total cost of Dr. Pollards services, including allowable travel expenses, without further order of the Court, as are reasonable for this examination.

Mr. Cuetara and the government request that all presently set trial-related dates and deadlines be vacated pending Dr. Pollard's evaluation and any subsequent proceedings or orders related to the instant motion.

                                            Respectfully submitted,

                                            VIRGINIA L. GRADY
                                            Federal Public Defender

                                            s/Laura Suelau
                                            LAURA SUELAU
                                            Assistant Federal Public Defender
                                            633 17th Street, Suite 1000
                                            Denver, CO  80202
                                            Telephone:  (303) 294-7002
                                            FAX:  (303) 294-1192
                                            Laura.suelau@fd.org
                                            Attorney for Defendant

---

[7] Counsel anticipates that evaluation will take place in a private room at the Office of the Federal Public Defender.

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Alecia Riewerts, AUSA
Email: alecia.riewerts@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Andres Cuetara (via Mail)

s/Laura Suelau
LAURA SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Laura.suelau@fd.org
Attorney for Defendant