# EXHIBIT A

JOURNAL OF SOCIAL WORK IN DISABILITY & REHABILITATION
https://doi.org/10.1080/1536710X.2017.1372240





# Forensic Evaluation of Deaf Individuals: Challenges and Strategies

Robert Q Pollard, Jr.[a] and Brian T. Berlinski[b]

[a]National Technical Institute for the Deaf, Rochester Institute of Technology, Rochester, New York, USA; [b]Platinum Senior Coach, Live at Choice, Houston, Texas, USA

**ABSTRACT**

Forensic evaluation of deaf individuals presents unique challenges due to many examinees' fund of information deficits, potential for language deprivation, and examiners' frequent lack of creativity regarding communication methods. This article describes challenges most frequently encountered in competency to stand trial and criminal responsibility evaluations and offers strategies for overcoming them. The value of employing multiple communication methods, especially the use of illustrations, is emphasized. Suggestions also are offered regarding preparing evaluation reports and effectively communicating "key deaf fundamentals" to legal personnel. Encouragement is offered for qualified, sign-fluent professionals to engage in forensic work.

**KEYWORDS**

American sign language; competency; criminal responsibility; deaf; deaf and hard of hearing; evaluation; forensic; legal; mental health

I (Pollard) have conducted dozens of forensic evaluations of deaf individuals over my 33-year professional career. I am a hearing clinical psychologist, a fluent signer, founder of the Deaf Wellness Center (DWC) at the University of Rochester Medical Center and, more recently, Associate Dean of Research at the National Technical Institute for the Deaf, also in Rochester, NY. The second author of this article, Brian T. Berlinski, is an art therapist who interned at the DWC many years ago and is presently employed at the Live in Choice program in Houston, TX. During his internship at the DWC, Mr. Berlinski and I worked together closely on several legal cases where his artistic expertise proved highly valuable in producing drawings that greatly facilitated my forensic interviews with deaf persons, several of which are reproduced herein. Because this article is written from my perspective, I use first person pronouns throughout.

The goal of this article is not only to share information and experiences that might facilitate better practice in this field, but also to encourage more professionals in deaf-related fields to consider engaging in forensic work. It is a field that is in need of far more sign-fluent, deaf-experienced talent. Many otherwise qualified professionals are reluctant to become involved in forensic

CONTACT Robert Q Pollard, Jr., PhD  rqpnop@rit.edu  Associate Dean of Research, National Technical Institute for the Deaf, Rochester Institute of Technology, 52 Lomb Memorial Drive, Rochester, NY 14623, USA.
© 2017 Taylor & Francis

work. Some find the prospect intimidating because they lack experience in this area, are apprehensive regarding the prospect of cross-examination, or prefer to avoid the stress that can be associated with an expert's role in litigation generally, especially in high-stakes legal cases.

The dearth of clinicians who are willing and qualified to conduct forensic evaluations with deaf persons is unfortunate for two particular reasons. First, deaf individuals, of course, do become involved in criminal and civil cases where experts of many types could provide valuable information and assistance (e.g., mental health professionals, linguists, audiologists, interpreting and deaf education experts). Second, serving (or prosecuting) a client who is deaf is an uncommon experience for most attorneys (Pollard, 2014b). Often, a presumption is made that engaging a sign language interpreter will be sufficient to overcome any communication or other competency-related difficulties, which might not be true for a significant subset of the deaf population (Brunson, 2008; LaVigne & Vernon, 2003). Professionals with expertise in sign language, Deaf culture (Holcomb, 2013; Padden & Humphries, 2005), interpreting, psychological testing and evaluation of deaf persons, and the wide distribution of literacy, language skills, and "fund of information" in the deaf population (Pollard, 1998, 2014a) can serve a crucial educational role for attorneys, judges, and jurors.

The term *forensic* pertains to any topic involving legal proceedings. Examples include questions regarding a defendant's or litigant's mental status, comprehension of the Miranda warning (i.e., "You have the right to remain silent … "), child custody matters, criminal recidivism risk, and more. The two most common issues I am asked to give opinions on are an individual's competency to stand trial (defined later) and, less often, matters pertaining to criminal responsibility, such as the so-called insanity defense.

