# EXHIBIT B

# 4
# Forensic Evaluation of Deaf Adults with Language Deprivation

ROBERT Q. POLLARD, JR. AND MEGHAN L. FOX

The involvement of deaf people who have significant language deprivation in the complex legal system presents numerous challenges. How can such people's legal rights be protected if the Miranda Warning (aka "police caution" in the UK) is incomprehensible? How can accused people adequately collaborate with their defense attorneys if they cannot express themselves or comprehend legal advice due to language deprivation? How do such individuals fare in prisons when guard directives or public address announcements cannot be understood (even if an interpreter is present, which is rare)? Can language-deprived deaf individuals adequately convey needs or complaints such as illness symptoms or harassment to legal authorities through gesture/mime alone? How can they establish relations with other prison inmates which may be key to protection from exploitation? How can they participate in educational or rehabilitation opportunities which might improve their chances for parole or benefit them after release? These questions are particularly poignant in light of a recent decision by the Supreme Court of Texas (Beeman v Livingston, 2015), which held that Texas prisons are not "public facilities" as defined by applicable laws that would otherwise require prisons to provide reasonable accommodations for persons with disabilities. Thus, deaf inmates in Texas are not legally entitled to reasonable communication accommodations such as sign language interpreters or videophones with which to communicate with persons (including family and attorneys) outside prison.

The presence of deaf people with language deprivation in the legal system is not an infrequent occurrence nor a situation that is easily addressed, even with the assistance of skilled, certified deaf interpreters (CDIs). Oswaldo Martinez, a Salvadoran immigrant with severe language deprivation, was charged with capital murder but has languished in the Virginia legal system since 2005 (Dugan, 2017). According to this *Washington Post* story:

> Unable to read, write or enunciate more than a few small words, Martinez communicates mainly through pantomime, grunts and crude drawings. As

a result, even though experts say he is not psychotic or severely intellectually impaired, he remains legally incompetent to stand trial because he cannot assist in his defense or understand what is happening in a courtroom.

This is a situation that I (Pollard) have encountered over a dozen times in my work as an expert examiner.[1] Almost always, the deaf individuals with whom I conduct competency evaluations have demonstrated a degree of language deprivation that was apparent to their attorneys (sometimes via consultation from an interpreter), leading to the evaluation request. Relatively few of my competency evaluation requests stemmed from suspicion of mental disorder *alone*, which is the *usual* reason that hearing persons are referred for competency evaluations.

The main purpose of this chapter is to provide specific recommendations and advice regarding the conduct of competency evaluations with deaf persons who present with language deprivation. Contextual information also is presented regarding legal competency and language deprivation issues in forensic settings generally.

## What Is Legal Competence?

In a landmark 1960 ruling, the US Supreme Court recognized that a defendant must be judged competent to stand trial for such legal proceedings to take place (Dusky v. United States, 1960). The Dusky ruling and related state statutes often merely cite the need for defendants to have the capacity to understand the proceedings against them and possess the ability to collaborate with their attorney(s). In practice, however, competency to stand trial (aka, adjudicative competence, competency to proceed, fitness to plea, fitness for trial) requires knowledge in six specific areas: (1) the crime(s) one has been charged with, (2) the potential punishments associated with each charge, (3) the attorneys involved in the case and their adversarial roles,[2] (4) the nature of pleas, plea options, and "plea bargains," (5) the key personnel involved in a trial and their respective roles,[3] and (6) the key steps involved in a trial.[4] As noted, beyond this knowledge, defendants must have the linguistic and cognitive abilities to collaborate effectively with their attorney(s).

In my experience with deaf defendants referred for competency evaluations, limitations in "fund of information" regarding legal issues alone are significant enough that education is virtually always needed in one or more of the aforementioned topic areas for the individual to reach minimal standards of competency (Pollard, 1998b; Pollard, 2014; Pollard & Berlinski, 2017). If the individual is language deprived as well, that challenge is all the greater. Table 4.1 depicts the rank order of requisite legal knowledge that I observe among deaf defendants, starting from the topics that are easiest to understand and progressing through those that are increasingly difficult to understand. Over the many competency evaluations I have conducted, this rank order has remained remarkably consistent.

*Table 4.1* Competency knowledge rank order typical of deaf defendants, from easiest to most difficult

1. One's own story regarding the legal problem
2. The attorneys involved in the case and their respective roles (i.e., PD/defense attorney, DA)
3. Identifying trial personnel (i.e., PD/defense attorney, DA, judge, witnesses, jury)
4. Understanding trial personnel roles (i.e., PD/defense attorney, DA, judge, witnesses, jury)
5. Key steps that take place in a trial (e.g., testimony, jury deliberation, decision, judgement)
6. The crimes one has been charged with and how they may differ from one's "story"
7. The potential punishments associated with each charge
8. What a pretrial plea is and how it differs from a posttrial judgement of guilt or innocence
9. Plea bargains

*Source:* ©2017 *Journal of Social Work in Disability and Rehabilitation*. Used with permission.

## Relevant Literature on Language Deprivation in Forensic Settings

The presence of severe language deprivation among a subset of the deaf population, and the frequent co-occurrence of cognitive and psychosocial difficulties, has long been recognized (Grinker, 1969; Rainer, Altshuler, Kallmann, & Demin, 1963). This constellation of symptoms was first termed "primitive personality disorder" by Altshuler and Rainer (1963) and later championed by McCay Vernon in his publications advocating justice for deaf defendants. Later, this constellation of symptoms was termed "surdophrenia" by Norwegian psychiatrist Basilier (1964). More recently, Glickman (2009) proposed the term "language deprivation with deficiencies in behavioral, emotional and social adjustment" to capture this set of characteristics with a less pejorative label while Hall, Levin, and Anderson (2017) and Gulati (Chapter 1, this volume) propose the diagnostic term "language deprivation syndrome" to highlight the social cause of the condition.

It should not be surprising that the knowledge and judgment problems that often are associated with language deprivation can lead to behaviors that result in encounters with law enforcement. In addition to lacking requisite competency knowledge and, usually, the ability to collaborate effectively with defense attorneys, deaf defendants with language deprivation are vulnerable and disempowered (Bramley, 2007; Miller & Vernon, 2002). They may mistakenly confess to offenses, make poor witnesses, and their conduct may inadvertently generate the impression that they lack remorse for their actions (McAlister, 1994; Miller, 2004; Miller & Vernon, 2001; Vernon, Raifman, & Greenberg, 1996).

While severe language deprivation is a rather low-incidence affliction among the general deaf population, it is frequently observed among deaf persons

accused of crimes. Vernon, Steinberg, and Montoya (1999) studied the cases of 28 deaf murderers, 13 of whom (46%) were functionally illiterate with no sign language or speech ability. Miller, Vernon, and Capella (2005) reported that 20.2% of "violent" deaf offenders in a prison population study possessed what they termed "minimal language skills" (another term sometimes used to refer to language deprivation) severe enough that the authors suspected these persons should have been deemed incompetent to stand trial. A British study of over 200 deaf persons in forensic settings found that 41.2% manifested "communication difficulties" (Young, Howarth, Ridgeway, & Monteiro, 2001). Miller (2004) gathered data on the "entire prison population in the state of Texas" and reported that 50% of these inmates had limited reading and other language abilities severe enough to lead Miller to doubt whether they had received due process during arrest and adjudication.

Beyond research studies, case law has recognized the presence and legal significance of language deprivation. In the case of People v. Lang (1979), the defendant, who was raised at home without any formal education and had no language system, was found incompetent to stand trial (Vernon, 1996). Miller and Vernon (2001) offer two other examples. In the case of Wilson v. North Carolina, the defendant was originally deemed incompetent to stand trial due to mental retardation (now termed "intellectual disability"). However, it was later determined that he was not intellectually disabled but, instead, used an obscure North Carolina sign language known as the Raleigh Dialect, a mixture of American Sign Language (ASL) and North American Indian Sign Language (NAISL). Similarly, these authors note, in Wisconsin v. Hindsley (2000), lawyers for that defendant, who also used a combination of ASL and NAISL, successfully motioned for the suppression of statements Hindsley made to police.

