IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-CR-00013-RM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

**ANDRES CUETARA**,

        Defendant.

---

**DEFENDANT'S BRIEF RE: MENTAL DISEASE OR DEFECT**

---

Andres Cuetara, through his attorney, Assistant Federal Public Defender Laura H. Suelau, submits that there is reasonable cause to believe that Mr. Cuetara suffers from a "mental disease or defect" as those terms are defined in 18 U.S.C. § 4241. He submits the following brief pursuant to this court's Order. Doc. 67 ("both sides shall file a brief with the Court stating whether the matter under discussion is a mental disease or defect.").

### I. Mr. Cuetara's background and conditions.[1]

In order to answer the court's query, it is useful to define "the matter under discussion." That being Mr. Cuetara's conditions that triggered counsel's Motion for Evaluation of Competency. Doc. 63. Mr. Cuetara suffers from "bilateral, severe-profound sensorineural hearing loss."[2] He has been deaf since birth – a condition his family discovered when he was non-responsive to music playing in

---

[1] The information contained herein is based on counsel's observations of Mr. Cuetara, interviews with his friends and family, and evaluations performed by experts at Gallaudet University. *See* Doc. 63. Those experts did not evaluate Mr. Cuetara for legal competency.

[2] This court is familiar with Mr. Cuetara's disabilities and attendant limitations; therefore, counsel will endeavor to avoid repetition and instead provide this court with additional relevant information and focus on the collateral impacts of those disabilities that form the basis of his suspected mental defect.

the home. He does not use hearing aids, cannot lip read, and (as discussed *infra*) has limited access to language of any kind. He is also non-verbal. Although many deaf individuals are non-verbal to some degree, Mr. Cuetara is unable to form any words or audible expression. Additionally, unlike many deaf individuals who are taught or learn the importance of facial and bodily expression and affect to aid in communication, Mr. Cuetara has a limited expressive affect when either expressing or receiving communication.[3]

Deafness, even in the absence of language deprivation, is not a "purely audiological" condition. *Heyer v. United States Bureau of Prisons,* 984 F.3d 347 (4th Cir. 2021).[4] Deafness is the "inability to hear *and* understand speech." *Id.* (emphasis added). Those born deaf, like Mr. Cuetara, "face unique barriers" to learning language. *Id.* For Mr. Cuetara, those barriers were compounded by his upbringing. Mr. Cuetara was born in Mexico where deafness and deaf issues, even as recently as 2015, are "vastly understudied."[5] Likely because of this mis- or deficient-understanding, deaf individuals in Mexico face enormous discrimination. *Id.* In the 1970s and 1980s, deafness was not viewed as merely a physical disability, but as a sign of evil or moral failing. Mr. Cuetara's mother, Carmen Martinez Montero, describes her mother-in-law asking about her sins, in an attempt to determine which sin made Mr.

---

[3] *See,* Canadian Broadcasting Company, *Seen and Heard: It's called sign language, but facial expressions are super important too,* https://www.cbc.ca/arts/it-s-called-sign-language-but-facial-expressions-are-super-important-too-1.4952771 (videos explaining and demonstrating importance of expression and differentiating between English and ASL) (last accessed June 30, 2022).

[4] In *Heyer*, Dr. Thomas Cokely, a sociolinguist expert, provided expert testimony and related reports on behalf of a deaf individual. Dr. Cokely opined on deafness, its effects on literacy, and its consequences for incarcerated and confined persons. *Id.*

[5] Pfister, A., *Myths and Miracles in Mexico City: Treatment Seeking, Language Socialization, and Identity among Deaf Youth and their Families,* Graduate Theses and Dissertations, Univ. S. Florida https://digitalcommons.usf.edu/cgi/viewcontent.cgi?article=6749&context=etd (2015) (last accessed June 31, 2022). It should be noted that Ms. Pfister's research focused on deaf education and experiences in the 1990s and 2000s. Mr. Cuetara attended school in the 1970s and 1980s; however, it's unlikely that the experience of deaf children and families was *better* in the decades before her research.

Cuetara deaf.

