```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3     Criminal Action No. 21-cr-13-RM

 4

 5     UNITED STATES OF AMERICA,

 6          Plaintiff,

 7          vs.

 8     ANDRES CUETARA,

 9          Defendant.

10     ----------------------------------------------------------------

11                     REPORTER'S TRANSCRIPT
                        Competency Hearing
12     ----------------------------------------------------------------

13
           Proceedings before the HONORABLE RAYMOND P. MOORE, Judge,
14      United States District Court for the District of Colorado,
        commencing at 9:08 a.m. on the 28th day of July, 2023, in
15      Courtroom A601, United States Courthouse, Denver, Colorado.

16                         APPEARANCES

17     For the Plaintiff:
       ALECIA L. RIEWERTS, ESQ., U.S. Attorney's Office
18     1801 California Street, Suite 1600, Denver, CO 80202

19     For the Defendant:
       LAURA H. SUELAU, ESQ., Federal Public Defender's Office
20     633 Seventeenth Street, Suite 1000, Denver, CO 80202

21

22

23

24

25
```

1                        I N D E X

2                                                            PAGE

3    WITNESSES:

4            For the Defendant:

5            DR. ROBERT POLLARD, JR.

6                    Direct Examination by Ms. Suelau...............5
                     Cross-Examination by Ms. Riewerts............49
                     Redirect Examination by Ms. Suelau...........63
7

8                        E X H I B I T S

9                                    PAGE OFFERED    ADMITTED

10           For the Defendant:

11                   Exhibits A though E..................--..........4

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1           (Counsel and defendant were present, and the following

2  proceedings were had:)

3          THE COURT:  We are here on the Cuetara case, and we

4  are here for a hearing on a motion for me to decide whether

5  Mr. Cuetara is competent to proceed and, if not, what comes

6  next.

7          In the courtroom, I have government counsel, Alecia

8  Riewerts.  I have the defendant's counsel, Laura Suelau.

9  Mr. Cuetara is here as well.

10          For private conversations, Ms. Suelau has her own

11  interpreters.  For the official proceedings, there are four

12  interpreters in this room.  Two are American Sign Language

13  interpreters.  They will understand the spoken word and

14  translate it to the second set of interpreters.  They are

15  Certified Deaf Interpreters.  They will translate to

16  Mr. Cuetara.

17          Before we can begin, I need to have all four of the

18  interpreters be sworn, and so I will need them to stand.

19  The -- and they can face each other.

20          COURTROOM DEPUTY:  Do you solemnly swear or affirm,

21  under the pains and penalties of perjury, that you will truly,

22  fairly, and impartially act as an interpreter in this matter

23  now before the Court?

24          INTERPRETER RICHARDSON:  Yes.  Keri Richardson.  I

```
 1    will.
 2              INTERPRETER VEGA:  Elizabeth Vega.  I will.
 3              INTERPRETER BUSCH:  Nowell, yes, I will.
 4              INTERPRETER LAMBERTON:  And, Jonathan Lamberton, I
 5    will as well.
 6              THE COURT:  Thank you all.  There are witnesses who
 7    will testify today.  There is a notebook of exhibits which has
 8    been prepared.  My understanding is that the only physical
 9    exhibits to be offered are those from the defense.  They are
10    Exhibits A through E.  They are in a notebook, and they are all
11    admitted now, because I have asked and learned that government
12    counsel has no objection to these exhibits.
13              I am now ready to proceed.  Call your first witness.
14              MS. SUELAU:  Your Honor, Mr. Cuetara calls to the
15    stand Dr. Robert Pollard.
16              COURTROOM DEPUTY:  Please come forward right here,
17    sir.  Raise your right hand, please.
18              (The witness was duly sworn by the courtroom
19    deputy.)
20              COURTROOM DEPUTY:  Thank you.  Please have a seat.
21              Please state and spell your last name.
22              THE WITNESS:  My full name?
23              COURTROOM DEPUTY:  Yes.
24              THE WITNESS:  Is Robert Q. Pollard, P-O-L-L-A-R-D,
25    Jr.
```

1           THE COURT:  My caution to the lawyers is this:  I'm

2    going to be a little bit of a traffic cop, and you may see me

3    asking you to slow down or stop.  If you do, please comply.

4    And I've told the interpreters that if I'm the problem, they

5    should do the same with me.

6           Let's see how this goes.  Please ask your questions.

7                    DR. ROBERT POLLARD, JR.,

8    called as a witness by the defendant, having been first duly

9    sworn, testified as follows:

10                      DIRECT EXAMINATION

11   BY MS. SUELAU:

12       Q    Good morning, Dr. Pollard.

13       A    Good morning.  Morning, everyone.

14       Q    Can you please tell us what you currently do for

15   work?

16       A    I am semi-retired from my previous academic

17   positions.  At the present time for work, I do a considerable

18   amount of expert witness work.  I also do consulting that does

19   not necessarily have a legal implication to it.  And I do some

20   public speaking, lecturing.  That's what I do.

21       Q    Prior to your present semi-retirement, what did you

22   do?  Or where did you work?

23       A    Do you want me to go back several jobs?

24       Q    You can start with the last two decades.  Is that --

25       A    Oh.  Fine.  I've only had, like, four jobs ever.

```
 1    Most recently -- well, actually, currently, I am on the medical
 2    faculty of the University of Rochester School of Medicine.  And
 3    even though I don't collect a salary, I remain on the medical
 4    faculty in a position that is an unpaid position.
 5           In -- about two years ago, I ended my employment at
 6    the National Technical Institute for the Deaf in Rochester,
 7    New York, which is one of the colleges of the Rochester
 8    Institute of Technology.  That position, where I served for
 9    five years, I was the associate dean of research.
10           I began at the University of Rochester Medical
11    Center in 1990 and served there for something like 30 years
12    until I went over to the National Technical Institute for the
13    Deaf for five years.  Prior to that, I worked for five years in
14    San Francisco in a branch of the University -- a medical
15    center, actually, known as the National Center on Deaf Health
16    Research.  That was five years.
17           Prior to that, my first professional job was in
18    Columbus, Ohio, where I worked for a little less than two years
19    for a mental health agency that ran a subprogram for deaf
20    individuals known as the Community Center for the Deaf.
21           That's my full professional work history.
22       Q    Specifically at University of Rochester School for
23    the Deaf, what kind of work did you do at that school?  What
24    kind of professor?
25       A    Let me clarify, because I --
```

```
1              THE COURT:  Let me be the traffic cop.  I want a
2    minimum of a three-second beat between a question and the
3    beginning of an answer and a three-second beat between the
4    answer and the next question.
5              THE WITNESS:  Understood.
6         A    You did not name the places I worked correctly, so
7    are you asking me about the University of Rochester Medical
8    Center where I founded the Deaf Wellness Center in the
9    psychiatry department?
10        Q    (By Ms. Suelau)  Yes.
11        A    Okay.  From 1990 until 2022.  I was hired to
12   initially begin a psychological testing service, which I did.
13   But -- excuse me -- the administration knew that my
14   professional work and academic work was regarding deaf
15   individuals, and in a very short period of time I established a
16   program called the Deaf Wellness Center in the department of
17   psychiatry.
18             And the Deaf Wellness Center and our small staff
19   provided direct mental health services to deaf individuals.  We
20   also did a considerable amount of research on a number of
21   topics and certain special projects when I was able to write
22   grants to support them, such as creating educational films in
23   American Sign Language.
24        Q    And at the Rochester Institute -- Rochester
25   Technical -- National Technical Institute for the Deaf, if I've
```

1    gotten that correctly, what was your role at that institution?

2         A    At the National Technical Institute for the Deaf,

3    which is one college of the Rochester Institute of Technology,

4    my role was associate dean of research, where I did a number of

5    things trying to improve the amount of research that happened

6    at the National Technical Institute for the Deaf, to prepare

7    faculty to conduct research better, to evaluate prospective

8    faculty on their research capabilities, and otherwise serve as

9    part of the main leadership group at the college.

10        Q    Concerning the -- concerning your research efforts

11   at the National Technical Institute for the Deaf, what specific

12   areas of research did you engage in?

13        A    I've conducted research all my professional career.

14   Most of it was done while I was at -- pardon me -- the

15   University of Rochester Medical Center.  I did a little

16   research at the National Technical Institute for the Deaf,

17   that's true.

18             My three areas of research, broadly speaking, are

19   psychology and mental health as they pertain to deaf

20   individuals; secondly, sign language interpreting; thirdly,

21   public health topics as they pertain to the deaf population.

22   Each of these three broad areas has many subtopics I could try

23   and describe if necessary.

24        Q    You also mentioned engaging in providing mental

25   health services.  Is there a specific specialty that you worked

```
 1    in within mental health providing mental health services?

 2         A     Exclusively with persons who are deaf.  I have done

 3    a considerable amount of psychotherapy-type work.  I tend to do

 4    more work of an evaluative diagnostic-type nature more so than

 5    psychotherapy, but I've done both.

 6         Q     In your diagnostic and evaluative work, have you had

 7    the opportunity to evaluate deaf individuals with language

 8    deprivation?

 9         A     Quite frequently.

10               INTERPRETER VEGA:  One moment for interpretation.

11               (There was a pause for interpretation.)

12         Q    (By Ms. Suelau)  Would it be --

13               INTERPRETER RICHARDSON:  Your Honor, if I may make a

14    suggestion that the attorney wait until they are not signing

15    any longer, that will help the whole team.

16               MS. SUELAU:  Understood.

17               INTERPRETER RICHARDSON:  Thank you.

18               THE COURT:  Again, we are all bad at dealing with

19    this.  Interrupt as often as you need to to facilitate

20    communication.

21         Q    (By Ms. Suelau)  Dr. Pollard, would it be fair to

22    say that you -- I'm sorry.  I've lost my train of thought.

23               Would it be fair to say that the evaluation of

24    individuals with language deprivation is a specialty of yours?

25         A     It's enough of a specialty that I am asked to speak
```

1    on it in conferences and -- or just by invited presentations.

2    But -- there's other things I do, but I do that very

3    frequently, especially -- especially in competency situations.

4              Q    And have you had the opportunity --

5                   INTERPRETER VEGA:  One moment.

6                   THE COURT:  You've been working with interpreters.

7    You shouldn't be the problem.

8                   (There was a pause for interpretation.)

9                   INTERPRETER VEGA:  Thank you.

10                  THE COURT:  Go ahead.

11             Q    (By Ms. Suelau)  Have you published any academic

12   materials concerning working with and evaluating individuals

13   with language deprivation -- deaf individuals with language

14   deprivation?

15             A    Yes, a number.  Two in particular specifically at

16   language deprivation and evaluation of persons with language

17   deprivation in legal situations.  But the topic comes up in

18   other things I've written as well.

19                  THE COURT:  Let me ask a question of the lawyers.  I

20   was looking to see whether there has already been filed the

21   witness's resume qualifications.  I suspect the answer is yes.

22                  MS. SUELAU:  Yes, Your Honor.

23                  THE COURT:  Number?

24                  MS. SUELAU:  It was filed as an attachment to my

25   motion for evaluation at Docket 63, and that's Document 63-3.

1           THE COURT:  I will take notice of 63-3 so that we

2    need not go through the preliminary stuff and get to the heart

3    of the matter.

4           My assumption -- and I am now speaking to government

5    counsel -- is that government counsel is not challenging any

6    aspect of the witness's qualifications.

7           MS. RIEWERTS:  That is correct, Your Honor.

8           THE COURT:  Then let's get to the meat.

9           MS. SUELAU:  Your Honor, certain of Dr. Pollard's

10   experience or qualifications are relevant to this proceeding.

11   So I will not ask about any more of his professional or

12   academic experience, but instead focus on those things relevant

13   here.

14      Q    (By Ms. Suelau)  In your work as an expert witness,

15   have you had the opportunity to evaluate legal competency in a

16   criminal case?

17      A    Yes.  A total of 23 times.

18      Q    And were all of those --

19           INTERPRETER RICHARDSON:  One moment, please.

20           (There was a pause for interpretation.)

21      Q    (By Ms. Suelau)  Were each of those individuals deaf

22   individuals?

23      A    Yes.

24      Q    During those evaluations, how do you communicate

25   with those individuals?

1          A     I'm a fluent user of American Sign Language.

2     Provided that the individual is a proficient or fluent sign

3     language user, that's how we will communicate.  Sometimes deaf

4     persons learn a different style of manual communication, which

5     is a mixture of ASL linguistic characteristics and English

6     characteristics, because some schools teach that way.  I can do

7     that as well.  And if that is what the individual I'm working

8     with prefers, I will do that.

9          If the individual has significant language

10    deprivation, I will communicate in signs or ASL to the degree

11    that I comprehend that the individual is understanding that.

12    But, in addition, I make extensive, extensive use of drawings,

13    writing simple words or other things I want to write on a white

14    board or large posters attached to the wall.  I even may act

15    out certain things in miming or what have you.  So it's a

16    function of what I think will work best for the individual in

17    question.

18         Q     First I'm going to ask you about the language of

19    ASL, and then I'll get to the tools you employed with

20    Mr. Cuetara.  Is ASL considered a language or a translation of

21    English?

22         A     Since the early 1960s, linguists who were interested

23    in signing were finally able to study it closely enough, the

24    characteristics of American Sign Language, and compare it to

25    the criteria for what truly constitutes an actual language.