The many potentially relevant topics regarding forensic evaluation of deaf persons cannot be addressed in one article (see, however, Pollard & Fox [in press] for an examination of "competency to stand trial" issues involving deaf individuals with significant language deprivation characteristics). Instead, herein, I focus on common issues that arise in competency to stand trial and criminal responsibility evaluations, the types most likely to involve a professional in the deaf mental health field. Yet, the insights offered herein are applicable to other forensic and even nonforensic evaluation topics. Further guidance regarding challenges that many deaf persons face in the legal system has been offered by Brunson (2008), Davidson, Kovacevic, Cave, Hart, and Dark (2015), LaVigne and Vernon (2003), Miller and Vernon (2001, 2002), O'Rourke and Grewer (2005), Pollard and Fox (2017), and Tuck (2010).

## Interview preparation and communication

I do not herein explicate certain fundamentals that a potential forensic expert must bear in mind. Suffice it to say that one must (a) be honest and objective

in arriving at your opinions, no matter which "side" of a case hired you;[1] (b) do your homework; that is, obtain and study as much background documentation and other relevant information as you can; failure to do so usually will damage your credibility; and (c) when rendering opinions in reports or testimony, acknowledge the degree to which you are confident of your opinions and the facts or other information you set forth. That is, be clear about what you are sure about versus what opinions or information you are somewhat less sure about. It is okay to have opinions that are less than 100% sure, just be clear and honest in that regard.

When preparing to interview a deaf individual, never assume that communication in sign language alone, even if the defendant is a fluent signer, is the exclusive or even the best method of communication to employ regarding a given topic. This is a common problem I observe in cases where deaf individuals are interviewed by persons collaborating with sign language interpreters, including certified deaf interpreters (CDIs).[2] In my experience, sign-fluent examiners, as well as hearing interpreters and CDIs, usually restrict their communication with signing deaf consumers to a discussion employing sign language alone. That is, they typically do not engage in more "liberal" communication efforts such as using writing, drawings, photos, role plays, and so on, or only do so to a limited degree. Quite to the contrary, in my experience, writing words or phrases on a whiteboard or poster paper, making drawings, "acting out" conversational topics, and using photos, maps, calendars, and so on, greatly enhances the clarity and reliability of data obtained from such multimethod interviews. Davidson et al. (2015), LaVigne and Vernon (2003), and Intermediaries for Justice (n.d.) have expressed similar opinions.

Even when the evaluation subject is a fluent signer, I always use whiteboards or large poster papers (affixed to a wall) to document key aspects of our conversation (using words if the individual understands them or drawing pictures if the person is not very literate).[3] Not only does this clarify and

---

[1] I have sometimes been criticized for accepting work from attorneys who are engaged on the side of a case that is "against" a deaf plaintiff or defendant. Such criticism is typically based on the incorrect assumption that my concluding opinions will therefore also be "against" the deaf person. The responsibility of an expert is to provide opinions in one's area of expertise without regard to who hires you and whether or not your opinions support or refute the agenda of the side that hired you. Without exception, every time my opinions have differed from what the attorneys who hired me were hoping for, they were grateful for my input and often used it, for example, to negotiate a settlement rather than go to trial. Attorneys value a trustworthy and honest expert, even when the expert's opinion is unfavorable to their case.

[2] CDIs are deaf individuals who are adept at communicating with deaf individuals who have compromised language or cognitive abilities. They do so through a combination of native-fluency sign language and very skilled gesturing, miming, and other visual methods of communication. CDIs almost always work in tandem with hearing sign language interpreters. That is, the hearing interpreter listens to what a hearing speaker says and translates that into ASL for the CDI, who then conveys the information in his or her particularly skilled and flexible manner to the deaf consumer. Similarly, statements emanating from the deaf consumer are interpreted and communicated by the CDI (in ASL) to the hearing sign language interpreter, who then translates the CDI's ASL into spoken English for the hearing consumer.

[3] Gaining insight into an evaluation subject's literacy abilities might result from formal psychological testing procedures (see Pollard & Fox, in press, for detailed examples) or from observations of what is evidenced as more or less successful as one is interacting with the subject, implementing and adjusting writing and other methods of communication while inquiring about and observing the individual's comprehension and preference for various communication methods.