LaVigne and Vernon (2003) describe other legal cases where language deprivation was a prominent issue. In Jackson v. Indiana (1972), the deaf defendant could not read, write, or otherwise communicate. He was found incompetent to stand trial based, in part, on language deprivation although he was intellectually disabled as well. In Shook v. Mississippi (2000), the deaf defendant was found incompetent to stand trial due to language deprivation alone. In Holmes v. State (1986), the Florida Court of Appeals determined that a deaf defendant with limited language skills should have been deemed incompetent when it was discovered that he was not able to communicate on the witness stand, including the inability to answer questions essential to his defense. In State v. Smith (1985), the Louisiana Court of Appeals explicitly excluded any claim that a deaf defendant must be mentally ill or mentally retarded to be deemed incompetent to stand trial; that is, language deprivation alone was judged a sufficient cause for a finding of incompetence. The Wisconsin Court of Appeals reached a similar conclusion in the case of State v. Haskins (1987).

Unfortunately, there is a dearth of published literature regarding *how* forensic evaluations of deaf persons with language deprivation should be conducted. LaVigne and Vernon (2003) provide valuable though somewhat general guidance. While not addressing potential forensic evaluators per se, Miller and Vernon (2002) gathered data from 46 sign language interpreters, many of whom had worked with language-deprived deaf defendants or inmates, which yielded relevant evaluation information. Further guidance for or about interpreters in forensic situations has been provided by Miller and Vernon (2001), Vernon and Miller (2001), Brunson (2007), and in a particularly detailed publication by Tuck (2010). Even literature regarding the conduct of forensic evaluations with deaf persons who *do* have language proficiency is rather limited (e.g., Davidson, Kovacevic, Cave, Hart, & Dark, 2015; Harry, 1986; O'Rourke & Grewer, 2005; Pollard, 2014; Pollard & Berlinski, 2017).

As noted, the main purpose of this chapter is to present specific recommendations and related advice regarding the conduct of competency evaluations with deaf persons who manifest language deprivation. This information can, of course, also be useful in conducting competency evaluations with deaf individuals who have competent language skills (see Pollard & Berlinski, 2017) and conducting evaluations with language-deprived deaf persons outside the realm of forensics.

## Conducting Competency Evaluations in Light of Language Deprivation

### Preparation

In my (Pollard's) view, competency must be evaluated within a broader context of one's basic cognitive abilities, language abilities (signed, written, and spoken), and fund of information. These capacities relate to the requisite competency topics noted before and, furthermore, apply to the *specific* circumstances of the defendant. Such circumstances include the narrative (story) of the individual's alleged criminal behavior, the specific charges they are facing, the associated potential penalties, the attorneys (defense and prosecution) involved in the case, and potential witnesses, among other topics.

I first request this legally-relevant case information from the attorneys who engage me. Competency statues applicable to the state in question also must be obtained and studied. I then request as much background information as may be available regarding the defendant, including his or her social, educational, medical, psychiatric, and legal history. When language deprivation is suspected, I also often request photos of the defendant, his or her family, any victims of the alleged crime, and other relevant parties, including the defense attorney(s) because such photos can be helpful when communicating with the defendant.

I always bring maps to evaluations of language-deprived individuals, to stimulate conversation about their place or country of origin (some of the defendants I've worked with have been immigrants) or simply their travels in

the United States, their knowledge of where they are presently being held, and where I live and have traveled to meet them. I find using maps to be an excellent "ice breaker," helping to establish rapport and, importantly, allowing me to observe individuals' communication abilities and adjust my communication approach accordingly.

Finally, I never evaluate a deaf individual—language deprived or otherwise—without access to a whiteboard or a large pad of easel paper (~2' × 2.5', available at office supply stores) that I can write/draw on and affix the sheets to walls. (It's helpful to obtain the kind of easel paper with sticky backing at the top. Masking tape will suffice but requires more time and effort and may damage paint.) I ask attorneys to provide me with these easel pads at the evaluation location since bringing them on an airplane is difficult. If I am using a whiteboard rather than easel pads, I take photos of the writing/images produced during the evaluation. (The easel pages can simply be brought home.) Prisons may not allow cell phones, in which case I'll request to bring a standard camera if using a whiteboard and not an easel pad.

### About Collaborating with Certified Deaf Interpreters (CDIs)

Working with Certified Deaf Interpreters (CDIs) is a relatively new approach to clinical work with deaf people in various settings. CDIs can bring tremendous value to the process given their native sign language fluency, ability to foster communication through a variety of visual and/or gestural methods, and cultural world knowledge. Skilled CDIs also tend to foster increased trust when working with a deaf client while improving information exchange and, accordingly, service outcomes.

Actually, though, I rarely work with CDIs during my forensic evaluations of language-deprived individuals. This has more to do with the context surrounding these evaluations, especially time limitations, than a presumption that my signing skills are native-like (they are not) or not appreciating the value that CDIs can offer in many clinical settings. I have been conducting forensic evaluations for over 30 years, long before CDI training became available. Clinicians with less experience and non-fluent sign language skills absolutely should work in collaboration with a qualified CDI when evaluating language-deprived deaf people.

Interpreters, deaf or hearing, are generally trained to facilitate communication between parties regardless of the quality of the deaf individual's sign language skills. When deaf individuals present with language deprivation or other forms of dysfluency (Andreasen, 1980; Pollard, 1998b), interpreters typically strive to "make sense of" the individual's signing, as best they can. This is especially the case when CDIs are brought into a situation after a hearing interpreter has struggled to understand a deaf client. This pressure to make sense out of very challenging language is even greater for a CDI in such situations.

Given the frequent co-occurrence of language deprivation and mental disorder (whether of psychiatric or neurological origin) among deaf people in forensic settings, it often is unclear whether their dysfluency has arisen from mental disorder and/or insufficient exposure to sign language (aka, "social origin dysfluency"). This differential diagnostic challenge is obfuscated if interpreters presume, or assert via their translations, logic or meaning in the deaf person's language that is not actually present, which can be very problematic both diagnostically and legally. Strategies for interpreting in language-dysfluent situations exist (Pollard, 1998a) but require special training. Deaf or hearing interpreters who work in psychiatric or forensic settings should take advantage of such educational opportunities. The weeklong mental health interpreter training hosted by the Alabama Department of Mental Health (www.mhit.org) is particularly recommended.

Let me explain why I usually conduct forensic evaluations alone but also offer advice on how evaluators and interpreters (both deaf and hearing) can work together most effectively.

1. My competency evaluations are conducted within strict time limitations since I am always doing so during an out-of-town trip. (I've never had such a case in my hometown.) If I were working with a CDI, the typical approach would call for me to convey to the CDI (in ASL) what I wished to communicate to the client and then the CDI would communicate with the client using a variety of methods and then provide input back to me (in ASL). This back-and-forth process would greatly extend the time involved compared with communicating directly with the client myself.
2. It also would be time-consuming for me to guide the CDI regarding the multi-method communication approaches that forensic evaluations with language-deprived individuals require (Pollard & Berlinski, 2017)—"Here's what I'm trying to achieve right now…let's try it this way." It would be rare for a CDI to be familiar with the specific methods that I have learned are optimally effective in these situations. Providing such guidance would take up valuable time.
3. Direct engagement with a deaf client facilitates my own rapport with that person—rapport that otherwise might be formed with the CDI instead. The importance of this rapport cannot be understated for gaining maximum cooperation and information disclosure from the client, in part because the client and I are in a 1:1 relationship rather than in a triadic relationship with an interpreter.
4. Evaluations frequently require me to be quite assertive in directing, and redirecting, the conversation to essential points. It is common for clients to take up valuable time retelling "their story" of the alleged crime or otherwise addressing irrelevant topics. Redirection is much more effective when I am in the forefront of communication and have a direct relationship with the client.