By extension, resources for deaf individuals and their families are extremely limited. When Mr. Cuetara was a child, deaf education in Mexico followed a "mainstreaming model" or "inclusion policy" premised on the belief that the best way to combat discriminatory attitudes towards the deaf and educate deaf children was to include them in regular schools without any deaf-specific pedagogy. *Id.* at 68-9. Inclusion policies do not work: "when deaf students are included in hearing classrooms, they face daily instruction in a spoken language they cannot fully access, which 'emphasizes precisely the limitation of deafness: the inability to hear.'" *Id.* at 76. Therefore, "instead of working to mitigate the marginalization of deaf children, national education policies in Mexico manage to further marginalize deaf students," and "their language needs go systematically unmet." *Id.* at 76.

Not only did Mr. Cuetara's language and educational needs go unmet, he was bullied relentlessly. Nor was he bullied only by his peers. Mrs. Martinez Montero recalls children repeatedly pushing Mr. Cuetara into a pool when he was in kindergarten at the encouragement of their parents. Parents of students in his classes often deemed him "crazy," would tell their children as much, and would lobby to have him removed from their children's classroom. Therefore, whatever time Mr. Cuetara spent in a classroom was rendered even more unproductive.

Misconceptions about and discrimination towards deafness also infected Mr. Cuetara's experiences outside of school. Although Mr. Cuetara's parents cared for him, their belief in mainstreaming and other "integration" theories contributed to his language deprivation. For example, neither of his parents ever learned sign language. To this day, when asked about her ability to communicate with her son, Ms. Martinez Montero estimates it at a four, with ten being "perfect communication." She reports using Google Translate to send her son text messages in English. Her primary language is Spanish and her own English is limited. Their conversations are limited to basic

3

and familiar concepts.

The specialist who worked with Mr. Cuetara as a child further contributed to his language deprivation. The "specialist" did not use sign and did not teach Mr. Cuetara sign. Instead, like many deaf children in Mexico, Mr. Cuetara received speech and language therapy. This type of therapy was widely recommended by medical professionals for deaf children. Parents were told that if a child were taught to sign, they would never speak. *Id.* at 202. Mr. Cuetara's first exposure to Mexican Sign Language (LSM) was in his adolescent or teenage years via a church pamphlet. He never received formal training or instruction in LSM. As a result, Mr. Cuetara had little to no access to any language for the first two decades of his life. He received his first formal lesson in ASL after moving to the United States in his twenties.

Because of this history, experts who have evaluated and interacted with Mr. Cuetara opine that he suffers from language deprivation. The term "language deprivation" is general and is "a term used to describe a child's lack of language during their critical learning period." Language deprivation among the deaf population is not uncommon and is often accompanied by cognitive and psychosocial difficulties. Doc. 63-2.[6] Language deprivation, naturally, has varying degrees and the experience of language deprivation is distinguished from Language Deprivation Syndrome (LDS). *Id.* LDS is, in simple terms, the most severe manifestation of language deprivation. Dr. Lawrence Pick opined that Mr. Cuetara suffers from LDS.

One result of Mr. Cuetara's deprivation is that his vocabulary, receptive language (input), expressive language (output), and literacy are not just limited, but "disordered." Mr. Cuetara is not fluent, either receptively or expressively, in any language at all. His knowledge of English and ASL is

---

[6] Fox, M., Pollard, R., *Forensic Evaluation of Deaf Adults with Language Deprivation,* Language Deprivation and Deaf Mental Health (Routledge, 2018).

4

estimated in the 2nd percentile as compared to other deaf individuals. Doc. 63. He reports almost no knowledge of Spanish and LSM.

Mr. Cuetara's nonverbal intellectual functioning is also "below-average" with an estimated IQ of 80, in the 9th percentile. Another relevant consideration is Mr. Cuetara's ability to learn. He tested "very low"– in the 4th percentile compared to other deaf adults. Mr. Cuetara's memory is also somewhat limited. Therefore, the limited information he might be able to learn, is often not retained.

Mr. Cuetara's functioning, intelligence, and memory are consistent with his language deprivation. Language deprivation "has implications not only for delayed language development/language dysfluency, but also deficits in fund of general knowledge, and possible delays or deficits in cognition, mood and/or behavior that may include weaker social and emotional skills." "Although this conceptualization of deaf youth and adults with limited to no accessible language during their childhood is still being formulated, it clearly describes a subset of deaf youth/adults in the United States, as well as individuals from other countries with similar experiences." Doc. 63. Like many deaf individuals with language deprivation, Mr. Cuetara also suffers from "fund of information" deficits. Doc. 63-1.