1   And since that time, it has been recognized as an actual unique

2   language very, very much different than English.

3        Q    Dr. Pollard, you mentioned criteria for language.

4   What are the criteria something needs to meet to be considered

5   a language?

6        A    I usually -- I usually answer that question by

7   saying there are four primary characteristics of a true

8   language.

9             The first is vocabulary, the concepts.

10             Second is the grammar, how vocabulary must be

11   changed depending on the function of that vocabulary concept in

12   a sentence, like run versus running.  That's grammar.

13             Thirdly is syntax or what you could understand as

14   how you put together words or concepts or signs in a particular

15   order which is normal, shall we say, for that particular

16   language.

17             Fourth is what we refer to as a discourse pattern,

18   the nature of how you say things and what order, normally, in

19   that language.

20             The -- all those things in American Sign Language or

21   other countries' signed languages, which are not like American

22   Sign Language, are unique and different from English.

23             The other thing we can get into is how signed

24   languages also make linguistic use of the space around the

25   body, literally assigning meaning to the space to my left or to

1    my right.  That's something that, of course, does not happen in

2    the spoken language.

3         Q    To help us understand the difference between English

4    and ASL, can you give me an example of grammar or syntax that

5    is unique to American Sign Language and distinct from English?

6              THE COURT:  If it helps, what I am trying to

7    accomplish is much more simplified questions and answers and

8    avoiding discussions about things that no one is arguing about.

9    ASL is a language.  I accept that.  Let's talk about other

10   things.

11             At the same time that I say this, if counsel

12   feels -- or if the lawyers feel that I'm cutting the corners

13   too much, let me know.  But I very much want this to be a

14   grade-school conversation without all the complex phraseology

15   that I just used.

16             MS. SUELAU:  Understood, Your Honor.  I would like

17   Dr. Pollard, if he remembers, to answer the question.

18             THE COURT:  I don't need it.  Ask him another

19   question.

20        Q    (By Ms. Suelau)  In your experience evaluating

21   Mr. Cuetara, was -- how would you evaluate his proficiency in

22   ASL?

23        A    I did have two prior reports where -- and other

24   discovery where I could begin to get a sense of that for myself

25   and -- from the experts who wrote those reports -- then in

1   person.  And I've met with him in person for 15 hours by now.

2   I'm able to observe what he can comprehend and what he can

3   express correctly and adjust my communication, as I described

4   earlier, the best I can to match his abilities.  And as I

5   mentioned earlier, I do that with Mr. Cuetara with extensive

6   use of visual materials.

7              THE COURT:  Let me interrupt.  You have a book in

8   front of you.  There are tabs in the book.  Exhibit A, is that

9   your report written to this Court?

10              THE WITNESS:  Yes.  It is my report from when I

11   evaluated him in August of last year.

12              THE COURT:  Are Exhibits B and C the other reports

13   that you just said you had available to you?

14              THE WITNESS:  Yes.

15              THE COURT:  Thank you.

16              MS. SUELAU:  Your Honor, it occurs to me that some

17   of my questions might be more efficiently asked as leading

18   questions.

19              THE COURT:  Knock yourself out.

20      Q      (By Ms. Suelau)  Dr. Pollard, you've met with

21   Mr. Cuetara on three occasions?

22      A      Correct.

23      Q      The first being August 29th, 2022?

24      A      Yes.

25      Q      The second being --

```
 1              INTERPRETER RICHARDSON:  Can you give us a moment?

 2              (There was a pause for interpretation.)

 3       Q    (By Ms. Suelau)  The second being January 2023?

 4       A    Yes.  On both January 8th and January 9th in '23.

 5       Q    And the third being yesterday, July 26th, 2023?

 6       A    Yes.

 7       Q    You stated the tools you used in communicating with

 8   Mr. Cuetara.  Were those tools necessary because Mr. Cuetara's

 9   ASL fluency is limited?

10       A    Precisely.

11       Q    Can you quantify, to the best of your ability, that

12   limitation or qualify that limitation?

13       A    I've evaluated many people with language

14   deprivation, deaf people with language deprivation.  I would

15   say I have seen worse and I have seen better.  So if I had to

16   roughly estimate, of the probably 30 or more people I've

17   evaluated with language deprivation, I'd say -- people with

18   language deprivation, I'd say he falls approximately in the

19   middle.

20       Q    When we're discussing ASL fluency, your report

21   mentions expressive and receptive abilities.  Can you explain

22   each?

23       A    Those are the two main avenues when you're

24   communicating with somebody:  An individual's ability to

25   express their ideas through language and their ability to
```

1    comprehend other people's ideas when they're expressing it

2    through language.  That's receptive.

3         Q    And with Mr. Cuetara, are both of those abilities

4    limited?

5              INTERPRETER VEGA:  One moment for interpretation.

6              (There was a pause for interpretation.)

7         A    Yes.  Quite considerably.

8         Q    (By Ms. Suelau)  Today we have Certified Deaf

9    Interpreter teams present.  Does that improve Mr. Cuetara's

10   communication over merely ASL communication?

11        A    Whether our wonderful team of interpreters, both

12   hearing and deaf, or my own abilities, we do not change the

13   expressive and receptive limitations that Mr. Cuetara

14   manifests.  What our wonderful team of interpreters are doing

15   are their very best, based on experience and training, to both

16   convey to him and learn back from him concepts.  Their efforts

17   do not change Mr. Cuetara's abilities in any way.

18             A different way to say that is he is the weak link

19   in the process, and interpreters don't fix that.

20        Q    So fair to say even the best communication methods

21   with Mr. Cuetara do not cure his limitations with

22   communication?

23        A    Absolutely.  The way I would say it is they don't

24   fully bridge the gap.

25             INTERPRETER VEGA:  One moment for interpretation,

```
 1        please.
 2                    (There was a pause for interpretation.)
 3                    INTERPRETER VEGA:  Okay.
 4                    THE COURT:  We -- we have been talking in more
 5        academic ways than I would like.  Tell me what he can do; tell
 6        me what he can't do.  Tell me what he can understand; tell me
 7        what he can't understand.
 8                    THE WITNESS:  Is Your Honor addressing me or
 9        addressing the attorney?  Excuse me.
10                    THE COURT:  You.  Wait.
11                    (There was a pause for interpretation.)
12                    THE WITNESS:  Mr. Cuetara's ASL vocabulary is quite
13        limited to signs he's learned.  There are many, many signs and
14        concepts he does not know.  Mr. Cuetara has extremely little
15        ability to put together a sentence longer than two signs, maybe
16        three, unless he's very familiar with the topic.
17                    Like, he does not employ proper grammar and syntax.
18        He does not use space around his body linguistically, which is
19        a key element of American Sign Language.
20                    THE COURT:  Based on your talks with him, what does
21        he understand and not understand about this court case?
22                    MS. SUELAU:  Your Honor, if I may interject to the
23        extent that it might be useful?
24                    THE COURT:  Go ahead.
25             Q    (By Ms. Suelau)  Dr. Pollard, referring --
```

 1              THE COURT:  No.  I want to hear his answer to my

 2     question first, because it was simple, straightforward, and

 3     easy to follow.  After that, you can re-explore the issue.  But

 4     I want you to tell me what he understands and what he doesn't

 5     understand about this court case.

 6              THE WITNESS:  The thing he understands best is his

 7     version of what occurred that led to his arrest.  He does not

 8     understand what charges are at all, much less his specific

 9     charges.  He does not understand any W-H-type question except

10     when.  Who, what, where, why, totally cannot understand.

11              He does not understand, regarding this case, that he

12     has a role to play, that he has agency.  He -- in his world,

13     things just happen.  They happen to him.  He doesn't understand

14     a plea.  He doesn't understand plea bargaining.  He doesn't --

15     I am quite confident he doesn't fully understand what our

16     wonderful team of interpreters are trying to convey to him

17     about this case.

18              THE COURT:  I am not --

19              INTERPRETER RICHARDSON:  Your Honor . . .

20              (There was a pause for interpretation.)

21              THE COURT:  I am not sure that this is a fair

22     question, but I am -- I am going to ask it anyway.  I have

23     people who come into court because they have been arrested, and

24     they are not very smart.  Some did not go to school or very far

25     in school.  Some cannot read and write.  And a good many lawyer

1   things are new to them and not understood by them.   How is this

2   different?

3               THE WITNESS:   Excellent question.   There is a great

4   deal of truth in the comparison you're making.   What is -- what

5   is different is that I expect that those individuals have a

6   language, have at least proficient language, whatever it might

7   be.   Mr. Cuetara does not have a proficient language.   And so

8   those things could possibly be taught to the individuals you

9   are referring to over time.   They also may understand that even

10  if they don't know legal procedures and terms well, that they

11  have agency, that they have a role to play.

12              THE COURT:   If I were to stop using terms like

13  "agency" and simply say to Mr. Cuetara that you can choose to

14  admit the crime or go to trial, what part of that would he not

15  understand?

16              THE WITNESS:   Choosing.   Mr. Cuetara does understand

17  the -- the modicum of what a trial is and the modicum of

18  what -- when a trial would be -- would not occur if a person

19  pleads guilty, but he doesn't understand a plea and he doesn't

20  understand he has a choice.   He sincerely -- in his world,

21  things just happen to him, and he's waiting to see what happens

22  to him.

23              THE COURT:   Do you have an understanding --

24              INTERPRETER RICHARDSON:   One moment, please.

25              (There was a pause for interpreting.)

1           INTERPRETER RICHARDSON:  Thank you.

2           THE COURT:  Do you have an understanding of what he

3   is doing at school?  And I ask because my understanding is that

4   he is taking some classes, or has taken some classes, at

5   school.  Is that --

6           MS. SUELAU:  Your Honor --

7           THE COURT:  -- incorrect?

8           MS. SUELAU:  The classes at Community College of

9   Denver I believe were about 20 years ago.

10          THE COURT:  Okay.

11          MS. SUELAU:  He did at that time take classes.

12          THE COURT:  Do you have an understanding of what

13  those classes were?

14          THE WITNESS:  I understand that there were classes

15  attempting to teach him ASL better and classes to teach him

16  English as a second language.  I don't know much more than

17  that.

18          THE COURT:  Do you know whether he passed or failed

19  those classes?

20          INTERPRETER VEGA:  One moment, please.

21          (There was a pause for interpretation.)

22          THE WITNESS:  I don't know if they were graded or

23  pass/fail in nature or just the person attended in nature.  I

24  don't know.

25          THE COURT:  Okay.  Do you know what he does for

1    employment?

2                    INTERPRETER VEGA:  One moment, please.

3                    (There was a pause for interpretation.)

4                    THE WITNESS:  My understanding, from previous

5    reports, is that he has a job that I believe entails stocking

6    merchandise or putting some type of items on shelves, that kind

7    of thing.

8                    THE COURT:  Does he drive?

9                    THE WITNESS:  I'm sorry.  Could you repeat --

10                   THE COURT:  Does he drive?

11                   THE WITNESS:  No.

12                   THE COURT:  Do you know what he does for recreation?

13                   INTERPRETER VEGA:  One moment, please, Your Honor.

14                   (There was a pause for interpretation.)

15                   THE WITNESS:  No.  We haven't discussed that, but I

16   am aware that he watches videos in American Sign Language that

17   are, like, news videos.

18                   THE COURT:  I'm sorry to have taken so much of your

19   time, but I wanted to get to very simple points.  And I'll stop

20   interfering momentarily.  For now, we're going to take a

21   10-minute break, recess.

22                   COURTROOM DEPUTY:  All rise.  Court is in recess.

23                   (A recess was taken from 10:00 a.m. until

24   10:11 a.m.)

25                   THE COURT:  Your witness.

1    Q    (By Ms. Suelau)   Dr. Pollard, how is it possible

2   that Mr. Cuetara both has the deficits you describe and has a

3   job?

4    A    As long as we're not talking about something related

5   to language, he can learn lots of things.  He actually

6   prefers -- excuse me, performs normally on a nonlanguage IQ

7   test, which involves thinking and analyzing.  So he can do many

8   things as long as it's visual.

9    Q    In your report, you mentioned the term "fund of

10   information."  Can you explain that term and how a person

11   obtains a fund of information?

12    A    All I mean by that is all the stuff you know, no

13   matter how you acquired that knowledge.  For hearing people, we

14   gather knowledge from the radio, from podcasts, television and

15   movies, from our family, who communicates with us in the

16   language that we share with our family.  And we even learn a

17   lot of stuff simply by overhearing things and by reading,

18   depending on our fluency of reading.

19        So there's all these sources of information for

20   hearing people, many of which are completely blocked for deaf

21   people, such as the radio, or severely curtailed, depending on

22   their upbringing, their education, et cetera.  So fund of

23   information for a given deaf individual is always a crucial

24   issue, especially in the medical and legal situations I work in

25   where you cannot presume that the individual has gathered the

1    amount of information you might well assume for a hearing

2    person.

3         Q    The judge asked you about a comparison with a person

4    who -- a hearing person who cannot read or write.  How would

5    you compare that person's fund of information to what you know

6    of Mr. Cuetara's fund of information?

7         A    I mentioned about five or six sources of gaining

8    information.  A hearing person who is illiterate will have

9    difficulty gathering information through reading.  That's just

10   one of the six channels I mentioned.