**Table 1.** Required competency knowledge (in situational, temporal order).

1. The crimes one has been charged with
2. The potential punishments associated with each charge
3. The attorneys involved in the case and their respective roles (i.e., PD/defense attorney, DA)
4. Pleas, plea options, and plea rationales including "plea bargains"
5. Trial personnel and their roles (i.e., PD/defense attorney, DA, judge, witnesses, jury)
6. Key steps during a trial (e.g., testimony, jury deliberation, decision, judgment/sentencing)

*Note.* PD = public defender; DA = district attorney.

reinforce key issues I want to emphasize during the evaluation, it also saves time. By simply pointing to things I have written or drawn during the conversation, that topic is "reintroduced" without having to do so via a longer sign language exchange. Further, I usually photograph what I have written or drawn, which assists me later when I am writing reports or explaining my evaluation methods and results to attorneys, judges, or juries.

One does not have to be talented in art to make effective interview drawings (although the incredible value of Mr. Berlinski's professional drawings is described later). I cannot draw much beyond the stick-figure level, but with a little thought and some familiarity with how cartoons are used to convey ideas, even crude drawings can convey essential information. For example, when drawing dead bodies, I make a stick figure with Xs where the eyes should be. Labeling stick figures with relevant persons' names (or nicknames or even sign name[4] initials) allows an interview to unfold with greater visual clarity, augmenting the sign language conversation. Deaf individuals respond very well, in my experience, to this multimethod communication approach, sometimes correcting things I have drawn or written, which not only clarifies misunderstandings on my part, but strengthens my opinion that the person is comprehending the topic we are discussing.

## Competence to stand trial

### What knowledge is required?

The most frequent issue I'm asked to opine on in criminal cases is a defendant's competence to stand trial (competence to proceed). Every state in the United States has standards for competency. Although the language of states' competency statutes differs to some degree, the essential standards are the same nationwide.

Table 1 depicts the key knowledge issues relevant to competency. The topics are presented in the order in which each issue becomes relevant in a legal case against a person accused of a crime. In my experience, the vast majority of hearing persons are sufficiently knowledgeable regarding these

---

[4]Sign names are single signs that represent someone's entire name or a proper noun, such as the name of a city, state, company, or school. Sign names often consist of a person's first initial, often produced at some location on the body that is a unique reference to a characteristic of that person (e.g., their curly hair, a dimple, or a birthmark).


topics to meet the minimal criteria to be considered competent to stand trial. The ubiquitous nature of television crime dramas is one reason these topics are common knowledge among most hearing persons.

### Hearing versus deaf causes of incompetence to stand trial

Among hearing defendants, a suspicion or judgment of incompetence to stand trial is almost always because the individual has a serious mental disorder (e.g., psychosis or severe intellectual impairment). This is not so with many deaf defendants. Although deaf defendants might be incompetent due to the same psychiatric or cognitive impairments hearing defendants sometimes present, deaf defendants could present competency limitations due to language deprivation (Hall, 2017; Hall, Levin, & Anderson, 2017) alone, in the absence of mental illness or other cognitive problems. Language deprivation is not uncommon in the deaf population. It occurs when an individual is not exposed to sign language early enough or long enough to acquire sign proficiency and also is not successful in acquiring a spoken language (see Humphries et al., 2014). Such individuals might present with little or no language proficiency of any kind. Obviously, significant language deprivation can severely impede such individuals' ability to understand and participate in legal proceedings (Miller & Vernon, 2001). Another challenge to effective participation in the legal system experienced by many deaf persons is insufficient knowledge (fund of information deficits; Pollard, 1998) regarding fundamental legal concepts and procedures (Pollard, 2014a, 2014b). Fund of information deficits are an invariable consequence of language deprivation, but also frequently arise from low literacy, limited communication within the family, inadequate education, and other causes, even when one's basic language proficiency is unimpaired.

Hearing persons virtually never suffer from language deprivation (in their preferred language), or even significant language dysfluency (Crump & Hamerdinger, 2017), at least in the absence of severe neurological impairment. Further, fund of information deficits regarding competency to stand trial topics are rarely as severe among hearing defendants as they are among deaf defendants. These two potential causes of incompetency among deaf defendants are thus seldom understood by persons in the legal system who are unfamiliar with deaf individuals (Pollard, 2014a, 2014b). This is another reason why experts in deaf-related fields could be so helpful to attorneys, judges, and juries.