5   Finally, in my evaluation reports and court testimony, it is *far more* influential to state that the communication between myself and the defendant occurred directly and was not mediated by a third party unrecognized by the court as an evaluation expert. As the engagement of CDIs in legal situations grows, the courts may well learn to recognize their expertise and utility in such situations.

While non-fluent signers absolutely should collaborate with a CDI during forensic evaluations, even sign-proficient evaluators are advised to engage a CDI as a "communication monitor." The CDI can observe the interactions between the evaluator and client, take over communication when prudent, and provide observations about the client's language abilities during or after the evaluation. This approach would circumvent many of the concerns I just listed and would lend an "extra set of eyes" to enhance and reinforce an evaluator's methodology and conclusions.

It is important to approach working with deaf and/or hearing interpreters as a partnership. This requires meeting with the interpreter(s) ahead of time and explaining and agreeing on the goals and methods of the evaluation, such as when communication will shift from the examiner to the interpreter(s). In my experience, freelance interpreters are much less likely to be engaged in the multi-method communication approach discussed herein than are staff interpreters who work regularly in psychiatric or forensic settings. This multi-method approach is far more "liberal" (Dean & Pollard, 2005) than interpreters' typical view of their role—which is often perceived as restricted to translating and producing language utterances alone—but is more in keeping with the linkage between role *and* responsibility common to other practice professions (Dean & Pollard, 2013). This underscores the necessity to encourage interpreters to use any means of communication that may facilitate engagement and comprehension with a language-deprived person (e.g., drawings, role play, and other visual aids). This should take the form of an ongoing dialogue with the interpreter(s) *throughout* the evaluation, so it is understood what the evaluator's communication objective is *at that specific moment*, allowing the interpreter(s) to determine or advise what communication strategies will work best to achieve that objective.

## Initial Evaluation Stage

Upon meeting language-deprived evaluation subjects, I'll spend a short time in casual interaction (linguistic and behavioral), often employing maps and attempting to gauge and adjust to their communication abilities and preferences. In my experience, deaf defendants are extremely pleased and cooperative when meeting an evaluator (or anyone else) who can sign, due to their infrequent encounters with sign-fluent persons involved in their case. The downside of this is that defendants often want to discuss all sorts of topics that are not relevant to the evaluator's goals, especially given the limited amount of time allotted for evaluation appointment(s). I've already mentioned the redirection that is necessary in this regard. I dress neatly but casually for these evaluations, never with a tie (which may be dangerous in forensic settings) or other formal attire that might underscore my role as an authority in an unhelpful manner. In addition, I need to dress comfortably, given the amount of movement I must engage in when doing role plays, affixing poster papers to walls, and frequently walking back and forth between them and/or a whiteboard while engaging in the evaluation conversation.

## Assessing Cognitive Functions

As noted, a thorough competency evaluation must address factors beyond the subject's knowledge of the legal topics listed in Table 4.1. The requisite ability to confer effectively with one's attorney(s) requires a number of intact cognitive functions, including attention, concentration, language, short and long-term memory, and adequate intelligence and critical reasoning skills. I therefore assess a range of cognitive abilities, albeit usually at a screening level, before turning my attention to the legal knowledge topics pertaining to competency. If screening procedures reveal significant cognitive ability deficits, then further assessment is called for. Any forensic evaluation should include a formal mental status exam (MSE). I will not describe MSE procedures here. See Pollard (1998b) for thorough coverage of MSE procedures with deaf individuals.

Many authors have provided guidance on psychological testing with deaf individuals (e.g., Brauer, Braden, Pollard, & Hardy-Braz, 1998; Elliott, Glass, & Evans, 1987; Zieziula, 1982). I will not address this topic here, though I recommend that readers be familiar with my five-step process for evaluating the appropriateness of a given evaluation tool for use with deaf individuals (Pollard, 2002). Otherwise, the measures and procedures described as follows are those I tend to use most often when evaluating cognitive and language functions with deaf adults (especially when time is limited). These methods and procedures are not intended to be an exhaustive or exclusive listing of potentially useful evaluation tools. Valuable measures and procedures are sure to emerge in the future through continuing research in Deaf mental health and related fields.

## Attention and Concentration

I like to use Knox's Cubes Test (Stone & Wright, 1980) for this purpose because it's highly visual and the instructions can be easily "acted out" if necessary. The test consists of a small board with four wooden blocks arranged in parallel. The examinee must watch the examiner demonstrate patterns of taps on the blocks and then repeat the patterns. The patterns become increasingly

lengthy, from three taps to seven or more. Age norms are provided up to an expected maximum performance of an 18-year-old, which should be applicable to adults who are not elderly. "Unexpected" errors early in one's performance or unexpected successes toward the ceiling of one's performance suggest inconsistencies in concentration, beyond the age-equivalent attention score the test generates.

This test, as with several others I recommend in the following, does not have, nor would it benefit from having, deaf norms. See Pollard (2002) for a discussion of when norming a psychological test with deaf persons is beneficial or detrimental.

## The Rey-Osterrieth Complex Figure Test

I find this test (Meyers & Meyers, 1995a, 1995b) very useful on a variety of levels. It involves copying a complex pattern of interwoven geometric shapes from a "stimulus page" onto another piece of paper. Conveying this simple instruction is easy, even to persons with language deprivation. The task requires concentration, visual perception, gross and fine motor skills, visual-motor integration skills, and the ability to plan and execute a successful approach to making the complex drawing, thus providing evidence regarding a number of cognitive functions that can be pursed further with other tests, if desired, when an individual's performance is poor. Deaf norms don't exist and are not needed for this test.

## Memory

After copying the Rey-Osterrieth Complex Figure, the examinee is asked to reproduce the drawing about 20 minutes later from memory alone, providing evidence regarding visual memory. Regarding the assessment of verbal (signed) memory, most language-deprived persons I've evaluated would not be able to respond well to the Signed Paired Associates Test (Pollard, Rediess, & DeMatteo, 2005), primarily because the instructions are more complicated than the test items themselves, but it may be worth considering for persons with less severe language deprivation. The ASL Stories Test (Pollard, DeMatteo, Lentz, & Rediess, 2007) is usually out of the question for this population, as it requires good receptive and expressive ASL skills.

Instead, I use a brief, unpublished screening method of verbal (signed) memory, referred to as the "Store, Dog, Black, Train" test, which I learned while working at the University of California San Francisco's Research and Training Center on Deafness and Mental Health. The examinee is instructed (via sign, gesture, etc.) that you want them to remember four signs. I always "index" the four signs by pointing to four outstretched fingers on my hand, in succession, as I show the examinee each sign. The signs are: *store, dog, black,* and *train.* You can even draw these four concepts, or write the words, on a paper or white board. Many, but not all, language-deprived person will know these common signs. The examiner repeats the four-sign sequence as many times as necessary until the examinee can recall all four signs over *two* consecutive immediate recall attempts. The vast majority of persons will require only one or two presentations before being able to recall all four signs. (They don't have to be recalled in order.) Failure to recall all four signs after two learning trials is suggestive of a learning difficulty that may have its source in attention, concentration, short-term memory, or a number of other potential cognitive deficit areas.