Dr. Robert Pollard offers a useful analogy for describing the "fund of information" issue in individuals, like Mr. Cuetara, who suffer from language deprivation in the context of legal competency:

> Imagine that the minimal criteria for a legal competency is akin to a bookshelf with ten books on it. (These ten books contain the necessary information and "abilities," such as intelligence and language, to achieve competency). Given the biological, language, and educational impoverishment that has stunted his cognitive development, Mr. Defendant's mental bookshelf has *room* for only five books. Furthermore, his limited language, education, and life experience to date has only allowed two books to be placed on those shelves. Through *intensive* language and other educational interventions, we might be able to increase the size of his mental library from two books to its limit of five books. But virtually all of these books would be of simplicity relegated to the children's section of his mental library. His lifelong language and learning impoverishment would not only preclude the inclusion of the vast majority of "adult" books (except perhaps a few topics on which he is visually familiar such as

5

janitorial tasks), but at his age, his mental library is limited in growth capacity and cannot be expanded to have the requisite 10 books needed to achieve legal competency.

Doc. 63-2.

## II. Mr. Cuetara's physical and mental disabilities provide reasonable cause to believe he is presently suffering from a mental disease or defect as defined in 18 U.S.C. § 4241.

Based on the foregoing and counsel's own difficulties communicating with Mr. Cuetara, counsel moved this court to determine his "mental competency to stand trial" and further requested this court order a psychiatric evaluation pursuant to 18 U.S.C. § 4241(a) and (b) in order to make that determination. Doc. 63. Section 4241(a) provides that, after a prosecution commences, and before sentencing, "the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant." 18 U.S.C. § 4241(a). The motion to determine competency "*shall*" be granted "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." *Id.* (emphasis added). The latter two phrases define, not modify, "mental disease or defect." If an individual is "unable to understand the nature and consequences of the proceedings against him" *or* unable "to assist properly in his defense," they are, by legal definition, suffering from a mental disease or defect. The genesis of § 4241 and the Tenth's Circuit's interpretation of that statute tells us as much.

18 U.S.C. § 4241 is the statutory codification of the standard the Supreme Court first set out in *Dusky v. United States*, 362 U.S. 402, 402 (1960). *Dusky* defined the competency standard as including both "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of

6

the proceedings against him." *Id.*; *see also United States v. Cornejo-Sandoval*, 564 F.3d 1225, 1232 (10th Cir. 2009) (describing two prongs of the *Dusky* test). This constitutional standard has since been applied to both state and federal prosecutions. *See Lafferty v. Cook*, 949 F.2d 1546, 1550 (10th Cir. 1991) ("[T]he legal standard by which competency is to be evaluated is constitutionally mandated. Accordingly, the components of that standard, required as they are by the Constitution, do not vary according to the views of a particular court.") (internal citations and quotations omitted). In *United States v. Sanchez-Gonzalez,* the Tenth Circuit endorsed the District Court framing "the entire question of competency" as one in which "the whole issue is whether or not you can assist your attorney in preparing for trial." 109 F. App'x 287, 290 (10th Cir. 2004). The focus of a competency inquiry should therefore not focus on the terms "mental disease or defect," but on the two requirements of *Dusky*.

Although a physical disability, like deafness, does intuitively not constitute a mental defect *per se,* courts have recognized that a physical disability may render a defendant incompetent to stand trial. In *Jackson v. Indiana,* 406 U.S. 715 (1972), the Supreme Court addressed the constitutionality of certain aspects of Indiana's system for pretrial commitment for competency in a case involving a "mentally defective deaf mute with the mental level of a pre-school child." The competency statute at issue in Indiana was analogous to 18 U.S.C. § 4241(a) and provided that, if "the trial judge has 'reasonable ground' to believe the defendant 'to be insane,' he must appoint two examining physicians and schedule a competency hearing." *Id.* at 720. Like in § 4241, the ultimate question in Indiana was whether the defendant "has not comprehension sufficient to understand the proceedings and make his defense." *Id.* Although not the question presented in the case, the Supreme Court presumed that Mr. Jackson's conditions met the standard of "insanity" but applying the *Dusky*-based test. In other words, whether called "mental defect," or "insanity," the question of competency is rooted in the two-part test, not the definition of the umbrella term.