11            So when I'm talking about a deaf person's challenges

12   in acquiring knowledge, acquiring information, it is very

13   different, because there are all these other sources of

14   information -- family conversation, radio, et cetera -- that

15   they also are not accessed to in many cases.

16            And even if one cannot read or write, a hearing

17   person will have a language with which they can discuss or be

18   taught something they don't know.  Not in Mr. Cuetara's case

19   very well.

20        Q    Given that Mr. Cuetara has a normal nonverbal IQ,

21   would it be possible to increase his fund of information in a

22   way that we could teach him about the necessary concepts at

23   issue here?

24        A    If the fund of information topic is about something

25   visual, yes, he can increase his fund of information, if it can

```
 1      be visually seen.  The types of things we're dealing with in a
 2      general competency case, even what a legal right happens to be,
 3      is -- is from extremely difficult to virtually impossible to
 4      teach visually.
 5              I think I said yesterday, you know, visually show me
 6      what a legal right is.  Visually show me what leukemia is
 7      without language.  There are some things that are just
 8      impossible when language is necessary to convey the
 9      information.
10              And in law, in medicine, language is very often
11      necessary to convey key concepts, including competency
12      concepts.  And I've spent 15 hours, at least, with Mr. Cuetara
13      doing my absolute best at trying to teach him key legal
14      concepts regarding competency, and it made extremely little
15      progress.
16          Q    In your opinion, what is -- what are the factors
17      that lead to that limitation, the inability to teach him those
18      things?
19          A    The --
20              THE COURT:  Stop.  Stop.
21              MS. RIEWERTS:  Your Honor, I'm going to object to a
22      line of questioning that is related to whether there is a
23      substantial probability that in the foreseeable future he will
24      attain the capacity to permit the proceeding to go forward and,
25      instead, ask that the line of questioning remain on whether he
```

 1    currently has the capacity to aid in his own defense and go to

 2    trial.

 3              THE COURT:  I understand that you are correct, but

 4    I'll take the information.  And we, meaning you, Ms. Suelau,

 5    and I will talk about that second matter if and when I need to

 6    make a decision about it.  I've not been very clear as to what

 7    that means, but you know and she knows what I'm saying.  And

 8    for now, I'm happy with that.

 9              Go ahead.

10       Q     (By Ms. Suelau)  Dr. Pollard, if you recall the

11    question, what are the factors that led to the limitation?

12    What are the key factors that lead to the limitation, the

13    limitation being his ability to learn?

14              THE COURT:  If I can make it more simple, why can't

15    he learn?

16              THE WITNESS:  He can learn visually quite well.  He

17    cannot learn things that require a language base to explain.

18    He was severely to profoundly deaf from -- probably from birth

19    or at least from a very early age.  He was raised in a home

20    that did not use sign language, and he could not acquire spoken

21    Spanish.

22              He did not get exposed to sign language, as far as

23    we know from reports, until he came to Denver in -- at age 24,

24    which is long, long, long past the critical language learning

25    period of time, which is very, very young.  Most scientists

1    would say three years or less.

2           And so he is not required -- excuse me.  He has not

3    acquired a first language and, therefore, cannot -- and he's

4    also illiterate and can't hear the radio and the other things I

5    mentioned, so he cannot acquire knowledge through

6    language-based means, including communication.

7           THE COURT:  If I may ask, and if you know, how does

8    he use a computer?

9           THE WITNESS:  I'm sorry, Your Honor.  How does he

10    use what?

11           THE COURT:  A computer.

12           THE WITNESS:  I know that he uses his cell phone.  I

13    don't know about computers.  But those --

14           THE COURT:  To be clear, how does he get to stuff on

15    the internet?

16           THE WITNESS:  If people sent him a link to this news

17    program I mentioned or if he -- if someone wrote that down,

18    what the link is, he could do that.  I saw him yesterday

19    receive an email from Ms. Suelau, and at the bottom of the

20    screen I observed -- sometimes the computer will suggest a

21    response, and he pressed a response that the computer

22    suggested.  He did not type one.

23           THE COURT:  That suggests that --

24           INTERPRETER VEGA:  One moment, Your Honor.

25           (There was a pause for interpretation.)

```
 1              THE COURT:  -- he can distinguish between particular
 2     responses, simple responses.  Is that a fair statement?
 3              THE WITNESS:  The types of responses that you'll be
 4     suggest -- that will be suggested to you are all pretty
 5     similar.  But they are simple, and I agree with that.  And he
 6     can read some simple words that he's familiar with.
 7              THE COURT:  Okay.  Let me -- I apologize, because
 8     I'm going to take over again.
 9              INTERPRETER VEGA:  And, Your Honor, just one moment
10     for the interpretation.
11              THE COURT:  Absolutely.
12              (There was a pause for interpretation.)
13              INTERPRETER VEGA:  Thank you.
14              THE COURT:  I want you to tell me what his
15     understanding is of why he got arrested based only on your
16     communication with him.
17              THE WITNESS:  He knows that very well.  That is the
18     simplest of a list of eight or nine --
19              INTERPRETER RICHARDSON:  Can you give us a moment.
20              (There was a pause for interpretation.)
21              THE WITNESS:  That is the simplest of about eight or
22     nine competency-related topics I have written about in a rank
23     order, easy to hard.
24              THE COURT:  That's all fine.  Tell me --
25              THE WITNESS:  He knows --
```

```
 1                    THE COURT:  -- what he understands about why he was
 2       arrested.
 3                    THE WITNESS:  Okay.  I'm sorry.
 4                    (There was a pause for interpretation.)
 5                    THE WITNESS:  He knows that he downloaded
 6       photographs of nude youngsters and had them on his computer.
 7       And because of what subsequently occurred in the -- when the
 8       authorities arrived, he then understood that he's in trouble
 9       for it.
10                    THE COURT:  Does he remember -- again, based on your
11       conversations with him -- how he got to look at those pictures?
12                    THE WITNESS:  Yes.
13                    THE COURT:  Can he --
14                    INTERPRETER RICHARDSON:  Can you give us a moment.
15                    (There was a pause for interpretation.)
16                    THE COURT:  Was he able to tell that to you?
17                    THE WITNESS:  In gestures, in limited signs, yes.
18       And I could compare it to what I read in discovery, and he was
19       accurate.
20                    THE COURT:  Are there --
21                    INTERPRETER VEGA:  One moment, please, Judge.
22                    (There was a pause for interpretation.)
23                    THE COURT:  -- any difficulties with memory that you
24       saw?
25                    THE WITNESS:  Not memory in the sense of recalling
```

```
1    something he already knows.
2              THE COURT:  And to be clear --
3              INTERPRETER RICHARDSON:  Your Honor, a moment,
4    please.
5              (There was a pause for interpretation.)
6              THE COURT:  I am understanding you to be saying to
7    me if he did not understand something that was happening, say,
8    three weeks ago, he really is not going to remember it well
9    today because he didn't understand it then and cannot
10   understand it now.  Is that fair?
11             THE WITNESS:  It is correct to --
12             INTERPRETER RICHARDSON:  Hold on a moment.
13             THE WITNESS:  I'm sorry.  My fault.
14             THE COURT:  We're all struggling.
15             (There was a pause for interpretation.)
16             THE WITNESS:  It is correct to say if he did not
17   understand something in the first place, he certainly couldn't
18   recall it, because it isn't in his memory bag, so to speak.
19             THE COURT:  Back to you, Ms. Suelau.
20        Q    (By Ms. Suelau)  Is the same true of new and
21   unfamiliar concepts?  What is his memory when you attempt to
22   teach him new or unfamiliar concepts?
23        A    It is very much the same.  If I or whomever is able
24   to successfully have him understand something, really
25   understand it, then I have no doubts about his ability to
```

1     recall it later.  But it has to be understood.

2          Q    Is it possible to gauge Mr. Cuetara's understanding

3     of a concept that you are teaching him?  Or to what degree is

4     it possible?

5          A    Well, that's what I've spent 15 hours doing,

6     teaching him competency-related topics and then seeing if he

7     could understand it and/or retain it.  And -- so, yes, I have

8     my professional opinions about that.  It's really difficult.

9          Q    Difficult -- difficult to teach or difficult to

10    gauge his understanding or both?

11         A    Both.

12         Q    In your report, you stated that language deprivation

13    is both a language problem and a cognitive problem.  Can you

14    explain the cognitive aspect of language deprivation?

15         A    The cognitive aspect is what you can do with

16    whatever language you have.  Can you reason with it?  Can you

17    put forth an argument?  Can you explain yourself?  Those are

18    all cognitive aspects.  That's not the language.  It's what

19    your brain does with the language or can do or can't do with

20    language.

21         Q    And -- so what you're saying, language deprivation

22    impacts what you can do with language and how you process it?

23         A    That's the second part.  The first part is having

24    language.

25                   THE COURT:  Did you happen --

1          INTERPRETER VEGA:  One moment for interpretation.

2          (There was a pause for interpretation.)

3          INTERPRETER VEGA:  The interpreters are ready.

4          THE COURT:  I am not saying you should have, but did

5    you videotape any of your meetings with Mr. Cuetara?

6          THE WITNESS:  Not video.  I took photographs of the

7    posters and things I put on the wall during the explanation,

8    but not a video.

9          THE COURT:  Okay.

10          MS. SUELAU:  Would Your Honor like copies of those

11    photographs?

12          THE COURT:  No.  I should say I think that there are

13    sketches that I have seen in different reports.  If there are

14    photographs that he took that are not available to me in a

15    report, I'll take it if you have it.  But I don't need it right

16    now.

17     Q     (By Ms. Suelau)  Did you form an opinion about

18    Mr. Cuetara's cognitive abilities, the cognitive aspect of his

19    language deprivation?

20     A     Yes.  Yes.  Again, splitting into language he has

21    versus language he can use, they are both quite significantly

22    compromised, slightly less compromised in terms of the language

23    he has.  He has a sign vocabulary.  He does not use syntax or

24    grammar.  There's many signs -- there's many concepts and signs

25    he doesn't know.  What he can do with language is even more

1    limited.

2        Q    I understand you to be saying his expressive

3    abilities are lesser than his receptive abilities.

4        A    I agree with what you just said.  However, I'm also

5    saying that his ability to think, to analyze, to cogitate in

6    language is also very severely limited, not just express

7    himself.

8        Q    How much can that ability to think or analyze be

9    improved in Mr. Cuetara specifically?

10       A    In light of his language deprivation, in light of

11   his age, I do not believe that this linguistic analysis,

12   cognitive work can be improved when it's linguistic.  He can

13   learn things visually.

14       Q    In your report, you used the analogy of a bookshelf.

15   Because all of the parties have read that report, I won't have

16   you repeat the analogy.  But can you quantify Mr. Cuetara's

17   ability based on that analogy?

18       A    I've published --

19           INTERPRETER VEGA:  One moment, please.

20           (There was a pause for interpretation.)

21       A    I've published three analogies in an effort to try

22   to help hearing people understand language deprivation at all,

23   and especially what it means for competency.  The particular

24   analogy you're referring to, which you say has been read by

25   people already, has to do with I say that you need ten books in

```
 1        your mental library, some of which are knowledge, some of which
 2        are abilities, to be competent.
 3               And I say that because of his early language
 4        deprivation and subsequent experiences or lack thereof in life
 5        in terms of language and fund of information, that he has
 6        perhaps two relevant competency books and a shorter library
 7        shelf than a hearing person would have.  And for him to get to
 8        the necessary ten books of knowledge and ability is not
 9        possible, and the shelf could not even be expanded from a total
10        of -- a maximum of five books to the necessary ten books.
11           Q     (By Ms. Suelau)  In January 2023, was the purpose of
12        your work with Mr. Cuetara to attempt to increase those two
13        books?
14               INTERPRETER VEGA:  One moment for the
15        interpretation.
16               (There was a pause for interpretation.)
17           A     Yes.  The purpose of the two days of working with
18        him were to reassess his competency based on when I saw him the
19        previous August, and then to spend 11 hours doing my very best
20        in the ways I try to teach him competency concepts.  So, yes,
21        you could say that was in an effort to put another book or so
22        on his library shelf.
23               THE COURT:  Tell me the concepts you tried to teach
24        him.
25               THE WITNESS:  What his charge -- what a charge is --
```

1          INTERPRETER RICHARDSON:  One moment.

2          THE WITNESS:  Sorry.  My fault.

3          (There was a pause for interpretation.)

4          THE WITNESS:  What a charge even is.

5          THE COURT:  And what did you explain that to be?

6          THE WITNESS:  Are you asking me, Your Honor, to tell

7    you what I believe his charges are?

8          THE COURT:  No.  I'm asking --

9          INTERPRETER RICHARDSON:  A moment.

10         (There was a pause for interpretation.)

11         THE COURT:  I want to pretend -- what I want you to

12   do is to pretend I am like Mr. Cuetara.  I want you to explain

13   to me what you were trying to teach him so that I can better

14   understand what the substance of that communication was.