### Competency instruction challenges

Because incompetence among hearing persons almost always is due to psychiatric or neurological impairment, efforts to "restore" the individual to competency will consist of psychiatric treatment that might be supplemented

with education (often in group settings) regarding the competence topics listed in Table 1. Although the methods used in competency education with hearing persons vary, a popular, 15-lesson competency training curriculum was developed by the Florida State Hospital (2011). I was recently informed by two different professionals who use this curriculum that the average hearing individual completes the curriculum successfully within 2.5 to 3 months of instruction. I have evaluated deaf persons with significant language deprivation and fund of information deficits, one of whom was being taught via this curriculum, who have not achieved competency despite years of instruction.

This is not to say that deaf defendants cannot be brought to competency via instructional methods, especially when they have adequate language and other cognitive skills and merely manifest fund of information deficits around legal topics relevant to competence. However, deaf defendants who manifest significant language deprivation, in addition to fund of information deficits, present competency training challenges that can be extremely difficult and time-consuming to address (see Miller and Vernon [2001]; Pollard and Fox [in press]). If a deaf defendant presents with mental illness or other cognitive impairments in addition to language deprivation, these combined challenges to competence can be almost insurmountable, despite extensive treatment and education efforts.

### Commonplace competency evaluation experiences with deaf individuals

The typical deaf individual I encounter in my criminal forensic evaluation work is not mentally ill, manifests at least some degree of language dysfluency, and has notable deficits in fund of information regarding legal topics relevant to his or her case (although I also have evaluated deaf individuals who were severely language deprived, mentally ill, neurologically impaired, or some combination of these). Almost always, an attorney has noticed the person's language or fund of information limitation (sometimes via consultation from an interpreter), which eventually leads to my engagement in the case.

Table 2 depicts the rank-order—from easiest to hardest—of competency knowledge topics as demonstrated by most deaf individuals I have worked with. Over the many forensic evaluations I have conducted, this rank order has emerged as remarkably consistent. Establishing the individual's knowledge base regarding the entire list of competency topics in Table 1 is, of course, essential. However, it is often challenging to elicit evidence of the individual's knowledge regarding these topics, not only because such knowledge might be lacking, but for other reasons as well.

For example, I once evaluated a deaf man who faced 12 distinct charges arising from a long-term sexual relationship he engaged in with an underage girl. These numerous charges resulted from the various alleged sexual

**Table 2.** Competency knowledge rank order typical of deaf defendants, from easiest to most difficult.

1. One's own story regarding the legal problem
2. The attorneys involved in the case and their respective roles (i.e., PD/defense attorney, DA)
3. Identifying trial personnel (i.e., PD/defense attorney, DA, judge, witnesses, jury)
4. Understanding trial personnel roles (i.e., PD/defense attorney, DA, judge, witnesses, jury)
5. Key steps that take place in a trial (e.g., testimony, jury deliberation, decision, judgment)
6. The crimes one has been charged with and how they might differ from one's "story"
7. The potential punishments associated with each charge
8. What a pretrial plea is and how that differs from a posttrial judgment of guilt or innocence
9. Plea bargains

Note. PD = public defender; DA = district attorney.

behaviors he engaged in, his age difference from the girl, how the girl's age changed over the course of the relationship (which brought different laws to bear), and a number of other factors. At the time of our interview, the defendant demonstrated no knowledge regarding the 12 charges he was facing but could only (repeatedly) convey "the story" of the improper relationship (Item 1 in Table 2). In his mind, he was in trouble for one thing only—engaging in the improper sexual relationship. It required many hours for me to educate him about how his story related to the 12 charges and, beyond that, the potential penalties associated with each charge, critical elements that must be established for competency.