The examiner then tells the person that they'll be asked to recall the four signs (about 20 minutes) later. For this recall trial, it is helpful to once again index the four previously referenced fingers of your hand as you prompt the examinee to recall the fours signs. I even "fold down" the corresponding finger when the examinee correctly recalls that particular sign. Most examinees will recall all four signs. Failure to recall more than two, provided the immediate recall trial(s) were successful, is suggestive of a verbal memory problem. If they do not recall one or more of the four signs, there are two "levels" of hints that can be provided. The first is a bit abstract and may not be successful with some language-deprived persons. The examiner provides the following hint(s) for any sign(s) that the examinee failed to recall: for *store*—"It's a kind of building"; for *dog*—"It's an animal"; for *black*—"It's a color"; and for *train*—"It's something you can ride in." If these hints are understood but the person still does not recall the sign(s), it is further evidence of a verbal memory problem. Finally, one can offer three multiple choice options for any signs that are not recalled (e.g., for *black*, offer three colors to choose from, including black). Again, if these second-level hints are understood but the person still does not recall the sign(s), it is still further evidence of a verbal memory problem. There are no deaf norms for this procedure, although my experience in using it a great many times is described earlier.

## Non-Verbal Intelligence

I tend to use the Raven's Progressive Matrices Test for this purpose (Raven, Raven, & Court, 2000). It requires the examinee to view a series of increasingly complex visual patterns, some which portray very abstract relationships, and select the proper "missing piece" from among a number of choices. Deaf norms don't exist and are not needed for this test. In addition to yielding a non-verbal IQ score, there is a method for assessing the validity of the test administration based on the examinee's pattern of correct and incorrect answers. It also is quite easy to convey the instructions for this test non-verbally. To accomplish this, I photocopied the possible answer choices for the first two test items (which are six images about one square inch each) and cut them apart, saving them in an envelope for reuse. I lay out the cut-out answer choices for the first item over the top of the corresponding answer choices

Case No. 1:21-cr-00013-RM   Document 63-2   filed 06/03/22   USDC Colorado   pg 8 of 18

shown in the test booklet. It is then a simple matter to point to the "missing piece" in the stimulus image, then physically put several (wrong-answer) cut-out choices onto the missing piece area and "act out" the concepts of "no, not right" and "almost right" (one answer choice is almost, but not completely right) and then encourage the examinee to put the correct cut-out piece in place. I then do the same with the second test item. Subsequently, examinees learn to simply point at their preferred answer in the test booklet, negating any further need for using cut-out answer choices. I've *never* seen this method of conveying the test instructions fail. This is important, because conveying the instructions to other so-called "non-verbal" IQ tests is more complicated and often hard to accomplish with a person who is language deprived.

## Language Evaluation

One cannot take for granted any aspect of a language-deprived individual's communication abilities, even if they sign "decently." A proper evaluation should take into consideration a number of specific sign language abilities: fingerspelling (expressive and receptive), sign production fundamentals (handshape, location, palm orientation, and movement), sign vocabulary, and sign language grammar and syntax.

I am not aware of useful, standardized tools for gauging these abilities in language-deprived deaf persons. Rather, I attend to these issues, based on my knowledge of ASL linguistics, while communicating with the examinee, and document my observations about the subject's linguistic abilities in my report. Examiners who not well-versed in ASL linguistics, even if they are skilled signers, should work with interpreters who are capable of providing this linguistic information via their observations and interactions with the examinee. The chapters on communication assessment by Charlene J. Crump and Roger C. Williams, and also by Jon Henner, Jeanne Reis, and Robert Hoffmeister reflect the state of the art of this important and developing area of expertise.

English language abilities (at least in the US and Canada) also must be documented. These include: alphabet and number knowledge, written vocabulary comprehension, written sentence comprehension, and expressive writing abilities (vocabulary, spelling, grammar, syntax, and even punctuation and capitalization). While sign language abilities usually are a greater strength than English abilities in language-deprived deaf individuals, it is nevertheless imperative to examine and document English language abilities because they are crucial regarding competency issues such as one's ability to read documents, understand handwritten notes, etc. Some of the available instruments are described below. The judgement of any evaluation tool's appropriateness for use with deaf individuals should be subject to the five-step test cited earlier (Pollard, 2002). Some language-deprived individuals hail from other countries and/or the language of their home is not English. In such cases, information regarding their proficiency in the non-English language(s) to which they

may have been exposed should be provided whenever possible. Information from records or from family members may be helpful in this regard.

Finally, a deaf individual's ability to speak should not be overlooked. In my experience, some evaluators—in particular those in the deaf field—dismiss speech ability as either irrelevant to a primary sign language user or "politically incorrect" to address in an evaluation. I disagree; *any* means that a deaf individual can use to communicate, especially a person with language deprivation, should be assessed and documented. Accordingly, I always ask evaluation subjects to offer me a sample of their speech, if they are not already in the habit of vocalizing when signing. If they can do so in English, I can assess the intelligibility of their voice myself. Deaf or hard-of-hearing evaluators can do the same via input from a hearing individual—preferably one who is familiar with "deaf voice" characteristics such as a sign language interpreter. If the examinee can only vocalize in another language, where possible, I will observe them speaking to a family member or someone proficient in that language and ask their opinion of the deaf person's speech intelligibility.

## Fingerspelling

Usually, my first approach to a language evaluation is to write the 26 letters of the English alphabet, out of order (to minimize the influence of "overlearning" based on alphabetical order), on a whiteboard or poster paper. I then ask the examinee to show me the fingerspelled equivalent of each letter, as I point to it, documenting whether their response is correct, incorrect, or partially correct (e.g., wrong palm orientation).[5] It is quite common for language-deprived deaf individuals to perform this task with less than 100% accuracy. If so, that is a more fundamental problem than limited ability to fingerspell <u>words</u> per se. Palm orientation may be erroneous (especially involving the letters "P" vs. "K" and "G" vs. "Q" which involve similar handshapes but different palm orientations) or other fingerspelled alphabet proficiency gaps may be noted. The consequences of deficits in fingerspelling ability are significant in terms of both expressive and receptive communication competency, including one's ability to learn English vocabulary relevant to legal settings, and therefore are crucial to document for attorneys, competency trainers, and the interpreters who work with them.

To evaluate signed number concepts, I write (on a whiteboard or poster paper) the numbers 1 through 10, in order, followed by three ellipses (…) as well as some numbers above 10, including some in the hundreds and thousands. I always include 20, 25, 30, 50, 100, 1,000, and 5,000 as well as variants of these numbers (e.g., 44, 360, 1,540, etc.). I do so because, in my experience, language-deprived individuals often present numbers above 10 as individual digits (e.g., 120 is signed as "1" then "2" then "0" rather than the ASL sign for 120). Regarding my use of the ellipses after the written number 10, I invite examinees to "keep going" (via gesture) to see how far they can go in their ability

to sign numbers. The inability to use the proper ASL signs for the numbers 1–10 (versus simply showing fingers) would be a significant language deprivation finding. Further deficits or oddities in expression or comprehension of numbers should be documented because they may have significance regarding the individual's legal situation and related communication.

## Sign Language

Since, by definition, language-deprived deaf individuals lack significant sign (and other) language abilities, evaluation and documentation of their sign skills is a difficult matter—in particular, in relation to how their communication abilities, or lack thereof, are best explained to legal authorities, who may have limited or no knowledge regarding sign language and its complex linguistic features. As noted before, my evaluation of an individual's sign skills is primarily derived from my direct experience in communicating with them, not through the use of formal evaluation tools. However, I do recommend review of the two communication assessment chapters in this volume and consideration of the recommendations contained therein.

My reports describe the individual's sign communication abilities in *functional* rather than in formal, academic, linguistic terms. By "functional," I mean that my reports endeavor to describe, in terms understandable to persons unfamiliar with sign language, what the individual communication strengths and weaknesses are, especially in regard to his or her legal situation or circumstances. Can they competently articulate the "story" leading to their legal involvement? In what way(s) is their narrative lacking in linguistic clarity (e.g., use of "home signs" or other idiosyncratic vocabulary, gestures, poverty regarding time references, cause-effect logic/clarity, actor-referent clarity, or other key linguistic problems commonly noted among language-deprived persons)? To what degree might deficits in fund of information or other nonlinguistic features of their communication abilities (e.g., superstitions, thought disorder) be affecting their sign communication? While too numerous and complex to elucidate here, *anticipating* and then responding to questions such as these is essential for producing a comprehensive and effective evaluation report.