Many courts that have examined competency in the context of a physical disability have looked to the Supreme Court's dicta in *Drope v. Missouri,* 420 U.S. 162 (1975): "[t]here are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." In *Jones v. United States,* the Sixth Circuit affirmed that an individual can be "mentally incompetent due to a physical disability." 495 F.3d 274, 277 (6th Cir. 2007) (involving a defendant with "severe hearing loss"); *see also Stanley v. Lazaroff*, 82 F. App'x 407, 418 (6th Cir. 2003) (unpublished) (examining contradicting findings of incompetence and competence in a deaf and "mentally retarded" individual with communication deficits).

Numerous district courts have found that deafness, and other conditions associated with that physical disability, are sufficient to sustain a finding of "reasonable cause," and trigger an evaluation and hearing. *See United States v. McFall*, 2011 WL 465718, at *9 (W.D. Pa. Feb. 4, 2011) (finding defendant with severe hearing problems competent to stand trial, but recognizing that "[c]ourts may consider whether a physical disability renders a defendant mentally incompetent under § 4241 and Dusky"); *United States v. Jones*, 2008 WL 5204063, at *3 (E.D. Tenn. Dec. 11, 2008) (finding defendant with severe hearing problems incompetent to stand trial after remand from the Sixth Circuit); *see also United States v. Allen,* 2011 WL 4352793, at *21 (S.D. Fla. Aug. 26, 2011) ("While neither deafness nor the linguistic difficulties associated with deafness constitute a mental defect per se, courts have recognized that a physical disability may render a defendant incompetent to stand trial.").

Of particular relevance is that Mr. Cuetara's conditions are not purely physical. His intelligence and memory were and are impacted by his deafness. Deficits in intelligence and memory are more traditionally considered mental defects. *See United States v. Valenzuela-Puentes*, 479 F.3d 1220 (10th Cir. 2007). In *Valenzuela-Puentes*, Mr. Valenzuela-Puentes had a nonverbal IQ square of 73, just 7 points

8

less than Mr. Cuetara's. Mr. Valenzeula-Puentes had already been ruled incompetent to proceed, but was refusing medication. *Id.* The district court was considering whether to forcibly medicate Mr. Valenzeula-Puentes and applied the wrong standard. In remanding the case, the Tenth Circuit was skeptical that, even if Mr. Valenzeula-Puentes' delusions were cured by the forcible medication, he could be rendered competent to proceed given his "exceptionally low IQ." *Id.* at 1229. If a nonverbal IQ score of 73 is "exceptionally low" and sufficient for a finding that Mr. Valenzeula-Puentes was incompetent to proceed, Mr. Cuetara's nonverbal IQ score of 80 is low and is sufficient to meet the "reasonable cause" standard and warrant further examination and hearing on his competence.

### III. The court should order a competency evaluation at this time.

The Constitution prohibits the trial of a defendant who lacks mental competency. *Indiana v. Edwards*, 554 U.S. 164, 170 (2008). The Court may order a competency hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). Before holding a competency hearing, a "court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247(b) and (c)." 18 U.S.C. § 4241(b).

Here, there is "reasonable cause to believe" that Mr. Cuetara is presently "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). Based on that cause, this court should order that a psychiatric or psychological examination be conducted, and that evaluation be conducted out of custody by Dr. Robert Pollard as requested in Unopposed Motion for Evaluation of Competency. Doc. 63.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


s/Laura Suelau
LAURA SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Laura.suelau@fd.org
Attorney for Defendant

**CERTIFICATE OF SERVICE**

      I hereby certify that on July 6, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

    Alecia Riewerts, AUSA
    Email: alecia.riewerts@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

    Andres Cuetara (via Mail)


                                        s/Laura Suelau
                                        LAURA SUELAU
                                        Assistant Federal Public Defender
                                        633 17th Street, Suite 1000
                                        Denver, CO  80202
                                        Telephone:  (303) 294-7002
                                        FAX:  (303) 294-1192
                                        Laura.suelau@fd.org
                                        Attorney for Defendan