15   Again, I recognize it's not equal and it's a little unfair, but

16   I think it would help me understand.

17         So go ahead.

18         MS. SUELAU:  Your Honor, may I make a suggestion?

19         THE COURT:  No.

20         THE WITNESS:  As I said earlier, Mr. Cuetara knows

21   very well what he was arrested for.  Regarding what a charge

22   is, I had to try and explain with pictures and diagrams and

23   sign language that when somebody --

24         THE COURT:  Explain to me.  Go ahead.

25         THE WITNESS:  -- that when somebody does something

1    wrong, the police, the government have a word for it, and that

2    word is called a charge.  If you were -- if -- if you stole a

3    small item from a store, there's a special word for that, petty

4    larceny, for example.

5            INTERPRETER VEGA:  One moment for interpretation.

6            (There was a pause for interpretation.)

7            INTERPRETER VEGA:  Thank you.  Interpreters are

8    ready.

9            THE WITNESS:  If you stole a car, there's a special

10   word for that.  It is my constant experience with deaf people

11   that they can tell me what they did but have no idea what these

12   words are called charges.  And that's the first part of the

13   answer.

14           You've also asked me some other things I tried to

15   teach him.  I tried to teach him what a plea is.

16           THE COURT:  Teach me what a plea is.

17           INTERPRETER VEGA:  And one moment for

18   interpretation.

19           (There was a pause for interpretation.)

20           THE COURT:  And I really am asking --

21           INTERPRETER VEGA:  I'm sorry.  One moment,

22   Your Honor.  The interpretation's not complete.

23           (There was a pause for interpretation.)

24           INTERPRETER VEGA:  Thank you.  The interpreters are

25   ready.

1              THE COURT:  And, remember, I am asking you to

2      pretend that you're trying to tell me.

3              THE WITNESS:  With respect, Your Honor, I -- when I

4      will answer your question, it's going to be in language, and

5      that's the difference.

6              THE COURT:  I know -- I know that, and I said that

7      it was unfair.  I get that.  But I still want to do it.

8              THE WITNESS:  Okay.

9              THE COURT:  Teach me what a plea is.

10             THE WITNESS:  You know what guilty is, Your Honor?

11             THE COURT:  No.

12             INTERPRETER VEGA:  One moment for interpretation.

13             THE WITNESS:  And I'm pretending.

14             (There was a pause for interpretation.)

15             THE WITNESS:  There's this word --

16             INTERPRETER VEGA:  One moment, please, for

17     interpretation.

18             (There was a pause for interpretation.)

19             INTERPRETER VEGA:  Thank you.

20             THE WITNESS:  This word or this sign, guilty, means

21     you admit that the thing you did wrong -- you admit what you

22     did wrong.

23             There's another -- there's another important word,

24     not guilty.  And that can mean two things.  It can mean that

25     you don't think you did that thing wrong.  You say, No, I

1    didn't do that.  The other thing it can mean is I'm not going

2    to tell you whether I admit what I did or I don't.  That's a

3    different kind of not guilty.

4              INTERPRETER VEGA:  One moment for interpretation.

5              (There was a pause for interpretation.)

6              THE WITNESS:  And what you may already know from TV

7    is that when people say they're guilty or in court somebody

8    else decides they're guilty, they might go to jail; they might

9    have to pay money.  And as you may know, that's when court is

10   all over.

11             You might be very surprised to know that you have to

12   make a decision now, early, about whether you want to say that

13   you admit what you did wrong, the guilty word, or you want to

14   say, "I did not do that thing wrong," or whether you want to

15   say, "I'm not going to tell."  You need to make that decision.

16   Nobody else can make that decision for you.

17             Next, what I want to go through with you is what

18   will happen if you make this decision to admit what you did

19   wrong, and then I will go through what might happen if you make

20   the decision to say that you did not do this thing wrong.

21             INTERPRETER VEGA:  One moment for the

22   interpretation.

23             (There was a pause for interpretation.)

24             THE WITNESS:  And then we will talk about if you

25   make the decision that you're just not going to tell whether

```
 1    you did this wrong thing or not.

 2              And I'd like to pause here, Your Honor, because of

 3    course you know that when a person makes any of those

 4    decisions, all sorts of things could happen next.  And that's

 5    the next thing I would have explained.

 6              THE COURT:  And I'm satisfied.  I just want to

 7    get -- I wanted to get a sense of the conversation, of the

 8    talk, of the exchange, recognizing that your exchange or

 9    conversation was not in words like we are now doing.  So I'm

10    done with my questions.

11              INTERPRETER VEGA:  Again, one moment for the

12    interpretation.

13              (There was a pause for interpretation.)

14              THE COURT:  And, again --

15              INTERPRETER RICHARDSON:  One more moment.

16              (There was a pause for interpretation.)

17              INTERPRETER VEGA:  Thank you.

18              THE COURT:  And, again, a 10-minute break.

19              COURTROOM DEPUTY:  All rise.  Court is in recess.

20              (A recess was taken from 11:00 a.m. until

21    11:12 a.m.)

22              THE COURT:  Please.

23         Q    (By Ms. Suelau)  Dr. Pollard, if you recall the

24    description you gave Judge Moore of what it means to plead

25    guilty, based on your interactions with Mr. Cuetara, how much
```

1    of that description do you believe he understood?  And to be

2    clear, I don't mean today.  I mean when you made efforts to

3    describe it to him.

4         A    I made those efforts all three times, including

5    yesterday.  I believe, first of all, that Mr. Cuetara still

6    struggles to actually properly use the signs for guilty and not

7    guilty.  He -- I believe he understands that guilty is a

8    concept where you are admitting that you did the wrong thing

9    that you're in trouble for.  I believe he understands that not

10   guilty pertains to when you deny that you did the thing you're

11   in trouble for or that when you don't talk or you're not

12   willing to talk.

13        I am not confident he understands that from a legal

14   implication or legal context.  He's learned -- I believe he's

15   learned those words when I teach him or point on the paper, but

16   I don't think it goes beyond that to a true legal

17   comprehension.

18        Q    I want to refer you to Defense Exhibit E, page 7.

19   Can you explain this list?

20        A    I wrote and published this list to convey to the

21   reader my consistent experience in doing competency evaluations

22   with deaf persons in terms of what the -- what the typical

23   individual that I tend to work with in competency cases will

24   understand, from easiest to most difficult, when all those

25   things have legal consequences related to competency.  And this

1    list, or rank order, is remarkably consistent over the 27

2    competency cases I've done.

3         Q    Starting with Number 1, fair to say Mr. Cuetara

4    understands his own story regarding his legal problems?

5         A    Yes.  He understands what he did and what he is in

6    trouble for and the details of his initial arrest.

7         Q    Is he able to differentiate -- is he able to

8    differentiate between this criminal case and his immigration

9    matter?

10        A    In my first two evaluations, he confused those

11   concepts most of the time.  In my evaluation yesterday, he

12   seemed to have now come to understand that those are not --

13   that those are different issues.

14        Q    You used the term "seemed to."  With what confidence

15   can you gauge something like that?

16        A    When I brought up the immigration case --

17             INTERPRETER RICHARDSON:  One moment.

18             (There was a pause for interpretation.)

19        A    Because I understood from previous experience with

20   him that he gets confused or -- or puts those two cases

21   together as if they're the same thing, I brought it up yet

22   again, and his response was to put his index finger to his

23   mouth like "shh."  And, also, he used the sign for secret.  And

24   from that, it was my judgment that he was conveying to me he

25   knows we aren't supposed to talk about that because that's not

1    what today is about and that's not what his downloading of the

2    pictures is about.

3         Q     If I told him in a past meeting I don't want to talk

4    about your immigration case, through an interpreter, we are not

5    talking about your immigration case, is it likely that that's

6    what he was conveying to you?

7         A     I believe that's what happened for the following

8    reasons:  When I was here in August and January, I never used

9    the gesture for "shh" with my finger on my lips.  I never used

10   the sign for secret.  I simply was using concepts like

11   different, separate, not now, you know, later.  And he chose to

12   use those gestures, which I had never seen him use in our

13   previous conversations about the immigration case.

14              And he did no more explaining than just those two

15   gestures, and I can only presume that that had to do with

16   conversations you've had with him since I was last here in

17   January.

18        Q     Fair to say that that's different than appreciating

19   the substantive nuances between the two cases?

20              THE COURT:  Can we move on to something else?

21              MS. SUELAU:  Yes.

22              INTERPRETER VEGA:  One moment for the

23   interpretation.

24              (There was a pause for interpretation.)

25              INTERPRETER VEGA:  Okay.

1          (By Ms. Suelau)  If you were to give Mr. Cuetara a
2   grade from A through F on Number 1, what grade would you give
3   him in terms of his competent knowledge?
4       A    Only regarding Step 1, his story, I'd give him an A.
5              INTERPRETER VEGA:  One moment for the
6   interpretation.
7              (There was a pause for interpretation.)
8              INTERPRETER VEGA:  Thank you.
9       Q    (By Ms. Suelau)  I wanted --
10             THE COURT:  Let me speed this up.  I'm going to give
11  you a number; you give me a grade.
12             Two?
13             THE WITNESS:  C-minus.
14             THE COURT:  Three?
15             INTERPRETER RICHARDSON:  Hold on a moment.
16             (There was a pause for interpretation.)
17             INTERPRETER VEGA:  Thank you.
18             THE COURT:  Three?
19             THE WITNESS:  B.
20             THE COURT:  Four?
21             THE WITNESS:  D-plus.
22             THE COURT:  Five?
23             THE WITNESS:  From 5 through 9, Your Honor, all the
24  rest would be F.
25             THE COURT:  Thank you.

1        Q      (By Ms. Suelau)   The report you wrote was prior to

2    your January 2022 meetings with Mr. Cuetara.   After those

3    meetings, did your opinion -- the opinions you wrote in your

4    report change?

5                 INTERPRETER VEGA:   We need one moment for the

6    interpretation.

7                 (There was a pause for interpretation.)

8        A      They didn't change substantively, with the exception

9    that on those two dates I had 11 hours with him, so I could

10   have opinions more nuanced than I was able to have back in

11   August '22.

12       Q      (By Ms. Suelau)   Were there any opinions material to

13   whether or not Mr. Cuetara understands the nature and

14   consequences of these proceedings?

15                INTERPRETER RICHARDSON:   Give us a moment, please.

16                (There was a pause for interpretation.)

17       A      I do not believe Mr. Cuetara understands what this

18   hearing is about at all, what the nature of it is is the word

19   you used, nor the consequences.

20       Q      (By Ms. Suelau)   What about --

21                (There was a pause for interpretation.)

22       Q      (By Ms. Suelau)   What about the nature of the crimes

23   he's been charged with and the consequences of those charges?

24       A      To repeat, he understands very well what he's in

25   trouble for.   He does not understand what charges are.   He has

 1    a vague comprehension, based on my teaching, that there are two

 2    potential things that could be discussed.  And when I say "two

 3    potential things," I'm referring to charges.  He does not

 4    understand that.  He seems to understand vaguely that of these

 5    two things, that one of them might be -- I'll use the word

 6    "dismissed" -- maybe that's not the right legal word -- and

 7    that would be good.

 8              He understands that as a result of his various legal

 9    problems, there could be jail.  He understands that how much

10    jail, if any, he receives as a sentence could vary a great

11    deal.  He wants -- last -- when I was here in January, he

12    seemed to have a vague comprehension of what he refers to as

13    supervision, which I understood him to be conveying the concept

14    of probation, which people have talked about with him.

15         Q    In terms --

16              INTERPRETER RICHARDSON:  Hold on, please.

17              (There was a pause for interpretation.)

18         Q    (By Ms. Suelau)  In your professional opinion, can

19    Mr. Cuetara assist in his own defense?  And, relatedly, does he

20    understand his role in assisting in his defense?

21         A    His ability to assist in his defense is limited to

22    being able to tell his story of what he did that got him into

23    legal trouble, his recognition that there are two attorneys

24    involved, you being the one who wants to help him.  He is less

25    cognizant of Ms. Riewerts' role.  He understands that you and

1    Ms. Riewerts are supposed to disagree.

2           He does not have anywhere near the language or fund

3    of information to otherwise assist in his defense, and he can't

4    answer what -- he can't answer W-H questions other than when.

5    He can't perceive of hypotheticals, what if this, suppose that.

6    Completely beyond him.

7        Q    If asked the question, Do you want to testify, what

8    would he understand of that question and how do you think he

9    would respond?

10           INTERPRETER VEGA:  One moment for interpretation.

11           (There was pause for interpretation.)

12       A    He could not respond with competence.  In terms of

13   these legal things, he doesn't understand at all that he has

14   choices that could be made.  He certainly does [sic] understand

15   what testimony is.  He knows a person who sits in my chair says

16   things, but not what testimony is.

17           And I never directly asked him if he wanted to be in

18   the chair I am and tell his story.  The -- he would want to

19   know what you want him to do, not what he wants to do.  He

20   doesn't have a want.  Things happen to him.  That's the nature

21   of his life.

22       Q    (By Ms. Suelau)  In your meetings with Andres, you

23   used two pictures, one for trial and one for court, meaning

24   plea, correct?

25           INTERPRETER VEGA:  One moment.

1                   (There was a pause for interpretation.)

2        A       Yes.   The picture is the same.   In discussing the

3    consequences of a plea, or trying to discuss it, I used the one

4    image -- it's an image of a courtroom like this with the

5    various characters in the courtroom.   For trial, I left the

6    characters of the jury and the characters of the witness, et

7    cetera, present in the image.   And in my attempts, especially

8    in January, I was trying to explain what that's like.