Clearly, this challenge was, in large part, a fund of information problem regarding the types of charges and crimes that applied to his situation. However, I also believe there was a sociocultural element to the difficulty of eliciting and teaching the necessary competency information in the limited time that I had available. It is my experience that many deaf defendants, especially those who are communicatively isolated in prison settings, relish the opportunity to be in the presence of a sign-fluent professional to whom they can "tell their story" or converse about other matters important to them, which might not be a priority for the examiner. This presents a challenge of maintaining rapport with, and showing respect to, the defendant while also managing one's evaluation time wisely. Often, redirection is required, along with explanations regarding what the examiner has already learned about "the story" and why shifting to a different topic is necessary.

### *Utilizing visuals when interviewing deaf subjects*

As mentioned earlier, whiteboards or large poster papers are extremely useful for visually documenting key elements of an individual's story, via words, phrases, and drawings. The visual representation of this information tends to reduce some deaf subjects' tendency to repeat their story because they can see that the key elements of their story have been documented. This further allows the examiner to efficiently refer to the key aspects of their story,

by pointing to and thus quickly reintroducing topics as they pertain to the competency issues listed in Table 1.

Items 2 through 5 in Table 2 are topics that many, but not all, deaf defendants either already know or can be taught readily if they have sufficient language skills. For those with less than proficient language abilities, "communication props" (Intermediaries for Justice, n.d.) can be particularly helpful in eliciting or imparting knowledge about these topics.

My primary experience with visual communication aids, other than the approaches described earlier, are professional drawings created for my forensic evaluation work by coauthor and deaf art therapist Brian T. Berlinski. Figure 1 depicts a series of competency topic images he created. These seven images have proven tremendously useful in fostering my conversations with deaf individuals regarding competency Topics 2 through 5 in Table 2.

Mr. Berlinski's artwork is "minimalist" in style, for example, avoiding obvious depictions of race and gender so that subjects can more readily "see themselves" or others involved in their legal situation in the images. He notes:

> A basic knowledge of linear perspective goes a long way toward depicting events with visual clarity, such as drawing objects that are positioned near the viewer at a larger scale than that of objects located farther away; [even] the outlines of the desks in the courtroom for example, need not only to be drawn minimalistically, they also ought to conform as much as possible to the basic rules of linear perspective … such conformity to linear perspective [also] enhances the possibility for deaf defendants to "see themselves" in the spaces that are being depicted. (B. T. Berlinski, personal communication, February 2, 2017)

Other aspects of Mr. Berlinski's artwork in Figure 1 are incredibly creative and effective, such as the flag behind the judge in the first image; the finger



Figure 1. Brian T. Berlinski's competency topic illustrations.



poised on the juror's chin in the fifth image, conveying that that he or she is deep in thought; and the sixth image, where jurors are depicted in a variety of calm or argumentative poses as they are deliberating. Mr. Berlinski refers to these illustration elements as "key props."

### *More challenging competency topics*

Items 6 and 7 in Table 2 relate to the legal charges and crimes one is facing (vs. simply one's "story of what happened"), as well as one's knowledge of the potential penalties associated with those charges and crimes. As illustrated in the preceding example, criminal behavior could result in multiple charges that are surprising when a defendant perceives his or her alleged wrongdoing as a single event. Another challenge is that charges might arise from nuances of the law that are unfamiliar, given the defendant's fund of information. An example of this is the far more severe charges and penalties associated with sharing child pornography versus simply possessing such images. I have been involved in several cases like this involving deaf defendants, none of whom perceived a distinction between possessing such images and sharing them, much less the drastically different penalties associated with these two behaviors.

The final two items in Table 2—pleas and plea bargains—I invariably find to be the most difficult concepts for deaf defendants to comprehend. The "entry" of a plea occurs very early in the criminal prosecution sequence of events. It happens shortly after the person is charged with a crime, during arraignment, when the defendant tells the court whether he or she wishes to be considered "not guilty," thus initiating the processes that this plea implies (i.e. many steps that may lead to a trial) or whether he or she pleads "guilty" to the charge(s) against them, thus precluding a trial and proceeding soon thereafter to sentencing.

Therefore, a plea is much more than a simple attestation of having done, or not done, the illegal behavior in question. That is an aspect of one's "story"—the easiest topic shown in Table 2. Rather, deciding on a plea involves considerable legal strategy. Because a guilty plea precludes a trial, one must consider whether a trial might help or hinder one's case and its potential outcomes. Most deaf defendants with whom I have worked only recognize the concepts of "guilty" and "not guilty" in the context of the ultimate decision made by a jury or judge, not in the more complex context of deciding on a plea much earlier in the legal process.