I sometimes use the California Picture Vocabulary Test (Layton & Holmes, 1985) as a rough gauge of receptive sign vocabulary, even though it was normed on deaf children and includes English-based signs on some items and iconic signs on others that detract somewhat from its usefulness. Nevertheless, it has value in eliciting receptive sign vocabulary data if one is cautious in how such data are reported.

## English

The Rhode Island Test of Language Structure (RITLS; Engen & Engen, 1983) is a great tool for evaluating deaf persons' English *syntax* knowledge because it keeps the sign vocabulary of the items quite simple while varying the syntactic difficulty of the 100 sentences presented. The sentences are presented in Manually Coded English and may be too difficult for more severely language-deprived subjects (plus it takes a long time to administer). The test's norms provide interesting opportunities to compare a subject's overall performance, not only to other deaf individuals (up to age 18), but also to norms regarding the types of English syntax that tend to be easier versus harder for deaf individuals to comprehend. I have evaluated two deaf subjects in forensic situations who could not comprehend *any* of the five RITLS sentences that include a negation concept (e.g., "not" or "can't"), which had crucial implications for these individuals' ability to comprehend legal questions. That is, they only could respond to questions presented in the affirmative; they could not comprehend or accurately respond to questions or assertions that involved a negation ("not") concept.

Regarding reading comprehension, I tend to use the Peabody Individual Achievement Test – Revised (PIAT-R) reading comprehension subtest as a start (Markwardt, 1989). It first presents a written English sentence and the examinee then must choose from among four response pictures the one that best matches the meaning of the sentence. In my experience, few severely language-deprived persons correctly respond to the test's practice items, much less the first few (easiest) actual test items. Still, it's a useful tool to document reading ability or lack thereof. Norms provide ("hearing") grade equivalent scores, which I find more comprehensible and relevant to persons in the legal system than standard scores or percentiles.

It is extremely common for deaf individuals' response patterns on this reading comprehension subtest to include "early" errors—below the average grade-equivalent level they eventually earn on the test, while also *successfully* responding to some items that are beyond their average grade-equivalent score. This happens when people do not acquire English vocabulary, grammar, and syntax knowledge in a smooth, grade-level progression—a common situation for deaf persons or anyone for whom English was not acquired as a primary language. For such persons, English language learning is a more erratic process, influenced greatly by their unique life experience exposure to various words and sentence types.

I also like the reading subtest of the Kaufman Functional Academic Skills Test (Kaufman & Kaufman, 1994), which presents "real life" reading tasks involving common public signs/placards, newspaper ads, product labels, recipes, etc. This measure, as well, often is too difficult for severely language-deprived persons, especially because they must comprehend questions posed by the examiner while viewing the reading stimuli. When feasible, the "real life" value of the data obtained can be influential in legal settings.

Regarding English vocabulary, the Peabody Picture Vocabulary Test (PPVT; Dunn & Dunn, 2007) and the Expressive One-Word Picture Vocabulary Test (EOWPVT; Martin & Brownell, 2010) are two that I have employed, but doing so requires considerable deviation from the normal administration

procedures.[6] The PPVT is intended for administration to hearing persons, where the examiner pronounces the vocabulary word in question and the respondent selects from among four pictures the one they believe depicts that vocabulary term. When using this tool, I do so as a reading test—showing the deaf individual the stimulus word on a typewritten sheet I've made before asking them to select the pictorial answer. Of course, I cannot use the test's norms to gauge the subject's performance, but it often is quite useful to be able to document words that the subject was or was not able to associate with the response picture, especially when erroneous answers (e.g., "close" ones) shed further light on their attempts at word recognition. This same type of error analysis is valuable when administering the PIAT-R reading comprehension subtest described earlier.

Regarding expressive, written English proficiency, again, there are many standardized measures available, but none, to my knowledge, are useful with language-deprived deaf individuals. I use a tool known as the "Cookie Theft Picture," a task from the Boston Diagnostic Aphasia Examination (Goodglass, Kaplan, & Barresi, 2000), to elicit a sample of the individual's written English. It depicts a "busy" kitchen scene where a mother is overlooking an overflowing sink, a boy is almost falling off a stool while stealing cookies from a jar high on a shelf, a girl is reaching up to him, and other things. The examinee is simply asked to write down what they observe in the picture, hopefully a few sentences. While many language-deprived persons respond with just a few words or limited sentence attempts, I find the ability to quote their verbatim responses to this picture quite powerful in my evaluation reports.

### Evaluating Competency Knowledge

Exploring the competency topics listed in Table 4.1 certainly is a challenge with language-deprived individuals, since the primary means of obtaining the relevant data must emerge through conversation. Previously, I have described the multimodal approach to communication that I recommend for competency evaluations. The use of multiple, flexible communication methods is particularly important in gathering competency knowledge data because one cannot use psychological tests to obtain such information. However, a set of visual communication tools developed for me by deaf art therapist Brain Berlinksi has proven invaluable—the seven illustrations depicted in Figure 4.1. In our recent publication (Pollard & Berlinski, 2017) we address how these illustrations can be used to elicit competency knowledge data, especially from individuals with limited language fluency.

One will note that the artwork is "minimalist" in style, avoiding obvious depictions of race and gender so that subjects might more readily "see themselves" or others involved in their legal situation in the images. Other aspects of the artwork, referred to as "key props," are both creative and effective, such as the flag behind the judge in the first image, the finger poised on the juror's



*Figure 4.1* Brian Berlinski's competency topic illustrations
Source: ©2017 Journal of Social Work in Disability and Rehabilitation. Used with permission.

chin in the fifth image, conveying that that he or she is deep in thought, and the sixth image where jurors are depicted in a variety of calm and argumentative poses during deliberation.

Though highly effective in stimulating competency-related conversation, the utility of these images is limited to eliciting information regarding competency topics 2–5 from Table 4.1. They cannot be used to elicit conversation about topics 1 and 6–9, although other illustrations Mr. Berlinski has made for *specific cases* I was engaged in have proven just as useful in addressing these other matters (see Pollard & Berlinski, 2017 for an example). Still, the ability to evaluate an individual's knowledge regarding competency topics 2–5 is significant, especially when language deprivation makes conversation in the absence of visual stimuli challenging.

### Competency Training

Oswaldo Martinez, mentioned at the beginning of this chapter, like some other language-deprived deaf defendants I've evaluated, underwent years of sign language training in efforts to "restore" him to competency (a term

are judged intractably incompetent yet still potentially dangerous (but not to a degree that reaches the threshold necessary for involuntary commitment to a psychiatric facility) is a thorny dilemma that plagues not only judges and attorneys but professionals in the deaf services fields who often end up with responsibilities regarding the treatment or oversight of such persons. To quote character Will McAvoy from the American television series *The Newsroom*, "The first step in solving a problem is recognizing there is one" and, to engage an African proverb in this context, "it takes a village," or *will* take a village, of multidisciplinary efforts to address this thorny problem. More on such collaborative recommendations appears as follows.

A fourth reason that effective competency evaluation and training recommendations are less available than desired is due to the dearth of experts able and willing to perform the types of competency evaluations described herein. While psychologists have been interested in deaf people since the late 1800s (Pollard, 1993), the modern era of psychological investigation and service provision by sign-fluent professionals (including those who are themselves deaf) who are truly qualified in this discipline is still young (Pollard, 1996). While the number of such individuals is growing, especially the number of deaf professionals, many hesitate to engage in forensic work for a variety of reasons.