9              Then, in the other image that we have simply labeled

10   court, I crossed out the jury and crossed out the witness and

11   tried to explain that it would be the attorneys and the judge

12   and that's different.

13             I also -- I also have many times tried to convey

14   that the trial where the jury's included, where the witnesses

15   are included is related to guilty or the word guilty or the

16   idea of guilty.   Again, I will not say he understands what a

17   plea is.

18             I have also tried to associate the image that we now

19   call court.   I'm sorry.   I'm -- I made -- I made a mistake just

20   then.   I said it wrong.   The image -- let me start again.   The

21   image that is called court without the jury, without the

22   witness, I have tried to associate that with a guilty plea,

23   whereas the image of -- the image that includes the jury and

24   includes the witnesses I have tried to associate that with the

25   term, the concept of not guilty.

1          Again, I don't like to use the word "plea," because

2     he doesn't understand it.

3          Q    (By Ms. Suelau)  Yesterday, after you met with

4     Mr. Cuetara, I asked you to inquire of him who decides court,

5     trial.  How did Mr. Cuetara respond?

6               INTERPRETER RICHARDSON:  One moment for

7     interpretation.

8               (There was a pause for interpretation.)

9          A    It's a W-H question.  Unless it's the question when,

10    he does not understand W-H questions, so he could not possibly

11    understand that.  So what does he do?  He takes a guess.  He

12    looks at me in a clear way I perceive as am I right, just

13    looking at me for approval.  Or he'll change his guess.  He

14    doesn't understand a question that begins with who.

15         Q    (By Ms. Suelau)  In response to that question, do

16    you recall that he said, I don't know?

17              INTERPRETER VEGA:  One moment, please.

18              (There was a pause for interpretation.)

19         A    He says "I don't know" constantly, either before an

20    attempt to answer a question like that or making a guess and

21    then, immediately after, "I don't know, I don't know."  He --

22    he said "I don't know" countless times in the times I've

23    evaluated him.

24         Q    (By Ms. Suelau)  In your report, you concluded that

25    understanding the concepts we've talked about are beyond

1   Mr. Cuetara's knowledge base.  Is that still your opinion?

2        A    Yes.  Talking about all the concepts in my original

3   report, the majority of them are still my same opinion.  Over

4   my about 14 more hours of teaching, he has made very

5   incremental progress on a couple things.  He has made -- he's

6   become less competent -- or less -- I shouldn't use the word

7   "competent."  He's become less knowledgeable or clear on

8   certain other things compared to when I wrote my report, but

9   most things have stayed the same.

10       Q    Would teaching Mr. Cuetara more ASL cure your

11  concern?

12       A    First, I don't think that's possible other than

13  vocabulary.  Not the other aspects of ASL.  And any progress in

14  that regard would not spill over into greater ability to use

15  that language to cogitate and make decisions about legal

16  things.

17            MS. SUELAU:  Your Honor, I have no additional

18  questions for Dr. Pollard.

19            THE COURT:  Ms. Riewerts?

20                     CROSS-EXAMINATION

21  BY MS. RIEWERTS:

22       Q    Good morning.  Dr. Pollard, you and I have spoken

23  over the phone with Ms. Suelau on at least two occasions,

24  correct?

25       A    Yes.  And the three of us met together for a while

1      in January.

2           Q    You stole my next question.  I am going to refer to

3      Defendant's Exhibit A in the binder in front of you, which is

4      your expert report.  On page 4 of that report, Dr. Pollard, you

5      reference that the defendant scored a 9th percentile score

6      reflecting an IQ of 80, based on your review of Dr. Pick's

7      report, correct?

8           A    I was --

9                INTERPRETER RICHARDSON:  One moment.

10               (There was a pause for interpretation.)

11          A    In that paragraph on page 4, I was just summarizing

12     Dr. Pick's main findings and conclusions.  That's all.

13          Q    (By Ms. Riewerts)  With regard to the IQ score

14     reflected in Dr. Pick's report, do you know if that was a

15     language IQ test or a nonlanguage IQ test that he used?

16          A    I'm aware of that test.

17          Q    Do you know whether it was a language or a

18     nonlanguage IQ test?

19          A    The items that a person has to look at and respond

20     to are nonlanguage, but it has language-based instructions

21     about how to do the test.

22          Q    On page 5 of your report, the report states that

23     Mr. Cuetara earned a normal score on the standard progressive

24     matrices test equating to an IQ of 103; is that correct?

25          A    Yes.  That was my finding on a different test than

1    Dr. Pick used.  Plus, I was in person, and Dr. Pick used his

2    tests over video conferencing.

3        Q    That IQ on this particular test reflected that

4    Mr. Cuetara tested in the 58th percentile, correct?

5        A    Yes.  You can translate IQ numbers and scales into

6    percentile scales.  It's just a mathematical translation.

7            THE COURT:  I have to interrupt.  Let me be clear.

8    The defendant's interpreters are not to communicate with the

9    Court's interpreters during this hearing.

10           INTERPRETER KEYSER:  I'm sorry, Your Honor.

11           THE COURT:  It's okay.  I noted it.  But, obviously,

12   not being fluent in either CDI or ASL, I can't tell what's

13   going on.  So that's going to be the rule that we have.

14   Nobody's in any trouble.  I'm not excited.  That's the rule

15   we've got to have.

16           MS. SUELAU:  I'll just explain that on the break my

17   interpreters and I talked to Mr. Cuetara about what he was

18   understanding.  And he gauged, on a scale of one to ten, he

19   was --

20           THE COURT:  I don't care what you and he and your

21   interpreters talk about on the break.  All that I'm saying is

22   the -- your interpreters are not to talk to these interpreters

23   while the hearing is going on any more than somebody in the

24   back gets to talk to the interpreters while this is going on.

25               I'm not accusing anyone of having a bad motive, but

1      I don't need an explanation.  Let's just not do that.  That's

2      all.

3                   MS. SUELAU:  I was just going to say that

4      Mr. Cuetara expressed that his understanding is between a two

5      and a six.

6                   THE COURT:  So what are you -- what is it that you

7      are trying to do here?  Is that supposed to be testimony?  Is

8      that supposed to be something I consider?  How was it an answer

9      to anything?

10                  MS. SUELAU:  No.  I was explaining --

11                  THE COURT:  Sit down.

12                  Go ahead.  Next question.

13         Q     (By Ms. Riewerts)  Could you please help me

14     understand -- and, of course, the Court, to the extent there's

15     any misunderstanding -- understand how these two IQ scores

16     interrelate?  You mentioned that one being in person and one

17     being over video conference makes a difference.  What else

18     makes a difference?

19         A     Understand that these nonverbal IQ tests always

20     involve images to be shown and answer choices to be selected.

21     I have never given psychological tests, especially IQ tests,

22     over video, and I never would.  I have no idea how Dr. Pick,

23     over video, conveyed, showed the items on the test to

24     Mr. Cuetara.  He doesn't address that in his report.

25                  Secondly, I own the test that Dr. Pick used.  I'm

1    familiar with it.  I don't like it because, in my opinion, it

2    requires more verbal, language-based instruction for how to do

3    the items than the test I used.  Even though the items

4    themselves are nonverbal, you have -- the person has to know

5    how to do the test.  And in the test that Dr. Pick used, in my

6    professional opinion, it requires too much explanation for how

7    to do the items, so I don't use it.  And I sure as heck

8    wouldn't use anything over video.

9         Q    With regard to the IQ score that you -- or the IQ

10   test that you used reflecting that Mr. Cuetara had a normal

11   score on the test, is it fair to say that you believe that is a

12   reliable test of Mr. Cuetara's IQ?

13        A    Let me clarify we are talking about nonverbal IQ.

14   It would help me if the word "nonverbal" kept coming up.

15             Yes, I believe it's valid.  And one of the reasons I

16   do, in addition to my methodology of administration, is that

17   the test I use has a way to check on validity based on the

18   pattern of correct and incorrect answers an individual gives.

19   And that pattern indicated a valid administration with

20   Mr. Cuetara.

21        Q    Would you please turn to Defendant's Exhibit E in

22   the binder before you to page 7 of that exhibit.  In the

23   conversations we had in January, one of the conversations we

24   had was by phone with Ms. Suelau before you traveled here

25   January 8th and 9th, correct?

1          A    I didn't write down what dates our phone

2     conversations were, so I believe you.  I trust you.  I just

3     don't have that information.

4          Q    But we did -- I apologize.

5               (There was a pause for interpretation.)

6          Q    (By Ms. Riewerts)  But we did have a conversation --

7     or, actually, two conversations over the course of months by

8     phone prior to your traveling here January 8th and 9th,

9     correct?

10         A    I believe that is correct, and I am grateful that

11    you participated in this work.

12         Q    During our conversations, we've discussed the table

13    on page 7 of the exhibit, correct?  And that is Table 2.

14         A    We may well have discussed it.  I don't really

15    recall.

16         Q    With regard to Topics 1 through 4 on Table 2, do --

17    is it -- it seemed consistent with your testimony today, but my

18    recollection of that conversation was that you had said that

19    Andres is okay -- or the defendant is okay with Topics 1

20    through 4.

21         A    I may have.  And that was before I've had about 15

22    more hours with him.

23         Q    While you may not specifically recollect what you

24    said during that conversation, it seems --

25              MS. SUELAU:  Your Honor, objection.  The witness

```
 1    says he doesn't recall the conversation.

 2            THE COURT:  Sustained.  But you can ask the question

 3    regardless of whether or not he remembers the conversation.

 4    Simply put, Did you tell me X?  Did you tell me Y?  Did you

 5    tell me Z?

 6        Q     (By Ms. Riewerts)  Do you agree that with regard to

 7    Topics 1 through 4 on the table, that the defendant had -- has

 8    understanding of Topics 1 through 4 on the table?

 9        A    He had some comprehension if we're talking back

10    before January, yes.  He had some comprehension of those

11    things, but not perfect, which I was better able to judge after

12    the two days in January and yesterday.

13        Q    And in --

14            THE COURT:  Hold on.

15            MS. RIEWERTS:  Oh, I apologize.

16            THE COURT:  No, no problem.  I just need to give

17    people a chance to eat.  So we're going to be in recess until

18    1:15, and we'll pick it up then.

19            I would like to talk to the two of you for two

20    minutes right after I step off the bench.

21            COURTROOM DEPUTY:  All rise.  Court is in recess.

22            (A recess was taken from 12:08 p.m. until 1:19 p.m.)

23            MS. RIEWERTS:  I apologize.

24            THE COURT:  That's okay.  I was staring you down,

25    and everyone noticed except you.
```

1        Q      (By Ms. Riewerts)   Hello, Dr. Pollard.

2        A      Hello again.

3        Q      I am going to ask you to turn back to

4    Government's -- I'm sorry, Defense Exhibit E in the binder

5    before you.  And turn to page 7, please.  We talked, prior to

6    the lunch break, about Items 1 through 4 on Table 2 of page 7.

7    I'd like to talk about Items 5 through 9.

8              With regard to Items 5 through 9, did you say,

9    during a conversation with me and Ms. Suelau prior to your

10   travel to Denver January 8th and 9th, that with regard to Items

11   5 through 9, that the defendant is not there yet?

12             MS. SUELAU:  Your Honor, same objection that the

13   witness has testified he does not recall the specifics of that

14   conversation.

15             THE COURT:  Do you want to just tell him that?

16   Overruled.  He's either -- he's either going to be able to

17   answer or he's not.

18        A      I don't recall the specifics of the conversation.  I

19   didn't review those notes, if I took notes during that

20   conversation.  It would not surprise me if I said that.

21        Q      (By Ms. Riewerts)   Thank you.  And that is

22   consistent with your testimony here today, as well, correct?

23        A      Yes.  That's correct.

24        Q      And even after your work with Mr. Cuetara yesterday,

25   he is still not there with regard to Items 5 through 9,

1    correct?

2           A    That's correct.

3           Q    When you came to Denver on January 8th and 9th, as

4    you indicated earlier, you and Ms. Suelau and I met together in

5    the conference room at the public defender's office during

6    those two days you were here, correct?

7           A    Yes.  The three of us met in person during that

8    trip, toward the end of it.

9           Q    And Mr. Cuetara was not present for that meeting; is

10   that accurate?

11          A    It is accurate to the best of my recollection,

12   right.  He would not have been there.  I wouldn't have wanted

13   him there.  It was a conversation between the three of us, as I

14   recall.

15          Q    And in the conference room, there were Post-it

16   notes, large Post-it notes and pictures and drawings that were

17   on the wall of the conference room, as you described it

18   earlier; is that right?

19          A    Yes.  Correct.

20          Q    And those were the Post-it notes and drawings that

21   you talked about earlier that you took pictures of to

22   memorialize them, correct?