Topic 9 in Table 2, plea bargains, usually presents the most complex challenge for deaf defendants to comprehend. Plea bargains are extremely common in U.S. jurisprudence. They occur when a prosecutor and a defense attorney reach a compromise to avoid a trial. The compromise typically involves dismissing or "lowering" charges the individual initially was facing.

For example, a murder charge might be lowered to a manslaughter charge or a felony charge might be dismissed in favor of a misdemeanor charge. Sometimes, plea bargains can result in a lesser charge that appears quite different from the actual behavior that the defendant was accused of (or even admits to). For example, an individual initially charged with assault might be offered a plea bargain where he or she will be charged only with disorderly conduct.

In my experience, many deaf defendants struggle to understand and participate effectively in plea bargaining because the new charge(s) being offered might differ markedly from the defendant's story, as they see it. To many, the concept of pleading guilty to something different than what they have conveyed in their story can seem nonsensical. "Why would I admit to [behavior X] when what I really did was [behavior Y]? That's not what happened." Beyond this apparent illogicality, plea bargains further involve complex legal strategy and, usually, negotiations between defense and prosecuting attorneys that can be very difficult for deaf defendants to participate in effectively due to fund of information deficits, if not language barriers and inadequate communication accommodations. Considerable time is often necessary to educate many deaf defendants sufficiently to assure their proper comprehension of, and participation in, plea bargain discussions.

### Criminal responsibility

Although competency to stand trial is the most frequent criminal issue I am asked to opine on, criminal responsibility also is an occasional topic. Criminal responsibility laws essentially offer leniency to persons accused or convicted of crimes if they are mentally impaired to a degree that they are judged unable to comprehend the difference between right and wrong or it is otherwise determined that they should not be held accountable for their criminal behavior. Criminal responsibility usually, but not always, pertains to a defense involving a "not guilty by reason of insanity" (NGRI) plea.

Criminal responsibility cases are particularly complex for both psychological and legal reasons. Insanity can have different meanings and standards in medical versus legal contexts, as well as how it is defined by different U.S. states' laws. As well, NGRI and related issues usually focus on the defendant's state of mind at the time of the crime, rather than at the time of a psychological or psychiatric evaluation, which often takes place many months or even longer after the alleged criminal incident occurred (especially with deaf defendants, when the search for qualified evaluators and interpreters can greatly extend the time between the alleged criminal incident and the NGRI evaluation).



### *Again, the value of visual images*

Here, I do not delve deeply into the complex matter of criminal responsibility evaluations of deaf defendants. Rather, I offer some strategies that I have found useful in such situations. In addition to a thorough review of records relevant to the alleged crime (including police records and any mental health or other relevant historical records), and a skilled mental status examination, I have found visual images (drawings, photographs, etc.) to be remarkably useful as a supplement to conversations in sign language with deaf defendants.

Visual images help stimulate a defendant's memory of the events surrounding an alleged crime and can be very effective when inquiring about a defendant's behaviors, thoughts, and emotions at various points in time before, during, and after the alleged criminal event, all of which might pertain directly to an NGRI defense.

Mr. Berlinski has collaborated with me several times by drawing images that have greatly facilitated my interviews with deaf defendants in criminal responsibility cases. When preparing to do this work with him, I first review the facts of the criminal situation, specifically, the timeline of events most relevant to the opinions I am being asked to provide. These data usually come from police and attorney records. I then summarize the key event timeline and ask him to produce illustrations depicting that sequence of events.

Figure 2 depicts one such image montage he created. The case involved a deaf man who shot someone with whom he lived, many hours after engaging in an argument with this person. After the argument but prior to the shooting, the accused was observed by witnesses to have spent time in a bar playing pool and, at one point, spilling a cup of coffee while angrily pounding his fist on the bar. Records also indicated that he took a taxi back to his residence before loading a rifle and shooting the individual with whom he had argued. Police reports also indicated that he surrendered while holding a beer can in his hand.