> Some find the prospect intimidating because they lack experience in this area, are apprehensive regarding the prospect of cross-examination, or prefer to avoid the stress that can be associated with an expert's role in litigation generally, especially in high-stakes legal cases.
> (Pollard & Berlinski, 2017, p. 2)

It is hoped that this chapter will inspire qualified psychologists and other professionals in the deaf field to become more involved in forensic work—the need is desperate.

More specifically, we call for the development of specialized training programs and other initiatives that will increase the number, competency, and confidence of otherwise-prepared (e.g., sign-fluent, deaf-savvy) persons to practice in forensic settings. Relevant strategies could include developing a network of experienced professionals who can provide mentored guidance via online consultation and supervision groups, establishing training and advocacy committees within prominent organizations (e.g., the National Association of the Deaf, the American Psychological Association, and the American Deafness and Rehabilitation Association), and including forensic practice topics in educational settings that already are preparing the next generation of deaf mental health professionals.

What should attorneys, judges, and other personnel within the legal system take away as the major learning points from this chapter? First, bear in mind that this chapter (and indeed this entire volume) focuses on a small though

not insignificant subset of the deaf population. Most deaf individuals either already are competent to stand trail or can become competent via instruction in some key, legally relevant fund of information issues. That being said, as noted before, deaf individuals with language deprivation are very much over-represented in the criminal justice and mental health systems and, accordingly, can be *expected* to be encountered therein.

Toward this end, the legal system needs to work closely with deaf-savvy experts in the fields of law (there are a growing number of deaf lawyers), law enforcement, corrections, psychology, and interpreting to expand and improve knowledge and resources that can be brought to bear in preserving language-deprived deaf persons' (and all deaf persons') legal rights and access to effective competency training in the pursuit of justice.

### Appendix A: Three Useful Analogies[7]

### The Alien Planet Analogy

You are born on another planet where communication is by voice, but almost entirely within a frequency range that is outside the normal range of human hearing—let's say at the high frequency range a dog can hear but humans cannot. People attempt to communicate with you in this way, but you can only hear an occasional glimpse of a sound that happens to fall in your human range of hearing. Remember, you are an infant. You are given no special treatment or apparatus to allow you to perceive 95% of these high-frequency speech sounds that people use around you. But your brain is otherwise healthy. You can see; you can observe; you can even reason to a degree limited only by your lack of exposure to language and education (and your innate intelligence). You can feel emotion and desires. You can try to convey things to others through your behavior—such as acting out or miming—and they can do the same with you. But you receive no education, other than a life of watching things happen around you and interacting with people and your environment without communication and without formal education. Despite your constraining circumstances, you learn to cook, sew, play simple games, even engage in a vocation such as gardening or carpentry simply by "figuring them out" visually, especially if you benefit from the assistance of a patient (though noncommunicating, other than gesture) parent or mentor. Remember, in this analogy, you have no language ability and you do not "think in words"—you just see, do, and learn visually, with your otherwise healthy brain.

Now, further imagine that this planet has rules, laws, etc., that are completely unlike those of Earth. (Not that you'd know anything about Earth laws either, having grown up in this isolated way on this planet.) Perhaps this planet's moral/legal system is similar to some ancient, geographically-isolated indigenous island society that pre-existed Roman times here on Earth or it contains

elements of "extreme" Jewish, Islamic, or Christian rules of behavior that would be wholly unfamiliar to you, having grown up in communicative isolation and without formal education. Now, imagine that you somehow happen to run afoul of this planet's laws. You did something that has caused you to be incarcerated. Recognizing your communication limitations, the authorities have determined that you must be evaluated for competency to stand trial. Let's say the criteria for competency are the same on this planet as are those in the US.

By now, you've figured out that you are in some kind of trouble or at least that you have been forcefully moved and confined to this place where all sorts of rules are restricting your former freedom. You may or may not know what specific thing you did that got you placed here. Even if you did understand that, let's consider the steps necessary to bring you to a state of legal competency in this society. You cannot communicate (and thus cooperate) with your "attorney"—if you even had any idea what an attorney *was* in this society, whose laws, we already noted, are completely unfamiliar to you. It is crucially important to recognize that there would be no way that the concept of an "attorney" would even exist in your mind. Your prior life experience wouldn't have exposed you to such a person or concept, at least not in any way you could understand, even if your uncle who you saw occasionally (and couldn't communicate with) was an attorney. You also don't know other fundamental aspects of competency knowledge—the meaning and role of judges and juries, the adversarial (or other) nature of this planet's legal system, charges (versus a specific behavior you are accused of doing, which are very different things), sentences, plea bargaining, etc. Remember, you don't have prior knowledge of these legal constructs; maybe this society uses these legal constructs, maybe not. Maybe it uses legal constructs that are completely different from these—you don't know.

Recognizing this challenge, someone in that legal system who is familiar with your "condition" recognizes that the high-frequency speech sounds people use on this planet will not be effective for communicating with you. Fortunately, there exists other people on this planet who are like you (although you don't know many), as well as some persons who not only use the high-frequency language, they also have skill in making low-frequency speech sounds in the range you are capable of hearing. A person is found who not only knows how to use this low-frequency language but also is qualified to conduct competency evaluations in this society.

So, your special evaluator arrives to interview you. You are skilled in "acting things out," as is he—having worked with persons like you before. His attempts at using the low-frequency language with you reveal that you are not at all skilled in understanding or producing that language, even though you can "hear" it. This low-frequency language is not the same as "acting things out"—it truly is a language, to which your brain has not been sufficiently exposed. Just because you can hear these sounds does not mean you can understand or respond to them, just like visiting a foreign country on Earth does not automatically make you fluent in that country's language, even though you can hear it "perfectly."

Suppose I am this evaluator, charged with judging your competency to stand trial. Without a shared language system, leaving us only to use gesture, drawings, and perhaps a few words I can teach you, or words that you might have picked up from others like yourself, how far can we go in accomplishing my task? If I show you pictures of a judge or jury, how will I convey to you their role to the necessary level of comprehension? (You certainly can't convey these things to me; your experience has never brought you into contact with such topics.) How would I explain what an attorney is, much less a prosecutor versus a defense attorney? How would I explain that this thing you did (let's say you recognize what behavior got you into trouble) could be associated with a number of different legal "charges" (an abstract concept you'd have no comprehension of), much less discuss with you the advantages and disadvantages of pleas and plea bargains? All you can do is simply tell me, and retell me (via acting out and a few words), your version of this behavioral incident that got you into trouble. Maybe you admit to doing something the law considers wrong; maybe you don't. It doesn't matter. I cannot give you the language or the knowledge to discuss this matter with me at the level, or with the competency focus I need, to accomplish my mission.

So, let's imagine that the authorities now decide that you are presently incompetent to stand trial but since this low-frequency language exists, you should be taught to use this language and thus eventually be brought to competency. Even if I had thousands of hours with you, this task would be herculean. With your brain long-past the fertile period of language learning, I would endeavor to teach you a language with which you are almost completely unfamiliar (although physically capable of using). This would be 1:1 instruction—not immersion in a social environment where this language is used by many people, which would enhance your learning curve, over time. Sure, you could learn nouns and verbs in this way, through pictures, etc. But knowledge of "words" (especially words that are limited to things you can observe rather than abstract and other linguistic-function words such as prepositions and "wh" question words) does not imply that you can understand or produce *sentences* of any complexity. In addition to certain words that are essential for sentence formation, there is grammar, syntax, and other elements of language you would have to acquire in order to communicate at the most basic level. How am I to teach you to understand *and use* these other elements of language and, furthermore, give you the knowledge necessary to attain legal competency? It is a practical impossibility given your age and the lifetime of language and learning impoverishment that you have been subjected to.