23          A    Correct.

24          Q    And -- and during that visit, you spent

25   approximately 11 hours between January 8th and 9th working with

```
 1        Mr. Cuetara; is that right?

 2            A    Yes.

 3            Q    Referring back to the chart on page 7 of Defendant's

 4    Exhibit E, with regard to that exhibit, you explained that the

 5    chart, as it goes from one through nine, that each step up on

 6    the chart or each higher number represents something more

 7    abstract as the numbers increase from one through nine; is that

 8    correct?

 9            A    I believe I did not use the word "abstract."  I

10    believe I explained that as the numbers increase from one to

11    nine, they represent topics that are increasingly difficult for

12    the deaf persons I work with in competency situations to

13    understand.

14            Q    During --

15                 INTERPRETER VEGA:  One moment.

16                 MS. RIEWERTS:  Thank you.

17                 (There was a pause for interpretation.)

18            Q    (By Ms. Riewerts)  During those 11 hours with

19    Mr. Cuetara during your January visit, you were able to make

20    incremental progress with Mr. Cuetara; is that right?

21            A    I'm thinking about not only that --

22                 INTERPRETER VEGA:  One moment.

23                 THE COURT:  Hold on.

24                 THE WITNESS:  I'm sorry.  I should know better.

25                 (There was a pause for interpretation.)
```

1         A    Yes.  Between that -- those two days and even

2    yesterday, I think I am able to identify some incremental

3    progress.

4         Q    (By Ms. Riewerts)  For example, Mr. Cuetara got to

5    the point during your January visit where you were able to

6    teach him the signs -- or teach him signs for guilty and not

7    guilty; is that correct?

8         A    I --

9              INTERPRETER VEGA:  One moment.

10             (There was a pause for interpretation.)

11        A    I cannot say whether he had never seen those signs

12   before and in that sense whether I truly taught him, but we

13   certainly used those signs a lot.  But as I mentioned in my

14   testimony earlier today, I can observe him struggle to form

15   those signs, especially the sign for guilty.  Not is a lot

16   easier.

17        Q    (By Ms. Riewerts)  During our conversation -- during

18   the conversation with you and Ms. Suelau, you expressed concern

19   to us that he knew the signs but does not necessarily

20   understand the concept of guilty and not guilty, correct?

21        A    I don't exactly recall what I may have said in that

22   regard that day, but that is pretty consistent with my

23   testimony today, except that I believe he connects the sign for

24   guilty with acknowledgment of what he is accused of doing

25   wrong, not as a plea.

1            May I add one short clarification?

2            THE COURT:  No.

3            THE WITNESS:  Okay.

4       Q    (By Ms. Riewerts)  On that -- on that point, in

5  January, you stated you wanted to do more testing to determine

6  whether he understood the concept of guilty along with the

7  sign, is that right, and that you were meeting with the

8  defendant further that day and would conduct that additional

9  testing.

10      A    I want to be clear that by the word "testing," then

11  or now, in January and yesterday, I'm not referring to

12  psychological testing.  I'm referring to basically evaluation

13  as a synonym for teaching and evaluating.  But, yes, the entire

14  purpose of my two-day session in January was to comply with

15  what I understood to be an agreement between the attorneys that

16  I be given a chance to do a bunch more teaching to see if that

17  would be helpful.

18      Q    And part of the testing that you conducted that

19  afternoon included covering up papers where you had written

20  things or drawn pictures to see if he was able to understand

21  those concepts with the pictures and the drawings covered; is

22  that right?

23      A    Yes.  Not only did I want to teach and assess his

24  comprehension with using all those pictures as helpful and

25  words that I'd written, but then I wanted to see how he could

1    do without seeing them.

2         Q    You -- in terms of conveying the results of that

3    testing, you and Ms. Suelau and I had another phone call that

4    evening, correct?

5         A    I don't recall if there was or was not another phone

6    call.  My memory of our physical meeting is much clearer.

7         Q    Was -- the result of the testing you conducted in

8    the afternoon before you left was that you determined that

9    Mr. Cuetara was able to understand quite a few things with the

10   papers covered?

11        A    With the paper covered, his ability to convey the

12   various topics we were talking about was dramatically worse.

13   But in part that's because it was then entirely dependent on

14   his language.  He would actually go to the wall where previous

15   pictures or words had been and point to the wall as if those

16   pictures were still there as a means to communicate.

17             But, correct, when the images were taken away, it

18   was dramatically poorer.

19        Q    While dramatically poorer, there were still -- based

20   on your testing with taking down the papers, still quite a few

21   things that he was able to understand, indicating he had made

22   progress, correct?

23             MS. SUELAU:  Your Honor, I'm going to object to the

24   use of the word "testing."  The witness has testified that he

25   did not perform testing.

1              THE COURT:  Overruled.

2              Look, all that I'm saying is we're now being

3     lawyerly with respect to things that I understand.  I don't --

4     the communication is hard enough here without me insisting on

5     one lawyer or the other using a particular phrase.  I

6     understand your point, but I'm not going to be confused by her

7     use of a particular word.

8              Go ahead.

9         A    I believe you worded your question with the phrase

10    "quite a few."  I'm not sure I would agree with that.  Also,

11    regarding the words "understand" or "comprehend," there's a

12    difference, in my opinion, between, shall I say, parroting back

13    something we had just talked about and demonstrating true

14    comprehension, especially when he kept going to the board and

15    pointing -- the blank board and pointing to things.  And that's

16    why I saw him again yesterday, to see what may or may not have

17    been retained.

18        Q    (By Ms. Riewerts)  But we can agree he did make

19    progress both during the January meeting and during yesterday's

20    meeting in incremental amounts?

21        A    Yesterday is the best evidence because it's the most

22    recent.  I would say there has been some incremental progress

23    subsequent to my January teaching.  Many things have stayed the

24    same, and a couple things deteriorated.

25        Q    And your opinion remains, after meeting with him in

1    January and yesterday, that the defendant is -- remains

2    incompetent to stand trial at this time?

3          A    Yes.  That remains my opinion.

4              MS. RIEWERTS:  I have no further questions,

5    Your Honor.

6                        REDIRECT EXAMINATION

7    BY MS. SUELAU:

8          Q    Going back to Mr. Cuetara's IQ testing, how do you

9    reconcile that he has an average nonverbal intelligence but

10   also that he's not competent?  Can you help us understand that?

11         A    The presence of a normal degree of performance on a

12   completely nonverbal intelligence test does not equate to how a

13   person might do on an intelligence test that included

14   language-based questions and thought processes.  That's why, in

15   my field, it's considered unethical to report a full IQ in the

16   sense of a nonverbal portion of the test along with a verbal

17   portion of the test when you're working with a deaf individual.

18              The reason that a normal performance on a nonverbal

19   test of intelligence can be consistent with being incompetent

20   to stand trial is because competency, a legal competency,

21   requires a considerable fund of information regarding the

22   American legal system and how it works, which most people get

23   from television, and also requires the linguistic and cognitive

24   ability to cooperate in one's defense.  And it's both of those

25   things that continue to relate to my opinion that he remains

1    not competent to stand trial.

2         Q    You stated the entire purpose of the January meeting

3    was to give you a chance to do more teaching and see if it

4    would be at all helpful.  We've talked about incremental

5    increases.  In your opinion -- what was your conclusion after

6    that -- that meeting quantified in terms of his bookshelf

7    ability?

8         A    Well, I'd still rather talk about yesterday because

9    of retention.

10             INTERPRETER VEGA:  One moment.

11             (There was a pause for interpretation.)

12        A    I would be happy to give you a short list of what I

13   think has been improved since my initial evaluation in August,

14   last August, what has stayed the same, and what has gotten

15   worse.  And it's a short list.

16             THE COURT:  Do it.

17             THE WITNESS:  You said do it, Your Honor?

18             INTERPRETER RICHARDSON:  We need interpretation.

19             (There was a pause for interpretation.)

20             THE WITNESS:  I believe he's made progress in

21   distinguishing his immigration case from his current criminal

22   case.  I believe he's made some progress in recognizing that

23   downloaded images from the internet were put up there by

24   someone and not him.  In that regard, I use the concept of

25   sharing.  The people who put it up and the people who take it

1    down are, shall we say, sharing.  I think he's made some

2    progress in that regard.

3            I do not believe he's made any significant progress

4    in truly understanding what a plea is.  I believe he has not

5    made progress --

6            INTERPRETER RICHARDSON:  Can you give us a moment?

7            THE WITNESS:  Oh, I'm sorry.

8            (There was a pause for interpretation.)

9            THE WITNESS:  I believe he has not made progress in

10   comprehending who -- and, again, that's a W-H question -- who

11   decides guilt or innocence, who decides whether he does jail

12   time or how long that is.  He will take guesses.  He has

13   guessed the judge before, but he's also guessed yourself,

14   Ms. Riewerts -- I'm sorry, Ms. Suelau are a person who makes

15   those decisions.  So I don't believe he's made any reliable

16   progress in that regard.

17           I believe he has made progress in comprehending that

18   it is possible that the prosecution may allow it to happen that

19   something worse -- a worse problem or worse punishment might be

20   taken off the table -- those are my words -- if -- if he points

21   to guilty.

22           And I want to be careful about the word "choose."

23   I'm not going to say "choose."  He seems to -- let me rephrase.

24   He seems to associate guilty with the potential that some more

25   severe punishment may, in my words, be taken off the table.

1            Finally, his progress has gone downhill compared to

2    January in terms of the specific roles and actions that the

3    prosecution might be responsible for in the American legal

4    system and has also become less clear or knowledgeable about

5    potential jail sentences when those topics come up.

6        Q    (By Ms. Riewerts)  Notwithstanding any incremental

7    progress or regression, is there some feeling after which you

8    believe Mr. Cuetara will not be able to make any more progress?

9        A    I would like to refer to my original report.

10            INTERPRETER VEGA:  One moment, please, for the

11   interpretation.

12            (There was a pause for interpretation.)

13            INTERPRETER VEGA:  The interpreters are ready.

14       A    In my original report from my first visit, which is

15   Exhibit A, on page 9, Conclusion Number 4 is the answer to the

16   question you're asking me.  I could read it if you like, or

17   however the Court wants to handle that.

18            THE COURT:  I read it.

19       Q    (By Ms. Suelau)  After meeting with Mr. Cuetara

20   yesterday, does that opinion remain the same?

21       A    Absolutely.

22            MS. SUELAU:  One moment, Your Honor.

23            (There was a pause in the proceedings.)

24            MS. SUELAU:  I have no further questions for the

25   witness.  Thank you, Dr. Pollard.

1             THE COURT:  You may step down.

2             THE WITNESS:  Sorry.  Your Honor, by "step down," do

3      you mean leave?

4             THE COURT:  Get out.

5             THE WITNESS:  Thank you, everybody, for your hard

6      work.

7             THE COURT:  You're obviously welcome to stay, but

8      yes, you may leave.  Sometimes the paper record suggests that

9      I'm being more aggressive with you than I obviously am.

10             Before you do, however, earlier it was referenced

11      certain pictures, and I was asked whether I wanted to see them.

12      I said not now.  If the sole source of those pictures is the

13      witness, then I would like to see them now.  If he does not

14      have to remain here in order for me to see the pictures,

15      meaning one of you has them, fine, then he can go.  And I just

16      simply don't know where the truth lies.

17             THE WITNESS:  I'm the only one that has them,

18      Your Honor, on my phone.

19             THE COURT:  Again, we are in what I will call

20      somewhat unusual and uncharted territory.  So what I am going

21      to do is walk down to where you are, have the lawyers meet me

22      there, and we will look at your phone, if you don't mind, just

23      so that I have a sense of what it is that you were talking

24      about.

25             Let's go.

1           (There was a conference held off the record at the

2    witness stand.)

3           THE COURT:  All right.  Now we are back on the

4    record.  What I am doing is having my staff give to the doctor

5    an email address, and I am requesting that those pictures be

6    emailed to that address.  And then when we receive them, we

7    will print them and put them on the record.  Do you understand?

8           THE WITNESS:  I do.

9           THE COURT:  Do you agree?

10          THE WITNESS:  Yes.

11          THE COURT:  Thank you.  Now you truly may leave.

12          (The witness was excused.)

13          THE COURT:  What I am going to do is take a

14   15-minute break.  I want the lawyers to talk to each other

15   about how we go forward from here.

16          What I want to do is take some limited argument

17   today on the finite issue of competency.  I then want to have a

18   bigger discussion next week, Tuesday, and in that bigger

19   discussion allow counsel to make a more expansive argument on

20   the issue of competency.  And thereafter, we will discuss what

21   I will do if I find Mr. Cuetara to be presently incompetent.

22          But neither today nor next week will I be trying to

23   decide the issue of whether he can ever be made competent,

24   because I believe that that issue is best decided after the

25   Government gets an opportunity to explore that secondary issue.

1              This afternoon's argument, which I've described as

2       limited, will be, obviously, in the presence of Mr. Cuetara.  I

3       am willing to waive his appearance for Tuesday for all of the

4       legal back and forth that I anticipate will be going on.

5       Simply meaning that the discussion will be more about options

6       and possibilities and schedules and whether or not I'm required

7       to do X or Y or Z.

8              He obviously has a right to be here.  And if you

9       want him here, then I will not necessarily proceed on Tuesday,

10      because I have to reassemble our interpreting crew.  So I want

11      to give you some time to make that call.

12             And with that, we'll be in recess until 2:30.

13             MS. SUELAU:  Your Honor, just briefly before we --

14             INTERPRETER VEGA:  One moment.  The interpretation's

15      not finished.

16             (There was a pause for interpretation.)

17             INTERPRETER VEGA:  Thank you.

18             MS. SUELAU:  I am not available Tuesday.

19             THE COURT:  Okay.  There's no magic to Tuesday.

20             MS. SUELAU:  Okay.  And just -- my next availability

21      is Thursday.