As I conducted my interview with the defendant, the sequence of events depicted in Figure 2 allowed me to delve into his behavior and state of mind during the long evening's events in a more effective way than I could have done without Mr. Berlinski's remarkable drawings. I placed each of the nine drawings, in turn, in front of the defendant and engaged him in a conversation about what was happening immediately before, during, and after the event depicted. Eliciting the defendant's input about his mindset, mood, behavior, and intentions at each point in time depicted in the drawings was remarkably informative, allowing me to form my opinions regarding criminal responsibility in a far more effective manner than a sign language interview alone ever would have produced.



**Figure 2.** Brian T. Berlinski's illustration of a case event sequence.

## Forensic reports and testimony

When engaged in forensic work, one should expect that a written report usually will be required. The report might cover any number of topics, depending on what the evaluator was asked to opine on (e.g., competency, criminal responsibility, IQ, mental status or illness, language abilities, or other topics). In some cases, depositions or court testimony will occur after a report is submitted. Depositions are interviews by attorneys consisting of formal, sworn testimony, including examination and cross-examination. They are typically conducted in lawyers' offices, not in a court of law. Depositions are arranged so that the involved lawyers can investigate how a particular witness might testify in a later trial. It is not unusual for an expert's work to come to an end after submitting a written report or after a follow-up deposition. Cases might be closed or settled for any number of reasons during this period. A smaller percentage of cases proceed to court hearings or formal trials.

Understandably, few individuals in the legal profession are familiar with information that those of us in the deaf-related fields consider fundamental.



This presents challenges in how we communicate such crucial information in timely, succinct, and effective ways, especially when we were not specifically asked to provide this information, but believe that doing so is essential for proper comprehension of the information we were asked to provide.

I approach this problem, first, by immediately assessing the deaf-related knowledge of attorneys who contact me, as relevant to the case at hand, the deaf individual(s) they are representing or prosecuting, or both. When relevant knowledge appears lacking, it is tempting to overwhelm them with literature or references regarding sign language, Deaf culture, and myriad other issues. Doing so would rarely be effective, though. Typically, attorneys do not request such information (i.e., "They don't know what they don't know") and might be unlikely to spend much time reading such information if they did not ask for it. Rather, I usually share with them two documents I have written: a brief essay that appeared in a newsletter for attorneys (Pollard, 2014b) and an unpublished document entitled "Key Deaf Fundamentals" (Pollard, 2014a) that I have included in several of my forensic evaluation reports. The five topics covered in this latter document (comprising only seven pages) are as follows:

1. The linguistic and cultural minority perspective (regarding many Deaf individuals who use sign language).
2. American Sign Language (ASL) and its differences from English.
3. Speechreading (especially the myth of speechreading ease and the reality of how situation-dependent it is).
4. English literacy (and why it should not be presumed in relation to a given deaf individual).
5. Fund of information.

Depending on the case, I might supplement this information with brief commentary (verbal or written) regarding other relevant topics, such as sign language interpreting, Deaf history, deaf education, health literacy in the deaf population, deaf mental health research, deafblindness, and so on. Attorneys will advise me whether this type of fundamental information on deaf issues would be useful to include in my formal report, in addition to the specific data and opinions regarding the forensic matters I was asked to opine on.

### Closing

Forensic work with deaf persons is both challenging (please read that as intellectually stimulating) and rewarding. The need for competent professionals in this field is so great that engaging in this line of work is sure to leave one with a feeling of satisfaction that his or her involvement was highly valued and useful. Hopefully, the information in this article, as well as the information in the literature cited, will encourage more professionals in the

deaf-related fields to engage in this type of work. If you do, bear in mind a few of the key points made herein: (a) that language dysfluency or deprivation and legal fund of information deficits are frequent challenges encountered with deaf individuals that many persons in the legal system are unlikely to understand; (b) that, when conducting evaluations, conversation in sign language alone is usually much less effective and efficient than a multimodal approach to communication, especially given; (c) the value of visual stimuli in eliciting relevant information from deaf persons, as optimally exemplified by Berlinski's approach to producing visual images for use in forensic evaluations.

Useful resources to learn more about deaf legal and representation issues include the National Association of the Deaf's Law and Advocacy Center (http://nad.org/issues/about-law-and-advocacy-center, Stein & Vargas, LLP (http://www.steinvargas.com/), and the U.S. Department of Justice Civil Rights Division (http://www.justice.gov/crt/).