### The Library Analogy

Imagine that the minimal criteria for legal competency is akin to a bookshelf with ten books on it. (These ten books contain the necessary information and "abilities," such as intelligence and language, to achieve competency.) Given the biological, language, and educational impoverishment that has stunted

his cognitive development, Mr. Defendant's mental bookshelf has *room* for only five books. Furthermore, his limited language, education, and life experience to date has only allowed two books to be placed on those shelves. Through *intensive* language and other educational interventions, we might be able to increase the size of his mental library from two books to its limit of five books. But virtually all of these books would be of a simplicity relegated to the children's section of his mental library. His lifelong language and learning impoverishment would not only preclude the inclusion of the vast majority of "adult" books (except perhaps a few on topics with which he's particularly, visually familiar, such as janitorial tasks), but at his age, his mental library is limited in "growth capacity" and cannot be expanded to house the requisite ten books needed to achieve legal competency.

### The Football Analogy

Let's compare the minimum cognitive, language, and knowledge capacities needed for competency to the goal line of a football field. The conclusions of my first evaluation report suggest that, at that time, the defendant was at about the 10-yard line (with 90 yards to go) on the path toward competency. Since then, he has been served at a forensic psychiatric facility, undergoing competency evaluation training in group and 1:1 sessions with sign language interpreters. He has made some additional progress, comparable to being on the 25-yard line (again, only in the areas of certain, *concrete* legal knowledge and related vocabulary). With more time at this facility, based on the education methods currently being used, I'd speculate that he might make it to the 35-yard line in the next year. If the instructional methods at this facility were substantially improved (in accordance with the recommendations in this chapter) I'd speculate he could make it to the 45-yard line in a years' time. However, there would be no chance—regardless of the excellence of instructional methods used—of advancing him to the goal line at the end of the field because his cognitive and language deficits constitute a finite limit on how far he can progress. Education alone cannot overcome those limitations and they cannot be repaired via psychiatric or medical treatment.

### Appendix B: Brian Berlinski's Competency Topic Illustrations Enlarged

We reproduce here, one figure per page, in the landscape mode in which they were drawn, the seven images from Figure 4.1. These figures can be copied and used by readers. We thank Robert Q. Pollard, Jr., Meghan L. Fox, and Brian Berlinski for making these drawings available, and we again acknowledge the permission granted by the Journal of Social Work in Disability and Rehabilitation (Figures 4.2–4.8).



*Figure 4.2* Judge



Figure 4.3 Defendant and attorney



Figure 4.4 Prosecution and defense

Figure 4.5 Witness

Figure 4.6 Jury deliberating

*Figure 4.7* Jury watching and listening

*Figure 4.8* Outcome

## Notes

1. I am a clinical psychologist and fluent in American Sign Language. I am not deaf. However, I have worked exclusively in the deaf field for over 30 years. The majority of my clinical practice is devoted to forensic cases, ranging from evaluations of competency and criminal responsibility to Americans with Disabilities Act litigation and other topics where my experience with deaf persons, deaf-related scholarship, and/or general training as a psychologist bear relevance.
2. The defense attorney, often a public defender, and the prosecuting, district attorney.
3. Including the key attorneys, the judge, potential witnesses, and the jury.
4. Plea, testimony, jury deliberation, the jury's decision, and judgement/sentencing. Also, that a plea of guilty precludes a trial.
5. One could also do the opposite—present the fingerspelled letter of the alphabet and ask the evaluation subject to point to the corresponding letter.
6. This does not mean that a given tool should not be employed in an evaluation if it is not perfectly designed for the person or situation at hand. I compare an assessment tool to a mechanical tool, like a wrench or hammer. One might use the tool in an unconventional way to try and achieve a certain result. As long as an evaluator explains how the tool may have been used in an unconventional manner, and how norms, etc., might not apply, there still can be value in the data obtained, provided it is reported honestly and interpreted carefully.
7. These three analogies were written about specific deaf individuals I (Pollard) evaluated; they are not intended to be representative of any subgroup of deaf individuals. That being said, these three individuals had several characteristics in common: they immigrated to the US as adults from countries where there was little or no deaf education, their families did not sign, and they had cognitive impairments beyond language deprivation alone.

## References

Altshuler, K. Z., & Rainer, J. D. (1963). Distribution and diagnosis of patients in New York State mental hospitals. In J. D. Rainer, K. Z. Altshuler, F. J. Kallman, et al. (Eds.), *Family and mental health problems in a deaf population* (pp. 195–203). New York, NY: Columbia University Press.

Andreasen, N. C. (1980). *Scale for the assessment of thought, language, and communication (TLC)* (Unpublished manuscript). University of Iowa, Department of Psychiatry.

Basilier, T. (1964). Surdophrenia. *Acta Psychiatrica Scandinavica, 39*, 363–372. doi:10.1111/j.1600-0447.1964.tb04948.x

Beeman v. Livingston, 468 S.W.3d 534 (Tex. 2015).

Bramley, S. (2007). Working with deaf people who have committed sexual offences against children: The need for an increased awareness. *Journal of Sexual Aggression, 13*(1), 59–69. doi:10.1080/13552600701365530

Brauer, B. A., Braden, J. P., Pollard, R. Q., & Hardy-Braz, S. T. (1998). Deaf and hard-of-hearing people. In J. H. Sandoval, C. L. Frisby, K. F. Geisinger, J. Ramos-Grenier, & J. Dowd-Scheuneman (Eds.), *Test interpretation and diversity: Achieving equity in assessment* (pp. 297–315). Washington, DC: American Psychological Association.

Brunson, J. L. (2007). Your case will now be heard: Sign language interpreters as problematic accommodations in legal interactions. *Journal of Deaf Studies and Deaf Education, 13*(1), 77–91. doi:10.1093/deafed/enm032

Davidson, F., Kovacevic, V., Cave, M., Hart, K., & Dark, F. (2015). Assessing fitness for trial of deaf defendants. *Psychiatry, Psychology and Law, 22*(1), 145–156. doi:10.1080/13218719.2014.919690

Dean, R. K., & Pollard, R. Q. (2005). Consumers and service effectiveness in interpreting work: A practice profession perspective. In M. Marschark, R. Peterson, & E. Winston (Eds.), *Interpreting and interpreter education: Directions for research and practice* (pp. 259–282). New York, NY: Oxford University Press.

Dean, R. K., & Pollard, R. Q. (2013). *The demand control schema: Interpreting as a practice profession*. North Charleston, SC: CreateSpace Independent Publishing Platform.

Dugan, P. (2017, March 13). Deaf, mute and accused of murder, an undocumented immigrant has been in legal limbo for 12 years. *The Washington Post*. Retrieved March 15, 2017 from www.washingtonpost.com/local/social-issues/deaf-mute-and-accused-of-murder-an-undocumented-immigrant-has-been-in-legal-limbo-for-12-years/2017/03/13/6f53c29c-fe8d-11e6-99b4-9e613afeb09f_story.html?hpid=hp_rhp-top-table-main_deaf-830pm%3A Ahomepage%2Fstory&utm_term=.60c0ad67df2d

Dunn, L. M., & Dunn, D. M. (2007). *Peabody picture vocabulary test manual* (4th ed). Bloomington, MN: Pearson.

Dusky v. United States, 362 U.S. 402 (1960).

Elliott, H., Glass, L., & Evans, J. W. (Eds.). (1987). *Mental health assessment of deaf clients*. Boston, MA: Little, Brown.

Engen, E., & Engen, T. (1983). *Rhode island test of language structure*. Baltimore, MD: University Park Press.

Florida State Hospital (2011, August revision). *CompKit: Competency to stand trial training resources. A comprehensive approach to competency restoration for criminal defendants*. Available from Florida State Hospital, P.O. Box 1000, Chattahoochee, FL 32324.

Glickman, N. (2009). *Cognitive-behavioral therapy for deaf and hearing persons with language and learning challenges*. New York, NY: Routledge.