22             THE COURT:  Now you've got me interested.  What are

23      you doing on Monday, Tuesday, and Wednesday?

24             MS. SUELAU:  Okay.  On Monday I'm traveling to

25      Goshen.

```
 1              THE COURT:  That's good enough for me.  Thursday is
 2    fine.
 3              MS. SUELAU:  Okay.
 4              THE COURT:  Are you open on Thursday?
 5              MS. RIEWERTS:  I am not, Your Honor.  I am --
 6              THE COURT:  Are you traveling to Goshen?
 7              MS. SUELAU:  I am not.  Mesa Verde, for an end of
 8    summer vacation.
 9              MS. SUELAU:  For the record, Goshen is not for
10    vacation purposes.
11              THE COURT:  I know what it is.  No one else does,
12    but I do.
13              What works for you?
14              MS. RIEWERTS:  Your Honor, I am out of the office on
15    Thursday, August 3rd, and Friday, August 4th.  I will be back
16    in the office the following week.  I'll be taking some leave
17    that week, but it's flexible.
18              THE COURT:  Monday the 7th?
19              MS. RIEWERTS:  That works for me, Your Honor.
20              THE COURT:  You can pick the time.
21              MS. SUELAU:  My only unavailability on Monday is
22    from 12:30 until 1:30 with VTC hearings in Durango.
23              THE COURT:  Nine o'clock.  What?  You can't wake up
24    that early?
25              MS. RIEWERTS:  I -- I do have to return a rental
```

```
 1        vehicle on Monday morning.  If we could lean toward the
 2        afternoon, I would be appreciative.
 3                    THE COURT:  That's fine.  That's fine.
 4                    MS. RIEWERTS:  My apologies.
 5                    THE COURT:  Monday -- what time did you say?
 6                    MS. SUELAU:  I have a telephonic status conference
 7        at 1:15 that I anticipate will take ten minutes.
 8                    THE COURT:  Two o'clock.
 9                    All right.  Recess --
10                    MS. SUELAU:  And then --
11                    THE COURT:  Go ahead.
12                    MS. SUELAU:  On Your Honor's second question --
13                    THE COURT:  I'm not looking for the answer now.  I'm
14        looking for you to have the opportunity to think about it and
15        talk about it, and --
16                    MS. SUELAU:  In terms of his appearance, yes.
17                    THE COURT:  And you can give it to me when I come
18        back.  2:30.
19                    COURTROOM DEPUTY:  All rise.  Court is in recess.
20                    (A recess was taken from 2:17 p.m. until 2:40 p.m.)
21                    THE COURT:  I cut a corner I did not mean to cut.
22        During the noon break, I spoke briefly with the lawyers in the
23        hallway.  Because of that, I knew that Dr. Pollard was the only
24        witness that was going to testify.  But hallway conversations
25        are not the record.  So, Ms. Suelau, do you intend to call any
```

```
 1      additional witnesses or present any additional evidence?

 2                  MS. SUELAU:  No, Your Honor.

 3                  THE COURT:  Ms. Riewerts, do you intend or wish to

 4      call any witnesses or put on any evidence?

 5                  MS. RIEWERTS:  No, Your Honor.  Thank you.

 6                  THE COURT:  All right.  The final thing that I will

 7      put on the record is something that was visual in the courtroom

 8      that I explained to the lawyers during the noon break.

 9                  During the entire third hour of this morning's

10      hearing, I positioned myself such that I was directly across

11      from Mr. Cuetara.  The way -- the way this courtroom is

12      arranged, it is only myself, my court reporter, and the

13      Certified Deaf Interpreters who have a full-face view of

14      Mr. Cuetara.

15                  I also told counsel, and it is the case, that I

16      spent the entire hour watching Mr. Cuetara and only

17      Mr. Cuetara.  I then told counsel that I had done some things

18      that might be considered strange, even for me.  I was flicking

19      my pen next to my face.  I was shaking my water bottle --

20      what's the term, Cathy?  Like a -- there you go.  And the

21      significance of that we'll talk about later.

22                  But I did want to put it of record, because it's

23      something that's happening that's purely visual.  But simply

24      put, I wanted to see where Mr. Cuetara's attention would go.

25                  I will tell you, further, the following:  Years ago,
```

 1    when I represented defendants who I suspected were illiterate

 2    but embarrassed by it, I would put a piece of paper in front of

 3    them, perhaps an indictment or charging document.  It didn't

 4    matter what.  And I would say things like, As you can see, it

 5    says here X.

 6              The conversation was irrelevant to me.  I wanted to

 7    watch his eyes.  If they behaved like a typewriter carriage

 8    moving left to right, I was comfortable that he could read to

 9    some degree.  If his eyes swirled around the way one would when

10    trying to see if your friend is in a group picture and where he

11    was in that picture, that person could not read.

12              I'm not saying that they have direct equivalence,

13    but that is what I spent an hour doing, watching Mr. Cuetara,

14    watching his facial expressions, watching his nods, watching

15    his eyes, watching when his shoulders would slump, watching

16    when he would nod, because it gave me additional information.

17              And I'm not trying to play secretive here.  The

18    information is that I might as well be a kumquat or an orange,

19    meaning at no point was anything that was going on up here ever

20    even worth seeing or looking at or acknowledging.  I am not

21    insulted by this.  I am not suggesting that he did anything

22    wrong.  It just gave me some information as to how perhaps he

23    views my role in this, and my conclusion is he doesn't have a

24    clue.

25              Anyway, Ms. Suelau, I left and gave you an option.

 1    Would you speak to it, please.

 2                MS. SUELAU:  I'm sorry.  I didn't catch the end of

 3    your question.

 4                THE COURT:  Talk to me.

 5                MS. SUELAU:  Your Honor, at this time, I would waive

 6    Mr. Cuetara's appearance on the 7th.  However, if minds

 7    different than mine disagree -- you know, if the appellate

 8    division or whatever advises me that that's not advisable, I

 9    will let Your Honor and Claudia know as soon as possible.

10                THE COURT:  And as soon as possible means by the

11    close of business tomorrow.

12                Ms. Riewerts, do you have any objection to the

13    waiver of Mr. Cuetara's appearance on the 7th if, in fact, that

14    waiver holds?

15                MS. RIEWERTS:  No, Your Honor.

16                THE COURT:  All right.  Then, as I indicated, I want

17    to take some argument now.  And as you can tell by the halting

18    way that I am deliberately speaking, I want you to do that as

19    well.  I will hear from Ms. Suelau first.

20                And in case it is not clear, what I'm really looking

21    for today right now is more of a discussion about what you

22    think the evidence shows and less about legal discussions of

23    case law and statutes and things like that.  I understand

24    they're connected, but I also think that what's fairest to

25    Mr. Cuetara is to talk about what each side believes went on

1    here today and less about the more lawyerly stuff that we might

2    otherwise engage in.  I know that is a fuzzy boundary.  I'm not

3    going to try and rein you in.  But let's just see if we can do

4    it.

5             MS. RIEWERTS:  Your Honor, may I confirm that we

6    will be able to make more expansive arguments on this topic in

7    addition to the topics on --

8             THE COURT:  Yes.  Yes.

9             MS. RIEWERTS:  -- our next hearing date?

10            THE COURT:  Yes.

11            MS. RIEWERTS:  Thank you.

12            THE COURT:  What I will do at the end of this is

13   tell you my leanings, but no ruling or final decision will be

14   made today.

15            (A discussion was held off the record between the

16   Court and courtroom deputy.)

17            THE COURT:  I'm sorry.  Go ahead.

18            MS. SUELAU:  Your Honor, the evidence shows that

19   Mr. Cuetara does not understand what is happening.  He does not

20   know what is going on in this proceeding today.  He does not

21   understand the nature and consequences of this criminal case

22   generally, and he cannot assist in his own defense.  He cannot

23   assist because he cannot understand, and he cannot assist

24   because he cannot communicate.

25            A case I cited in my brief that I won't repeat talks

1    about framing this whole issue as whether or not you can assist

2    your attorney in preparing for trial.  The testimony today and

3    Dr. Pollard's report is that Mr. Cuetara cannot assist me.  In

4    fact, he does not foundationally understand what trial is.  He

5    may understand who a few of the people involved are, but any

6    nuance even about those people he knows is lost.

7              The issue is not just that Mr. Cuetara cannot

8    communicate with me but that he cannot understand the questions

9    that are relevant both to whether or not to go to trial and the

10   questions that are relevant at trial.  At a basic level,

11   although it may have improved because Mr. Cuetara understood me

12   to say, Stop talking about your immigration case --

13             THE COURT:  Yeah.  That's what you want me to

14   believe, but that's not what the testimony was.

15             MS. SUELAU:  Mr. Cuetara during our meeting and with

16   Dr. Pollard --

17             THE COURT:  You don't get to testify.

18             INTERPRETER RICHARDSON:  Hold on a moment.

19             (There was a pause for interpretation.)

20             MS. SUELAU:  Mr. Cuetara conflates the criminal

21   charges at issue here and his immigration case.  He cannot

22   understand and/or answer W-H questions, including --

23             THE COURT:  So if I asked him, What did you eat for

24   lunch, he would not be able to answer that?  I find that hard

25   to believe.

1          MS. SUELAU:  Your Honor --

2          THE COURT:  And I could test it right now, but I

3     won't, because the evidence is closed.

4          MS. SUELAU:  Similarly, I could speak to my

5     experience with him.  However, the question is not can

6     Mr. Cuetara answer questions about topics with which he is

7     familiar, because Dr. Pollard did establish there are topics

8     about which Mr. Cuetara is familiar.

9          THE COURT:  I agree.  I'm not disagreeing with that

10    so much as stretching this to a point where if I say, Here's

11    two cookies, a chocolate chip cookie and a sugar cookie, which

12    do you want, he stands paralyzed.  It's too much.

13          Within reason, I understand what you're saying, but

14    I won't take it quite so far as you want me to take it.  All

15    that I mean by that is there are other things that have

16    occurred here.  He had a phone.  You have sent him emails; he

17    has responded.  He has a computer.  Or had one.  I am not in

18    opposition to you in broad strokes, but the man has some degree

19    of functionality.  He's been to school.  He has a job.  He

20    comes to court.

21          Do not mistake my comments for saying he is as

22    capable as you or I, but he is not an uncomprehending zombie,

23    for lack of a better word.  And trying to figure out where on

24    that spectrum he falls is the question.  And I guess what I'm

25    saying to you is you don't have to spend a word or a second of

1    time trying to convince me that he is not where you and I are,

2    but I doubt that I can be convinced that he is at the very far

3    end of the other spectrum.  I guess it depends on how many

4    steps we put in between and where you think he falls.

5                MS. SUELAU:  So --

6                (There was a pause for interpretation.)

7                MS. SUELAU:  Two parts of that I'd like to address

8    separately.  First, my statement of he cannot comprehend W-H

9    questions was prefaced and is prefaced by as relevant to

10   whether or not he can assist me in preparing for trial.  And

11   those questions include --

12               THE COURT:  And so you're telling me that if you

13   said to him, Where did you get that picture, he could not

14   answer, or, What did you do with that picture, he could not

15   answer?  I don't believe that, and I don't think the testimony

16   is consistent with that.

17               MS. SUELAU:  Your Honor --

18               INTERPRETER RICHARDSON:  One moment.

19               (There was a pause for interpretation.)

20               MS. SUELAU:  Your Honor, preparation for trial

21   includes more complex questions than where did you get that

22   picture.

23               THE COURT:  I get that.

24               MS. SUELAU:  And Dr. Pollard's testimony was if

25   something is within Mr. Cuetara's vocabulary and it's

1    communicated in a way he understands and that is limited to

2    familiar concepts, he may be able to answer.  However,

3    consider, also, that Dr. Pollard testified as to agency and

4    passivity.

5         And so in an example such as do you want a sandwich

6    or do you want a salad, it would not be uncommon for someone

7    who experiences life as happening to them to not be able to

8    answer that question.

9         And in Mr. Cuetara's case, that could be for one of

10   several reasons.  One, he doesn't know the sign for sandwich;

11   two, he doesn't know the sign for salad; three, he doesn't

12   understand what tense I am speaking in; or, four, he does not

13   understand that he has agency and instead would look to me or

14   the question-asker for the answer to that question.

15        THE COURT:  And I can go to the detention center and

16   round up 20 defendants and say, Sir, would you explain the

17   concept of agency to me?  And my bet is a bunch of them would

18   not know what the hell I was talking about.  It's not

19   convincing to me to choose a highbrow word and say he doesn't

20   understand it, and I believe that some of that is mixed in

21   here.  That's why I was saying things like let's pretend you're

22   trying to teach me, so I could get a better handle on what was

23   really the communication.

24        Don't get me wrong.  I'm not necessarily in

25   disagreement with your position.  I simply think you overplay

1   the cards you have.

2           MS. SUELAU:  Your Honor --

3           THE COURT:  And my apologies for using words that

4   are tricky enough without having to go through interpreters,

5   because I'm not trying to confuse them.

6           MS. SUELAU:  I'll not comment on Your Honor's use of

7   idioms, but my explanation to Your Honor, using the term

8   "agency" should not be conflated with me saying Mr. Cuetara

9   needs to understand the concept of agency to be competent.