## Acknowledgment

Thanks to Meghan Fox, postdoctoral fellow in the Department of Psychiatry at the University of Rochester Medical Center, who conducted a literature review that was helpful in preparing this article.

## References

Brunson, J. L. (2008). Your case will now be heard: Sign language interpreters as problematic accommodations in legal interactions. *Journal of Deaf Studies and Deaf Education*, 13, 77–91. doi:10.1093/deafed/enm032

Crump, C. J., & Hamerdinger, S. H. (2017). Understanding etiology of hearing loss as a contributor to language dysfluency and its impact on assessment and treatment of people who are deaf in mental health settings. *Community Mental Health Journal*. Advance online publication. doi:10.1007/s10597-017-0120-0

Davidson, F., Kovacevic, V., Cave, M., Hart, K., & Dark, F. (2015). Assessing fitness for trial of deaf defendants. *Psychiatry, Psychology and Law*, 22(1), 145–156. doi:10.1080/13218719.2014.919690

Florida State Hospital. (2011). *CompKit: Competency to stand trial training resources. A comprehensive approach to competency restoration for criminal defendants*. Chattahoochee, FL: Author.

Hall, W. C. (2017). What you don't know can hurt you: The risk of language deprivation by impairing sign language development in deaf children. *Maternal and Child Health Journal*, 21, 961–965. doi:10.1007/s10995-017-2287-y

Hall, W. C., Levin, L. L., & Anderson, M. L. (2017). Language deprivation syndrome: A possible neurodevelopmental disorder with sociocultural origins. *Social Psychiatry and Psychiatric Epidemiology*, 52, 761–776. doi:10.1007/s00127-017-1351-7

Holcomb, T. K. (2013). *Introduction to American deaf culture*. New York, NY: Oxford University Press.

Humphries, T., Kushalnagar, P., Mathur, G., Napoli, D. J., Padden, C., Pollard, R., … Smith, S. (2014). What medical education can do to ensure robust language development in deaf children. *Medical Science Educator*, 24, 409–419.


Intermediaries for Justice (n.d.). *Communication props in the justice system: The benefits and risks*. Retrieved from http://www.intermediaries-for-justice.org/communication-props-justice-system-benefits-risks/

LaVigne, M., & Vernon, M. (2003). An interpreter is not enough: Deafness, language and due process. *Wisconsin Law Review*, *844*, 843–936.

Miller, K. R., & Vernon, M. (2001). Linguistic diversity in deaf defendants and due process rights. *Journal of Deaf Studies and Deaf Education*, *6*, 226–234.

Miller, K. R., & Vernon, M. (2002). Assessing linguistic diversity in deaf criminal suspects. *Sign Language Studies*, *2*, 380–390. doi:10.1353/sls.2002.0021

O'Rourke, S., & Grewer, G. (2005). Assessment of deaf people in forensic mental health settings: A risky business! *The Journal of Forensic Psychiatry & Psychology*, *16*, 671–684.

Padden, C., & Humphries, T. (2005). *Inside deaf culture*. Cambridge, MA: Harvard University Press.

Pollard, R. Q (1998). Psychopathology. In M. Marschark & D. Clark (Eds.), *Psychological perspectives on deafness* (Vol. 2, pp. 171–197). Mahwah, NJ: Erlbaum.

Pollard, R. Q Jr. (2014a). *Key deaf fundamentals*. University of Rochester School of Medicine, Rochester, NY.

Pollard, R. Q Jr. (2014b). What if your client is deaf? *Atrium Experts Monthly Newsletter*, *9*(4). Retrieved from http://www.atriumexperts.com/blogs/view/case-consulting-what-if-your-client-is-deaf

Pollard, R. Q & Fox, M. (in press). Language deprivation in forensic settings. In N. Glickman & W. Hall (Eds.), *Language deprivation in deaf mental health care*. New York, NY: Routledge.

Tuck, B. M. (2010). Preserving facts, form, and function when a deaf witness with minimal language skills testifies in court. *University of Pennsylvania Law Review*, *158*, 905–956.