Goodglass, H., Kaplan, E., & Barresi, B. (2000). *The Boston diagnostic aphasia examination manual* (3rd ed). Bloomington, MN: Pearson.

Grinker, R. R. (1969), *Psychiatric diagnosis, therapy and research on the psychotic deaf*. Washington DC: Social Rehabilitation Service, Department of Health, Education and Welfare.

Hall, W. C., Levin, L. L., & Anderson, M. L. (2017). Language deprivation syndrome: A possible neurodevelopmental disorder with sociocultural origins. *Social Psychiatry and Psychiatric Epidemiology*. doi:10.1007/s00127-017-1351-7

Harry, B. (1986). Interview, diagnostic, and legal aspects in the forensic psychiatric assessments of deaf persons. *The Bulletin of the American Academy of Psychiatry and the Law, 14*(2), 147–162.

Holmes v. State, 494 So.2d 230 (Fl. Ct. App. 1986).

Illinois v. Lang, 391 N.E.2d 350 (Ill. 2d. 1979).

Jackson v. Indiana, 406 U.S. 715 (1972).

Kaufman, A. S., & Kaufman, N. L. (1994). *Kaufman functional academic skills test manual*. Circle Pines, MN: American Guidance Service, Inc.

LaVigne, M., & Vernon, M. (2003). An interpreter isn't enough: Deafness, language, and due process. *Wisconsin Law Review, 5*, 844–936.

Layton, T. L., & Holmes, D. W. (1985). *Carolina picture vocabulary test (for deaf and hearing impaired) manual*. Austin, TX: Pro-Ed.

Markwardt, F. C. (1998). *Peabody individual achievement test – Revised manual*. Minneapolis, MN: Pearson, Inc.

Martin, N. A., & Brownell, R. (2010). *Expressive one-word picture vocabulary test manual* (4th ed.). Austin, TX: PRO-ED, Inc.

McAlister, J. (1994). Deaf and hard of hearing criminal defendants: How you gonna get justice if you can't talk to the judge? *Arizona State Law Journal, 26*, 162–200.

Meyers, J. E., & Meyers, K. R. (1995a). *Rey complex figure test and recognition trial*. Lutz, FL: PAR.

Meyers, J. E., & Meyers, K. R. (1995b). Rey complex figure test under four different administration procedures. *The Clinical Neuropsychologist, 9*(1), 63–67.

Miller, K. R. (2001). Forensic issues of deaf offenders (Doctoral dissertation). Lamar University, Beaumont, TX.

Miller, K. R. (2004). Linguistic diversity in a deaf prison population: Implications for due process. *Journal of Deaf Studies and Deaf Education, 9*(1), 112–119. doi:10.1093/deafed/enh007

Miller, K. R., & Vernon, M. (2001). Linguistic diversity in deaf defendants and due process rights. *Journal of Deaf Studies and Deaf Education, 6*(3), 226–234. doi:10.1093/deafed/6.3.226

Miller, K. R., & Vernon, M. (2002). Assessing linguistic diversity in deaf criminal suspects. *Sign Language Studies, 2*(4), 380–390. doi:10.1353/sls.2002.0021

Miller, K. R., Vernon, M., & Capella, M. E. (2005). Violent offenders in a deaf prison population. *Journal of Deaf Studies and Deaf Education, 10*(4), 417–425. doi:10.1093/deafed/eni039

O'Rourke, S., & Grewer, G. (2005). Assessment of deaf people in forensic mental health settings: A risky business! *Journal of Forensic Psychiatry & Psychology, 16*(4), 671–684. doi:10.1080/14789940500279877

Pollard, R. Q. (1993). 100 years in psychology and deafness: A centennial retrospective. *Journal of the American Deafness and Rehabilitation Association, 26*(3), 32–46.

Pollard, R. Q. (1996). Professional psychology and deaf people: The emergence of a discipline. *American Psychologist, 51*(4), 389–396.

Pollard, R. Q. (1998a). *Mental health interpreting: A mentored curriculum.* Rochester, NY: University of Rochester.

Pollard, R. Q. (1998b). Psychopathology. In M. Marschark & D. Clark (Eds.), *Psychological perspectives on deafness* (Vol. 2, pp. 171–197). Mahwah, NJ: Lawrence Erlbaum, Inc.

Pollard, R. Q. (2002). Ethical conduct in research involving deaf people. In V. A. Gutman (Ed.), *Ethics in mental health and deafness* (pp. 162–178). Washington, DC: Gallaudet University Press.

Pollard, R. Q., Jr. (2014, October 2). What if your client is deaf? *Atrium Experts Monthly Newsletter, 9*(4). Available at www.atriumexperts.com/blogs/view/case-consulting-what-if-your-client-is-deaf

Pollard, R. Q., Jr., & Berlinski, B. (2017). Forensic evaluation of deaf individuals: Challenges and strategies. *Journal of Social Work in Disability and Rehabilitation, 16*(3), 261–275.

Pollard, R. Q., DeMatteo, A., Lentz, E., & Rediess, S. (2007). A prose recall test using stories in American Sign Language. *Rehabilitation Psychology, (52)*1, 11–24. doi: 10.1037/0090-5550.52.1.11

Pollard, R. Q., Rediess, S., & DeMatteo, A. (2005). Development and validation of the Signed Paired Associates Test. *Rehabilitation Psychology, 50*(3), 258–265. doi:10.1037/0090-5550.50.3.258

Rainer, J. D., Altshuler, K. Z., & Kallmann, F. J. (Eds.). (1963). *Family and mental health problems in the deaf population.* New York, NY: Department of Medical Genetics, New York Psychiatric Institute, Columbia University.

Raven, J. C., Raven J., & Court, J. H. (2000). *Raven manual.* Oxford, UK: Oxford Psychologists Press.

Shook v. Mississippi. No. 2:93CV118-D-B, 2000 WL 877008 (N.D. Miss. June 8, 2000).

State v. Haskins, 407 N.W.2d 309 (Wis. Ct. App. 1987).

State v. Smith, 471 So. 2d 954 (La. Ct. App. 1985).

Stone, M. H., & Wright, B. D. (1980). *Knox's Cube Test.* Wood Dale, IL: Stoelting Company.

Tuck, B. M. (2010). Preserving facts, form, and function when a deaf witness with minimal language skills testifies in court. *University of Pennsylvania Law Review, 158*, 905–955.

Vernon, M. (1996). Deaf people and the criminal justice system. *Deaf American Monograph, 46*, 149–153.

Vernon, M., & Miller, K. (2001). Linguistic incompetence to stand trial: A unique condition in some deaf defendants. *Journal of Interpretation, Millennial Edition*, 99–120.

Vernon, M., Raifman, L. J., & Greenberg, S. F. (1996). The Miranda warnings and the deaf suspect. *Behavioral Sciences and the Law, 14*, 121–135. doi:10.1002/(SICI)1099-0798(199624)14:1<3.0.CO;2-R

Vernon, M., Steinberg, A. G., & Montoya, L. A. (1999). Deaf murderers: Clinical and forensic issues. *Behavioral Sciences & the Law, 17*(4), 495–516. doi:10.1002/(SICI)1099-0798(199910/12)17:43.0.CO;2-6

Wilson v. North Carolina. 1996 US Dist LEXIS 16221 (1996).

Wisconsin v. Hindsley. 99-1374-CR; 2000 Wisc. App. LEXIS 437 (2000).

Young, A., Howarth, P., Ridgeway, S., & Monteiro, B. (2001). Forensic referrals to the three specialist psychiatric units for deaf people in the UK. *Journal of Forensic Psychiatry, 12*(1), 19–35. doi:10.1080/09585180122591

Zieziula, F. R. (Ed.). (1982). *Assessment of hearing-impaired people: A guide for selecting psychological, educational, and vocational tests.* Washington, DC: Gallaudet College Press.