10          What I am saying about agency is that because of his

11  low fund of information, because of his language deprivation,

12  and because of his lived experience, Mr. Cuetara experiences

13  the world as things that happen to him.  And so when presented

14  with a question or options, his response of yes or no may not

15  be valid.  It may be in response to what he thinks the asker is

16  asking for.  It may be a 50/50 guess.  And then we don't know

17  if he understood the question at all.

18          THE COURT:  And when the statement includes words

19  like "agency" and "conflating," I know the answer, because this

20  is like a game of telephone where I'm saying something that the

21  ASL has to interpret, in a way that the CDI has to interpret,

22  in a way that they then have to communicate and we hope that

23  Mr. Cuetara can understand.

24          All that I'm saying to you is there may be

25  difficulties that are part of how things are said to him as

1    well as how he understands.

2              MS. SUELAU:  I feel that, Your Honor, and I --

3              INTERPRETER RICHARDSON:  One moment.

4              (There was a pause for interpretation.)

5              MS. SUELAU:  I'm trying not to use an idiom.

6              THE COURT:  But yet you just did.

7              MS. SUELAU:  Previously I was using the example of

8    asking Mr. Cuetara a simple question about do you want a

9    sandwich or do you want a salad and using that question to

10   demonstrate all the things that could go wrong in the question

11   and in the answer.

12             To be clear, I do not believe that Mr. Cuetara

13   comprehending things like "agency" or "conflate" is necessary

14   for legal competence.  The point I intend to make is that even

15   when the most basic question is asked, the answer cannot be

16   relied upon, because there may be an expressive problem; there

17   may be a receptive problem.  It may be that the content is

18   beyond the fund of knowledge.  Or -- oh, sorry.

19             THE COURT:  And that entire sentence may not be

20   understood by people on the 16th Street Mall.  How you phrase

21   things can impact understanding.  That's all I'm trying to say.

22             MS. SUELAU:  I --

23             (There was a pause for interpretation.)

24             MS. SUELAU:  The final one was that the answer

25   Mr. Cuetara gives may be merely the result of his learned

1    compliance.  So no matter how simple something is communicated,

2    it is exceedingly difficult, given what we know about

3    Mr. Cuetara's limitations, to gauge whether any answer is, in

4    fact, a reliable answer.

5           So the question isn't today am I communicating well

6    enough to Mr. Cuetara.  The question is does he have certain

7    hardware and software limitations such as those outlined in

8    Dr. Pollard's report that limit his ability to understand at

9    all certain concepts.  And the answer is yes.

10          And those same hardware and software limitations

11   mean that no matter how I alter my communication, however I

12   rephrase something, no matter how good the CDI team is, he

13   simply cannot participate in that conversation in a way that

14   would assist me in his defense.  Basic W-H questions that are

15   necessary are do you want to go to trial or plead guilty?  Who

16   decides if you go to trial or plead guilty?  Who decides

17   whether or not you testify?

18          THE COURT:  And do we ever tell him that he decides?

19   The fact that he may not know may be simply that he has not

20   been exposed to that information.  The notion that he tells you

21   or me which he wants is not a simple question, I understand

22   that, because you need to understand what each of those choices

23   is.

24          The only real pushback you're getting from me is

25   that you are functionally equating him, in my mind, with

1  someone who has been lobotomized.  He doesn't know.  He can't

2  learn.  He can't answer questions about salads and sandwiches.

3  You can't trust anything he says.

4        You may be right, but it goes so far beyond what I

5  wanted -- what I need to decide now.  And what you're really

6  doing to me, and I see it, is you're trying to get me to

7  understand that he can never be fixed.  And I'm not addressing

8  that right now.

9        If you're asking me do I believe him to be competent

10  today?  No, I do not.  But that is all that I am prepared to

11  say today.  And I don't want to do anything that is interpreted

12  as me agreeing with the second issue when I have no intention

13  of discussing the second issue today because, as I said, that's

14  not what this hearing is about.  This hearing is is he now

15  incompetent.

16        I said I'm not making a final ruling, and I'm not.

17  But my leaning is toward incompetency.  You seem to want me to

18  go further, and I'm not prepared to do so.

19        MS. SUELAU:  Your Honor, it's -- Your Honor, it is

20  neither my intention to try and induce you to go further nor to

21  paint Mr. Cuetara as -- I want to use the right word -- more

22  disabled than he is.  But there is necessary nuance to his

23  disease or defect, so I want to parse that out a little bit,

24  because the first thing Your Honor talked about was can you

25  just ask him a simple question of do you want to testify.  The

```
1     issue there is the word "testify" and the understanding of that
2     legal right and the implications of that legal right.
3                 THE COURT:  I get it.
4                 MS. SUELAU:  There are many things that Andres does
5     understand -- Mr. Cuetara does understand and can learn, but
6     the salad versus sandwich analogy is actually apt, because it
7     touches on something that seems basic but he very well may
8     struggle with for the reasons Dr. Pollard outlined.  Either he
9     doesn't have that sign, he doesn't understand choice, or it's
10    not been communicated to him effectively.
11                And so what I mean to illustrate is that each of
12    those components need to be in place in order for him to
13    understand a given question or a given concept.
14                THE COURT:  What is --
15                MS. SUELAU:  And while --
16                THE COURT:  What is it that you are trying to get me
17    to see when I am telling you that as of right now I do not
18    believe him to be competent?  What more is it that you are
19    trying to get me to see?
20                MS. SUELAU:  It is my impression --
21                (A cell phone rang.)
22                THE COURT:  Okay.  Whoever's phone that is needs to
23    turn it off or take it out in the hallway.
24                (There was a pause in the proceedings.)
25                THE COURT:  Go ahead.
```

1          MS. SUELAU:  It is my fear that this is being viewed

2    through a black and white lens of understanding or not

3    understanding or intelligent or not intelligent.  And that is

4    not necessarily what is at issue here when you're dealing with

5    the concept of language deprivation, fund of information, and

6    language disfluence.

7          And my fear is that analogies to hearing people

8    create misapprehension about the issue, even the analogy to a

9    literal hearing person versus an illiterate hearing person.

10   And so what I'm doing, as it were, is trying to impress what I

11   think -- or explain what I think that nuance is, because I

12   myself have taken 2 1/2 years to understand some of that

13   nuance, including the unique features of being a deaf person,

14   unique features of ASL, unique features of a language, those

15   five things Dr. Pollard talked about, and the unique features

16   that come from a lifetime of language deprivation.

17         THE COURT:  You are asking me to find that he is not

18   competent today.  I am telling you that I'm generally --

19   subject to hearing from Ms. Riewerts and considering the matter

20   further, I'm agreeing with you.  What are we fighting about?

21         MS. SUELAU:  I don't believe we're fighting,

22   Your Honor.  I am, perhaps, poorly wanting to make sure that

23   those concepts in Dr. Pollard's report and that he testified to

24   today are clear.  And perhaps they are, and so rather than

25   saying up/down back and forth to each other, we're both

```
1        actually saying up and I should leave it at that.
2                    THE COURT:  We have reached a point of further
3        agreeing.
4                    MS. SUELAU:  I'm so glad that we could find common
5        ground.
6                    THE COURT:  Ms. Riewerts, please.
7                    MS. RIEWERTS:  Your Honor, the Government takes the
8        position at this time that the defendant has demonstrated by a
9        preponderance of the evidence that the defendant is presently
10       suffering from a mental disease or defect such that he lacks
11       the capacity to understand the nature and object of the
12       proceedings against him, to consult with counsel, and to assist
13       in preparing his defense.
14                   INTERPRETER VEGA:  Can the interpreter ask a
15       clarifying question?
16                   THE COURT:  Yes.
17                   INTERPRETER VEGA:  Did you say that he is competent
18       or is not competent?
19                   MS. RIEWERTS:  Is not competent.
20                   INTERPRETER VEGA:  Thank you.  One moment for the
21       interpretation.
22                   (There was a pause for interpretation.)
23                   MS. RIEWERTS:  There are several factors in this
24       case that indicate that the defendant has been able to navigate
25       the world.  He has been able to get a degree from a community
```

1     college and maintain employment, acquire roommates, and he has

2     even succeeded in downloading child pornography from the dark

3     net and transporting child pornography to at least one

4     individual.

5               THE COURT:  You do realize --

6               INTERPRETER RICHARDSON:  Your Honor, we're still

7     interpreting.

8               (There was a pause for interpretation.)

9               INTERPRETER RICHARDSON:  Thank you.

10              THE COURT:  You do realize, of course, that I have

11    no intention of saying he did or did not do what you have

12    accused him of.

13              MS. RIEWERTS:  I understand, Your Honor.  I am only

14    attempting to point out that in many ways the defendant has

15    engaged in numerous activities which show his competence, if

16    not his legal competence, at this time.

17              However, the exhibits admitted by the defendant,

18    including the report written by speech language pathologist

19    Ms. Perez and the report submitted by Dr. Pick, which were

20    reviewed by Dr. Pollard in preparing his evaluation, in

21    addition to the evaluation prepared by Dr. Pollard himself and

22    the testimony in court today by Dr. Pollard, demonstrate that

23    the defendant, both due to his individual circumstances

24    stemming from his deafness and personal history, have resulted

25    in language deprivation and fund of information deficits.

1          According to Dr. Pollard's testimony regarding

2     Defendant's Exhibit E on page 7 of that exhibit, which contains

3     a table describing what Dr. Pollard believes to be nine

4     different steps that help him to assess a defendant's

5     competency, the defendant fails to comprehend what constitutes

6     Items 5 through 9 on that table.

7          Clearly, competent defendants often do not fully

8     comprehend the intricacies of the legal system, which is not

9     required for competency.  A defendant does not need to

10    comprehend every legal term.  But the things that the defendant

11    does not yet understand about the criminal justice system,

12    including how a trial unfolds, the crimes with which the

13    defendant is charged, and how a pretrial plea works versus a

14    trial, means that there is still work to be done to ensure the

15    defendant's competency.

16         Therefore, the Government agrees that in this

17    moment, the defendant's mental condition is such that he lacks

18    the capacity to understand the nature and consequences of the

19    proceedings against him or assist properly in his defense.

20         Thank you.  I will supplement my argument when we

21    next convene.

22         THE COURT:  All right.  And as I said, I will give

23    an indication of where I'm leaning.  I'm leaning the same way

24    everybody else is in terms of present competence.

25         I will see you on August 7th, and we will have

1   further discussion, at which point I would expect to make a

2   final decision as to whether or not he is incompetent.  But

3   even then I would need, I believe, some brief written order to

4   follow.

5            So we're done for today.

6            MS. SUELAU:  Could Your Honor repeat the -- I didn't

7   hear the end.  You would need --

8            THE COURT:  What I'm telling you is I'm not going to

9   just -- I will announce what I will rule from the bench, but I

10  will need a written order.  I'm -- I do not want to open up the

11  debate now, but, for example, if in some way, shape, or form I

12  am to commit him to the Attorney General, I think there needs

13  to be some written order that comes from me and lands with

14  whoever is the appropriate person at the other end of that

15  decision.  That's all I mean.

16           All right.  So to recap, by the end of tomorrow,

17  Ms. Suelau will advise me -- and, frankly, you can do it by

18  email to chambers -- as to whether or not you want Mr. Cuetara

19  here.  If so, I can almost guarantee you that I will want to

20  move this to a day that we start at nine and end whenever we

21  end.

22           And I say that only because the mechanics of these

23  proceedings, by necessity, are slower, where we speak, the ASL

24  hears and then communicates to the CDI, who then communicates

25  to Mr. Cuetara.  I have no interest in speed.  I am simply

1    saying, however, that if you wish to waive his appearance, no

2    one has objected, nor will I; and any further discussion, which

3    may be more complicated, can happen more quickly.

4            And I don't know that there's anything else to say

5    today.  I don't have anything.  Ms. Riewerts?

6            MS. RIEWERTS:  Nothing from the Government.  Thank

7    you, Your Honor.

8            THE COURT:  Ms. Suelau?

9            MS. SUELAU:  No, Your Honor.  I just want to thank

10   our interpreter team.

11           THE COURT:  Well, everybody has thanked them and

12   called them wonderful.  And it's all true.  But let's not let

13   them get too impressed.  We may bring them back here and not be

14   as nice to them next time.

15           They're smiling.  They understand that I'm joking.

16   I don't think Mr. Cuetara does.

17           Recessed.

18           COURTROOM DEPUTY:  All rise.  Court is in recess.

19           (The hearing was concluded at 3:53 p.m. on Thursday,

20   July 27, 2023.)

21

22

23

24

25

1                        <u>REPORTER'S CERTIFICATE</u>

2          I, ERIN E. VALENTI, Official Court Reporter for the

3    United States District Court for the District of Colorado, a

4    Registered Merit Reporter and Certified Realtime Reporter, do

5    hereby certify that I reported by machine shorthand the

6    proceedings contained herein at the time and place

7    aforementioned and that the foregoing pages constitute a full,

8    true, and correct transcript.

9          Dated this 29th day of July, 2023.

10

11

12

13

14                              <u>    /s/ Erin E. Valenti    </u>

15                              ERIN E. VALENTI, RMR, CRR
                                Official Court Reporter
16

17

18

19

20

21

22

23

24

25